UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
LAVASTONE CAPITAL LLC,                :
                                      :
          Plaintiff,                  :
                                      :
     -v-                              :          14-cv-7139 (JSR)
                                      :
                                      :          MEMORANDUM
COVENTRY FIRST LLC, LST I LLC,        :
LST II LLC, LST HOLDINGS LTD.,        :
MONTGOMERY CAPITAL, INC., ALAN        :
BUERGER, REID BUERGER, CONSTANCE      :
BUERGER, AND KRISTA LAKE,             :
                                      :
          Defendants.                 :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

     Plaintiff Lavastone Capital Inc. brings this action against

defendants Coventry First LLC, LST I LLC, LST II LLC, LST Holdings

Ltd., Montgomery Capital, Inc., and four individuals — namely Alan

Buerger, Reid Buerger, Constance Buerger, and Krista Lake — for

allegedly violating federal and state law and the parties' contracts

by marking up the prices of certain life insurance policies that

defendants sold to Lavastone.[1]

     In an Order dated February 2, 2015, the Court dismissed three

of plaintiffs' thirteen claims, leaving the following ten causes of

action at issue in this litigation: violations of RICO, 18 U.S.C. §

1962(c) (against all defendants); conspiracy to violate RICO, 18

U.S.C. § 1962(d) (against all defendants); fraud (against all

defendants); fraudulent inducement (against all defendants); breach

---

[1] The Court assumes basic familiarity with the allegations set forth in
Lavastone's Complaint. See Order dated April 21, 2015, at 3-6 (summarizing factual
allegations).

of contract (against Coventry First); breach of implied covenant of good faith and fair dealing (against Coventry First); negligent misrepresentation (against Coventry First); breach of fiduciary duty (against Coventry First); aiding and abetting breach of fiduciary duty (against Montgomery Capital Inc., the LST entities, Alan Buerger, Reid Buerger, Constance Buerger, and Krista Lake); and unjust enrichment (against all defendants). *See* Complaint ¶¶ 264-407; Order dated Feb. 2, 2015, at 2-3. On May 18, 2015, the parties filed cross motions for summary judgment. Plaintiff moved for summary judgment in its favor on all remaining claims; defendants similarly moved for summary judgment in their favor on all remaining claims, except for aspects of the breach of contract claim. Separately, defendant Constance Buerger moved for summary judgment in her favor on all claims (on the grounds that there is no basis for the federal claims against her and that the Court lacks personal jurisdiction over her with respect to the state claims).

On July 10, 2015, the Court granted summary judgment in favor of plaintiff on aspects of its breach of contract claim against Coventry First, granted Constance Buerger's motion for summary judgment in its entirety, dismissing her from the case, and denied summary judgment to both parties on all remaining claims. *See* Order dated July 10, 2015, at 2-3. This Memorandum sets forth the reasons for those rulings.

Turning first to plaintiff's breach of contract claim, both parties assert that the plain language of the Origination Agreement[2] warrants summary judgment in their favor on the issue of whether the Agreement permitted Coventry First to mark up prices of non-exclusive policies (including "out-of-the-box" or "initially disapproved" policies) that it purchased from a policyholder and then sold to Lavastone. *See* Memorandum in Support of Defendants' Motion for Summary Judgment, ECF No. 77 ("Defs. SJ Br.") at 33-34; Lavastone's Memorandum of Law in Support of its Motion for Summary Judgment as to Liability, ECF No. 76 ("Pl. SJ Br.") at 33, 35-37. Even drawing all inferences in favor of defendant Coventry First, as is required when granting summary judgment in favor of the opposing party, *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994), the Court finds that the contract unambiguously does not permit Coventry First to mark up prices on non-exclusive policies, for which it had received a POR approval from Lavastone and then purchased the policy from the policyholder with the expectation that Lavastone would purchase it from Coventry First or an LST entity.

The contractual arrangement that mandates this conclusion may be summarized as follows. The Origination Agreement governs the sale

---

[2] All references to the Origination Agreement are to the agreement entered into by the parties on February 12, 2010, which in all material respects mirrors previous agreements that are relevant to this case. *See* Lavastone's Memorandum of Law in Support of its Motion for Summary Judgment as to Liability, ECF No. 76 ("Pl. SJ Br.") at 3 n.1; Memorandum in Support of Defendants' Motion for Summary Judgment, ECF No. 77 ("Defs. SJ Br.") at 3 n.2.

of "Eligible Life Policies" by Coventry First to Lavastone.

Declaration of Jefferson Bell dated May 18, 2015, Ex. 55

(Origination Agreement) (hereinafter, "OA") at 1 (whereas clauses

stating each parties' desire to purchase or sell "Eligible Life

Policies" subject to the terms and conditions of the Origination

Agreement). An "Eligible Life Policy" is defined as a policy that

satisfies specified eligibility criteria, or a policy for which

Lavastone waived the satisfaction of any such criteria. OA, Ex. D at

9. Both parties agree that the former, so called "exclusive" or "in-

the-box" policies that met the eligibility criteria, had to be sold

to Lavastone at cost. *See* Lavastone's Local Rule 56.1 Statement of

Undisputed Material Facts as to Which There Is No Genuine Issue to

Be Tried in Support of Its Motion for Summary Judgment as to

Liability ("Pl. 56.1 SUF") ¶ 259; Defendants' Response to

Plaintiff's Statement of Undisputed Facts and Counterstatement of

Additional Facts ("Defs. 56.1 Response") ¶ 259; Memorandum Order

dated April 21, 2015, at 5 n.2.[3]

While the Origination Agreements do not state *in haec verba*

that exclusive policies must be sold at cost, this becomes evident

upon a review of the contractual scheme. Once Coventry First

presents an exclusive policy for purchase to Lavastone pursuant to

Section 2.01(b) of the contract, Lavastone must conduct a "Pre-Offer

---

[3] Given that the parties do not dispute that the Origination Agreement does not permit exclusive, or in-the-box, policies to be sold at a markup, the Court grants plaintiff's motion for summary judgment on the breach of contract claim with regard to any exclusive policies that were, in fact, sold at a marked-up price.

Review" ("POR") within a certain amount of time and respond to
Coventry First indicating whether it has approved the purchase of
the policy, has approved the purchase of the policy subject to
conditions, or has not approved the purchase of the policy. OA §
4.01(a). If Lavastone approves the exclusive policy in the POR
review process, then Coventry First is obligated to prepare a "Sales
Documentation Package" to initiate the sale and transfer of the
related "Funded Costs."[4] OA § 5.01(a). The Funded Costs include,
among other expenses and fees, "related Acquisition Costs." OA, Ex.
D at 10. "Acquisition Cost" includes the "Purchase Price," which is
defined as *the amount that will be paid to the "related Seller." Id.*
at 1, 17 (emphasis added). The "Seller" is defined as the "owner of
a Life Policy who is selling or has sold such Life Policy to
[Coventry First]." *Id.* at 21. Accordingly, following this
contractual road map, it becomes unambiguously clear that the price
at which Coventry First may sell an exclusive policy to Lavstone (in
addition to other specified fees and costs) is the price that
Coventry First paid to the original seller.

---

[4] Under the Origination Agreement, Coventry First is obligated to prepare a Sales
Documentation Package "with respect to any Life Policy as to which [Coventry
First] has made a firm purchase offer to the related Seller *with the expectation
that [Lavastone] will purchase such Life Policy* from [Coventry First] in
accordance with section 4.01[]." OA § 5.01(a) (emphasis added). In the context of
exclusive policies, this obligation is inherent, since for all exclusive policies
where Lavastone has issued a POR approval, Coventry First makes a firm offer to
the seller knowing it has an obligation to sell the policy to Lavastone. *See* OA §
2.01(b). Even for non-exclusive policies, which will become important later in the
discussion, where there is no inherent obligation on Coventry First's part to sell
to Lavastone, the language here is clear that once Coventry First makes a firm
purchase offer to the related seller with the expectation that Lavastone will
purchase the policy, it must prepare the Sales Documentation Package. *Id.* §
5.01(a).

The parties disagree, however, with respect to whether the contract specified how to calculate the purchase price of "non-exclusive" policies, such as initially disapproved policies and policies that did not meet the eligibility criteria but for which Lavastone still offered a POR approval (i.e., policies for which they waived eligibility criteria). Coventry First asserts that the contract does not prohibit it from marking up the purchase price of non-exclusive policies. *See* Opposition to AIG's Motion for Summary Judgment ("Defs. Opp. Br.") at 25, 27. The Court finds that Coventry First's interpretation is incorrect with respect to initially disapproved policies, and that any reasonable reading of the contract requires a finding that the contract likewise prohibits marking up policies where Lavastone waived the eligibility criteria and issued a POR approval prior to Coventry First's purchase of the policy from the original seller.

Reaching this conclusion requires a return to the POR review process for initially disapproved policies (which defendants characterize as "non-exclusive," Defs. SJ Br. at 4). These are policies that Coventry First offers for sale to Lavastone, but that Lavastone disapproves in the course of the POR process. *See* OA § 4.01(a); *supra* at 4-5 (discussion of POR approval process). Once Lavastone disapproves a policy, the policy is no longer exclusive (even if it technically meets the specified eligibility criteria), but, instead, is now non-exclusive: "[Coventry First] will have the right (but not the obligation), in its sole discretion, to offer to

6

sell to any other Person any Life Policy . . . as to which
[Lavastone] disapproves the purchase thereof pursuant to Section
4.01." *Id*. § 2.01(b). However, "[i]f [Coventry First] and
[Lavastone] agree to proceed with the purchase of a [Life Policy
that Lavastone had previously disapproved], . . . then [Lavastone]
promptly will deliver to [Coventry First] a modified notice to such
effect." *Id*. at 4.01(a). In other words, once the parties agree to
the sale of an initially disapproved policy, Lavastone is directed
to issue a new POR approval notice.

Upon receiving the modified notice of approval under 4.01 and
once Coventry First has made "a firm purchase offer to the related
Seller with the expectation that [Lavastone] will purchase such Life
Policy from Coventry First," *id*. § 5.01(a), then Coventry First is
obligated to create the Sales Documentation Package, triggering all
the same "Funded Costs" as it would have for an exclusive policy, as
described above. *Id.*; *see supra* note 4. The key difference in the
process between exclusive and non-exclusive policies here is whether
Coventry First has made a firm purchase offer to the seller with the
expectation that Lavastone will purchase the policy. That is a given
with respect to exclusive policies, because Coventry First must sell
the policy to Lavastone; but in non-exclusive policies, even if
Lavastone has issued its POR approval, Coventry First is not
obligated to sell the policy to Lavastone (and move forward in
preparing a Sales Documentation Package) until it makes a firm offer
to the seller *with the expectation Lavastone will purchase it*. With

respect to both exclusive policies and initially disapproved policies, however, once there is an agreement on both sides to go ahead with the sale, the Origination Agreement's funding provisions kick in. OA § 5.01(a). Accordingly, Coventry First's argument that the mere fact of non-exclusivity means that the Origination Agreement does not prohibit a markup on a non-exclusive policy is an untenable construction of the contract. Initially disapproved policies that are later the subject of a sale are governed by the same pricing requirements as exclusive policies.

With respect to life policies that do not meet all of the specified eligibility criteria, Coventry First has no obligation to sell the policies to Lavastone, making them non-exclusive policies. *See* OA § 2.01(b). While the Origination Agreement does not make express reference to these policies in section 2.01(b) and 4.01, the only logical reading of the contract requires that once Lavastone issues a POR approval with respect to the policy and Coventry First makes a firm offer of sale to the related seller *with the expectation that Lavastone will purchase the policy*, *id.* § 5.01(a), the same funding provisions take effect as they would for an exclusive or initially disapproved policy.

Indeed, to find otherwise — that Coventry First could mark up policies for which Lavastone had waived certain eligibility criteria (thereby circumventing the funding provisions in the agreement) — would frustrate the overarching purpose of the Origination Agreement, which is to effectuate the sale of "Eligible Life

Policies" that include both exclusive and non-exclusive policies. *See Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 624 (S.D.N.Y. 2010) ("Under New York . . . law, parties are not free to interpret a contract in a way that frustrates the purpose of that contract."). A reading of the Origination Agreement that outlines specific pricing with respect to the sale of exclusive policies and non-exclusive initially disapproved policies, but provides absolutely no detail for the pricing of other non-exclusive policies, produces an absurd result that is "commercially unreasonable and contrary to the reasonable expectations of the parties." *SportsChannel Assocs. v. Sterling Mets, L.P.*, 807 N.Y.S.2d 61, 61 (1st Dep't 2006) (alterations omitted).[5]

Accordingly, in its order of July 10, 2015, the Court granted summary judgment in favor of plaintiffs on the issue of whether Coventry First breached the Origination Agreement by marking up prices of policies, for which it had obtained a POR approval from Lavastone and then purchased from the seller with the expectation that Lavastone would buy the policy.[6] The issue of the amount of

---

[5] The Court's interpretation is further reinforced by the fact that regardless of the type of policy — exclusive or non-exclusive — Lavastone paid Coventry First origination fees and, at times, incentive fees for negotiating a price with the related seller at a lower cost than the maximum approved through the POR. *See* OA, Ex. D at 1 (definition of "Acquisition Cost" includes origination fee), 10 (definition of "Funded Costs" includes any incentive fee).

[6] With respect to policies that Coventry First purchases prior to the issuance of a POR approval from Lavastone (i.e., that it purchases from the initial policyholder without an expectation that Lavastone would buy the policy), the Origination Agreement allows for Coventry First to sell the policy at a price higher than that which it paid to the original policyholder. In that instance, Coventry First or one of the LST entities would become the "related Seller" for purposes of the Origination Agreement. This distinction is derived from the wording of section 5.01(a) of the Origination Agreement, which discusses the

damages Coventry First owes as a result of this breach remains for
trial.

With respect to plaintiff's claim that Coventry First breached
the Origination Agreement by overcharging for broker fees, the Court
finds there is a genuine issue of material fact as to whether
Lavastone suffered damages as a result of any alleged overcharge,
and, if so, of what amount. Under the Origination Agreement, the
Funded Costs of a policy include "the total fees and expenses
related to any broker." *See* OA § 5.01(a); *id.*, Ex. D at 1, 10.
Coventry First concedes that at times, for an individual policy
sale, it would seek reimbursement for broker costs that did not
match the broker costs associated with the sale of that policy. *See*
Defs. SJ Opp. Br. at 15; Defs. 56.1 Statement ¶¶ 1610-20. Coventry
First's explanation is that, at times, it would "pay[] broker
compensation out of its pocket on policies where there was not room in
AIG's pricing for the broker compensation, and charg[e] AIG for extra
broker compensation on policies where there was room to do so and still
meet AIG's pricing requirements." Defs. SJ Opp. Br. at 15; Defs. 56.1
Statement ¶¶ 1612, 1617. This practice is at odds with the plain
language of the contract. Nonetheless, there is a genuine issue of
fact as to whether Lavastone suffered any damages as a result of

---

timing of Coventry First's firm offer of purchase to the related Seller. If
Coventry First or an LST entity already owns the policy prior to Lavastone's POR
approval, then at the time Coventry First makes a firm offer to purchase the
policy with the expectation that Lavastone will purchase it (triggering section
5.01(a)), the "purchase price" will consist of the price that the LST entity sells
the policy to Coventry First (regardless of the original price). *See* OA § 5.01(a);
*id.*, Ex. D at 1 (definition of "Acquisition Cost"), 17 (definition of "Purchase
Price"), 21 (definition of "Seller").

this practice — whether the overall broker fees evened out over time, or whether Coventry First made a profit on overcharging for broker fees. *See* Pl. 56.1 Statement ¶ 473; Defs. 56.1 Response ¶ 473; Transcript of Oral Argument dated July 1, 2015, at 75:8-13. Accordingly, in its order of July 10, 2015, the Court denied summary judgment for both parties on the issue of whether Coventry First breached the contract by allegedly overcharging for broker fees.[7]

Turning to plaintiff's RICO, conspiracy to violate RICO, fraud, fraudulent inducement, negligent misrepresentation, and unjust enrichment claims, the Court denies summary judgment to both sides on each of these claims. There remain genuine issues of material fact as to whether Lavastone had knowledge that Coventry First was marking up the prices of life policies and overcharging for broker fees, which may defeat its claim that the defendants acted under false pretenses or made materially false statements or omissions in the course of the parties' dealings or that plaintiff reasonably relied on any purported misrepresentation.

---

[7] The Court also denied summary judgment to both parties on the issue of whether Coventry First breached the Origination Agreement and/or the servicing agreement by creating IB interests in life policies it sold to Lavastone that were in favor of third parties. *See* Compl. ¶¶ 345, 348. Plaintiff does not brief this issue in its motion for summary judgment. In the context of Coventry First's motion for summary judgment, there is a genuine issue of fact regarding whether plaintiff was required to give notice of a breach with respect to the IB interests. *See* Lavastone's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. SJ Opp. Br.") at 37-38 n.22; Defs. 56.1 Statement ¶¶ 101, 1626; Pl. 56.1 Response ¶¶ 101, 1626. Plaintiff's motion for summary judgment is also denied on the issue of whether Coventry First breached the confidentiality agreements, as it does not raise the issue in its briefs, despite purporting to move for summary judgment on liability in its entirety. *See* Pl. SJ Br. at 2, 40.

Relevant factual disputes include, but are not limited to the following. First, defendants cite to statements of three former employees of Lavastone, William Taylor, David Beckelman, and Ed O'Leary, which suggest that they knew that Coventry First was marking up prices on non-exclusive policies and that, under their understanding, such conduct was permitted under the parties' agreement. Defs. 56.1 Statement ¶¶ 186, 188, 190, 444. Plaintiff challenges the testimony of these witnesses, because each of them was subsequently recruited by defendant Reid Buerger to work for Miravast LLC, a Coventry First affiliate owned primarily by Reid Buerger. Pl. 56.1 Statement ¶¶ 573-75. Plaintiff also argues that their testimony is contradicted by other evidence. *Id.* ¶¶ 462-63 (former Lavastone employee Dave Fields testifying that prior to 2007, there was no instance when mark ups were allowed and thereafter only for a subset of policies), 550 (email directly contradicting William Taylor's deposition testimony). However, while plaintiff's challenges to the testimony of Mr. Taylor, Mr. Beckelman, and Mr. O'Leary will be relevant at trial, it is not appropriate on summary judgment for the Court to assess credibility. *See Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995).

There is also a genuine issue of material fact as to whether Lavastone had knowledge of the purportedly fraudulent markups by way of the 2007 and 2008 audits. During the 2007 audit, AIG auditors noted that for some policies where LST was the seller, they did not have wire transfers or checks to confirm that Coventry First had

made payments to the original policyholder (and, in turn, they could not decipher the original purchase price). *See* Defs. 56.1 Statement ¶ 967 (excepts of audit report). The parties allegedly agreed that Coventry First should thereafter submit a certification saying it paid the original seller, and that AIG could further audit evidence of payment by viewing the check or wire payment to the original seller. *Id*. AIG argues that they had every reason to rely on the certifications without investigating further by reviewing checks and wire transfers and therefore this agreement would not have put them on notice of the markups. Pl. SJ Opp. Br. at 7. Coventry First essentially argues in response that the original purchase prices for these policies would have been available to them if they had taken advantage of the information available through this agreement. *See* Defs. SJ Br. at 10.

Defendants also point to the 2008 audit to support their claim that Lavastone knew they were marking up prices and that Lavastone expressly gave them permission to withhold the original purchase price. The auditors note in the report that for policies where Coventry First initially purchased the policy and resold it to AIG, the purchase price initially paid was not necessarily the same amount paid to the original policyholder. Declaration of Kenneth J. Brown in Support of Defendants' Memorandum in Support of Motion for Summary Judgment ("Brown Decl."), Ex. 93 (2008 Audit). Coventry First did not provide auditors with information requested to uncover the original price paid to the policyholder. *Id*. The auditors

recommended that Coventry First disclose original purchase price information to AIG. *Id*. However, in the division response, the audit states that Dave Fields (AIG Risk Finance President) "has agreed to allow Coventry to redact the dollar amounts paid to the sellers on policies purchased from Coventry. Coventry acknowledges that there are differences, some in Coventry's favor, and some in [AIG's] favor." *Id*.

Lavastone responds to this audit report by arguing that defendants misled them into believing the price discrepancies were limited to a small subset of policies that Coventry First purchased before Lavastone issued a POR approval of the policy. Pl. SJ Opp. Br. at 8-10. Dave Fields attests that he had given permission to defendants to withhold the purchase price of policies that Coventry First purchased without a POR approval, because Coventry bore the risk of ownership. Pl. 56.1 Statement ¶ 460 (quoting Fields deposition). He assumed the policies identified by the auditors were policies in accordance with that agreement. *Id*. ¶ 527. Furthermore, plaintiff alleges that when its executives reached out to defendants regarding discrepancies in purchase prices, defendants explained away the differences by indicating the policies were limited to those subject to the agreement between Dave Fields and Alan Buerger described above. *See e.g.*, Pl. 56.1 Statement ¶ 469.

Considering the evidence presented by both parties above, among other evidence in the record, the Court finds that a genuine issue of material fact exists as to whether Lavastone had knowledge of

defendants' practice of marking up prices on policies that Coventry purchased and then sold to Lavastone. Accordingly, the Court denies summary judgment to both sides on plaintiff's RICO, conspiracy to violate RICO, fraud, fraudulent inducement, negligent misrepresentation, and unjust enrichment claims, as the issue of knowledge pertains to whether defendants acted under false pretenses or made material misrepresentations or omissions, and whether plaintiff reasonably relied on defendants' alleged misrepresentations.

With respect to plaintiff's breach of fiduciary duty and aiding and abetting a breach of fiduciary claims, the Court again finds that there are genuine issues of material fact with respect to whether a fiduciary relationship existed between Lavastone and Coventry First that arose above and beyond the parties' contractual agreement. The primary issue is whether the parties' relationship demanded a level of trust such that it was unlawful for Coventry First to use its position to benefit itself to Lavastone's detriment. *See GLM Corp. v. Klein*, 665 F. Supp. 283, 286 (S.D.N.Y. 1987). Plaintiff alleges that while it had expertise in life settlements generally, Coventry First had expertise in the field of *origination* of life settlements and Lavastone greatly relied on that expertise in furtherance of the agreement. *See Marini v. Adamo*, 995 F. Supp. 2d 155, 193 (E.D.N.Y. 2014) ("In evaluating the sophistication of a plaintiff, courts must determine whether the [plaintiff] is sophisticated in the [matter] at issue, not whether

he is generally knowledgeable . . . ."). Defendants respond, however, that plaintiff's sophistication in the area of life settlements was proficient enough that it knew what type of information to request from Coventry First to develop a full understanding of the life policy transactions. *See Stuart Silver Assocs., Inc. v. Baco Dev. Corp.*, 665 N.Y.S.2d 415, 418 (1st Dep't 1997) (denying fiduciary duty claim); *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 789 (2d Cir. 2003) (holding that a plaintiff "cannot claim it relied on [defendants'] special expertise" when "it is clear that [the plaintiff] itself had the relevant expertise at issue"). Lavastone had a strong underwriting department with state-of-the art databases and systems to analyze policies. Defs. 56.1 Statement ¶¶ 31-32. Considering the facts in the record, the Court finds that there is a genuine issue of material fact as to whether Lavastone's expertise in the life settlements industry generally was sufficient so that its alleged reliance on Coventry First did not reasonably create a fiduciary relationship between the parties. Accordingly, the Court, in its order of July 10, 2015, denied both parties' summary judgment motions on plaintiff's claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty.[8]

---

[8] The Court also denied summary judgment to both parties on plaintiff's breach of the implied covenant of good faith and fair dealing claim, as it is dependent upon a finding that Coventry First owed an extra-contractual duty to Lavastone, such as a fiduciary duty. *See* Memorandum Order dated April 22, 2015, at 26-27; *Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246, 261 (E.D.N.Y. 2014).

Turning to defendant Constance Buerger's separate motion for summary judgment, she first argues, and the Court agrees, that plaintiff has failed to present sufficient evidence to establish her liability under RICO and conspiracy to violate RICO. Specifically, plaintiff has not presented evidence to support a finding that Ms. Buerger participated in the operation or management of the RICO enterprise, *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993), or that she even knew about the general nature of the alleged conspiracy, *United States v. Pizzonia*, 577 F.3d 455, 462 n.4 (2d Cir. 2009). The primary evidence plaintiff presents that Ms. Buerger participated in the operation or management of the enterprise comes down to: generalized statements that she and her husband, defendant Alan Buerger, are "leaders" of Coventry First and "ma[k]e the decisions . . . [and] set the guidelines" and that Ms. Buerger has authority to approve life settlement transactions (though there is no evidence that she exercised that authority), *see* Lavastone's Response to Defendant Constance Buerger's Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("Pl. 56.1 Response to Ms. Buerger") ¶ 4; the fact that Ms. Buerger is on Coventry First's four person executive committee, that she is a member of Montgomery Capital's board of directors, and that she is a manager at Coventry First and the LST entities, *id.* ¶ 3; the fact that between 2006 and 2010, more than $200 million was transferred from Montgomery Capital to accounts of Ms. Buerger and Alan Buerger, *id.*; and emails relating to the parties' relationship and/or the

life settlements industry, in the vast majority of which Ms. Buerger is copied on the emails and does not reply, *see, e.g.*, Declaration of Akiva Shapiro in Opposition to Defendant Constance Buerger's Motion for Summary Judgment ("Shapiro Decl."), Exs. F, G, I-U.[9] In response to defendant's position that she did not know the meaning of basic terminology used in the parties' relationship (e.g., "out-of-the-box," "in-the-box", "pre-offer review," or "exclusivity"), plaintiff refers to the emails cited above that include those terms and cites to a document and testimony that show that Ms. Buerger attended a limited number of meetings with AIG where the parties' relationship was discussed. *See* Pl. 56.1 Response to Ms. Buerger ¶¶ 11-12; Shapiro Decl., Ex. H.

This evidence, even if taken in the light most favorable to plaintiff, is not sufficient to establish RICO liability. The fact that Ms. Buerger was an owner or manager of the defendant corporations is not sufficient on its own to show operation or management of the enterprise. *See De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 302-04 (S.D.N.Y. 2013) (dismissing RICO claim against an owner, despite some allegations of knowledge, because his actions did not meet operation or management test); *Cement-Lock v. Gas Tech. Inst.*, 523 F. Supp. 2d 827, 855-57 (N.D. Ill. 2007) (granting summary judgment to a president of a company for lack of

---

[9] Ms. Buerger wrote only two of these emails — one in 2007 that states she will have someone send Dave Fields information on "how a life settlement works," and another where she responds "Outstanding!!" to an email report on what appears to be profits from life settlement sales. *See* Shapiro Decl., Exs. F, P.

sufficient evidence of operation or management). Furthermore,

plaintiff points to very limited evidence that Ms. Buerger fully

understood the relationship between Lavastone and Coventry First,

and no evidence that she was directly involved in or had knowledge

of the alleged scheme to defraud plaintiff. Specifically, there is

no evidence that she had knowledge, or understood the significance,

of marking up prices sold from Coventry First or an LST entity to

Lavastone. The evidence in the record does not show that Ms. Buerger

played even "some part" in the operation or management of the

enterprise, *see Reves*, 507 U.S. at 179, nor that she knew of the

alleged conspiracy's general nature and was aware that her actions

went beyond her "individual role," *Pizzonia*, 577 F.3d at 462 n.4.

Accordingly, in its order of July 10, 2015, the Court granted Ms.

Buerger's motion for summary judgment on the RICO and conspiracy to

violate RICO claims.

Ms. Buerger's motion further asserts that, in the event the

RICO claims fail as against her, the Court lacks personal

jurisdiction over her with respect to the remaining state law claims

against her (fraud, fraudulent inducement, aiding and abetting

breach of fiduciary duty, and unjust enrichment). Under New York

law, a court has personal jurisdiction over a non-domiciliary "who

in person or through an agent . . . transacts any business within

the state or contracts anywhere to supply goods or services in the

state." N.Y. C.P.L.R. 302(a)(1). An out-of-state corporate officer

may be subject to personal jurisdiction where "it can be shown that

the corporation transacted business in New York as the officer's

agent." *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 323 (S.D.N.Y.

1998) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467

(1988)). "At the heart of this inquiry is whether the out-of-state

corporate officer[] [was a] primary actor[] in the transaction in

New York that gave rise to the litigation, and not merely some

corporate employee[] who played no part in it." *Id.* (internal

quotation marks and alterations omitted).

Again here, plaintiff has failed to present sufficient evidence

to show that Ms. Buerger transacted business in New York. The fact

that she had authority to approve life settlement transactions is

not sufficient without evidence that she actually exercised that

authority with respect to transactions that are relevant to the

claims at issue here. *See id.* at 323. Plaintiff asserts, citing

*Brady v. Basic Research, L.L.C.*, No. 13 Civ. 7169 SJF, 2015 WL

1542094 (E.D.N.Y. Mar. 31, 2015), that because Ms. Buerger was in

charge of labeling, advertising, and media placement, she helped

place Coventry First's originating services into the stream of

commerce, which helped foster the relationship with Lavastone. *Id.*

at *7 (finding that an officer's management of advertisements and

media was prima facie evidence of control over the corporation and

that the corporation acted with his consent). However, in *Brady*, the

deceptive practices at issue involved advertising and marketing,

making the defendant there a primary actor with respect to those

claims. *Id.* at *2, 5. Here, Ms. Buerger's role in advertising for

the company is too remote from the life policy transactions that
allegedly make up the fraudulent conduct that is the basis of
plaintiff's claims. The mere fact that she is an owner and director
of the defendant corporations, and that she attended a few lunch
meetings with AIG or Lavastone, are insufficient to support a
finding of personal jurisdiction. *Rovio Entm't, Ltd. v. Allstar
Vending, Inc.*, No. 14 Civ. 7346 KBF, 2015 WL 1508497, at *3
(S.D.N.Y. Apr. 1, 2015); *Gates v. Pinnacle Commc'ns Corp.*, 623 F.
Supp. 38, 42 (S.D.N.Y. 1985) ("A single meeting in New York meets
the requirements of NYCPLR § 302(a)(1) only where that meeting is
the beginning and end of negotiations."). Accordingly, the Court
finds that it lacks personal jurisdiction over Ms. Buerger with
respect to the remaining state claims. She was therefore dismissed
from this action. *See* Order dated July 10, 2015, at 3.

In sum, for the foregoing reasons, the Court, by its order
dated July 10, 2015, granted plaintiff's motion summary judgment on
its breach of contract claim with respect to Coventry First's
practice of marking up prices of policies, for which it had obtained
a POR approval from Lavastone and then purchased from the seller
with the expectation that Lavastone would buy the policy (whether
the policy was "exclusive" or "non-exclusive"); denied summary
judgment to both parties on the remaining breach of contract issues;
denied summary judgment to both parties, except with respect to Ms.
Buerger, on the violations of RICO, conspiracy to violate RICO,
fraud, fraudulent inducement, breach of implied covenant of good

faith and fair dealing, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment claims; and granted summary judgment to Ms. Buerger, dismissing her from the case.[10]

Dated:     New York, NY
           July 3⌐, 2015                    JED S. RAKOFF, U.S.D.J.

---

[10] The Court denies defendants' motion for summary judgment with respect to the issue of statutes of limitations, which in some respects is dependent upon genuine issues of material facts identified above. Appropriate damages and other relief sought will be determined at trial.