UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAVASTONE CAPITAL LLC,

                          Plaintiff,

             -against-

COVENTRY FIRST LLC et al.,

                          Defendants.

14 Civ. 7139 (JSR)

## PRETRIAL CONSENT ORDER

Pursuant to the Federal Rules of Civil Procedure and the Court's Individual Rules of

Practice, Plaintiff Lavastone Capital LLC ("Lavastone" or "Plaintiff"), and Defendants Coventry

First LLC ("Coventry First"), LST I LLC ("LST I"), LST II LLC ("LST II"), LST Holdings Ltd.

("LST Holdings"), Montgomery Capital, Inc. ("Montgomery Capital"), Alan Buerger, Reid

Buerger, and Krista Buerger (collectively, "Defendants"),[1] by and through their undersigned

attorneys, respectfully submit the following Pretrial Consent Order.

### I.    Joint Overview of the Case

The life settlements industry provides a secondary market for life insurance policies

("Life Policies").  Lavastone is in the business of, among other things, investing in Life Policies.

Coventry First is a life settlement provider; LST I, LST II, and LST Holdings (collectively, the

"LST Entities") acquire, invest in, and hold Life Policies, including for re-sale; and Montgomery

Capital provides management services to various entities, including Coventry First, LST I, and

---

[1]       Because Constance Buerger has been dismissed from the case, *see* Dkt. 119 at 2, she is
not discussed herein and is excluded from the term "Defendants," as used herein.

LST II.  Alan Buerger and Reid Buerger hold management and/or board positions in certain of the Defendant entities.

In 2001 and in subsequent years, Coventry First and Lavastone[2] entered into several origination agreements (the "Origination Agreements") and related contracts.  Over the course of the parties' decade-long relationship, Coventry First and the LST Entities sold to Lavastone a combined total of slightly fewer than 7,000 Life Policies.

The following paragraph is drafted by Plaintiff without input from Defendants. Defendants dispute the factual and legal merit of all of these claims and allegations:

Plaintiff alleges that, over the course of the parties' relationship, Defendants exploited Lavastone's trust and confidence, violated the parties' agreements, and executed a scheme to defraud Lavastone, by, *inter alia*, systematically misusing Lavastone's proprietary and confidential information, including its maximum purchase price; misrepresenting the underlying purchase price and broker's fees incurred in the acquisition of Life Policies; artificially inflating the price of Life Policies; charging Lavastone for broker's fees that were not actually paid by Defendants to Life Policy brokers; laundering the Life Policies through affiliates to conceal the underlying purchase price; diverting irrevocable beneficiary interests that benefitted the Defendants and diminished the value of the Life Policies; and reselling Life Policies to Lavastone with hidden mark-ups.  Defendants induced Lavastone to pay over $150 million in markups and broker's fee overcharges, in addition to the $1 billion in origination, incentive, and other fees Lavastone paid to Coventry First for its expertise and assistance in identifying, negotiating, and acquiring Life Policies in the secondary market.  Defendants' conduct violated federal and state law.

---

[2]  The definitions of which here include their predecessors.

The following paragraph is drafted by Defendants without input from Plaintiff.  Plaintiff disputes the factual and legal merit of all of these defenses and allegations:

Defendants contend that Lavastone's claims and factual allegations are without merit.  In particular, Defendants believed that the Origination Agreements permitted Coventry First and the LST Entities to sell Life Policies that were not subject to the exclusivity provisions of the contracts ("nonexclusive Life Policies") to Lavastone at a price greater than acquisition cost, without restriction, and the parties' repeated course of conduct confirmed that belief.  Defendants made numerous disclosures to Lavastone of the existence and amount of gains on nonexclusive Life Policy sales, and Lavastone never claimed that such gains breached the contracts or suggested that they were fraudulent.  Moreover, Lavastone indicated to Defendants, by both its actions and words, that it and its senior executives believed the contracts permitted these gains on sale.  Lavastone—through Defendants' disclosures, its ordinary business activities, and its own formal audits of Coventry First and Lavastone's fiscal agents—knew and approved of Coventry First or its affiliates selling Lavastone nonexclusive Life Policies at prices higher than acquisition cost.  Lavastone concedes that Coventry First or its affiliates properly sold Lavastone hundreds of Life Policies at greater than acquisition cost.  Similarly, Lavastone approved of Coventry First in certain instances reimbursing broker compensation on an aggregate basis across Life Policy sales, as well as Coventry First's decision to place irrevocable beneficiary interests on certain Life Policies.  Lavastone has incurred no damages as a result of any conduct by Defendants.

II.     **Particularized Description of Claims And Defenses**

      A.     **Particularized Description of Claims**

      In an Order dated February 2, 2015, the Court dismissed three of Lavastone's thirteen claims, leaving the following ten causes of action at issue in this litigation:  violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (against all Defendants); conspiracy to violate RICO, 18 U.S.C. § 1962(d) (against all Defendants); fraud (against all Defendants); fraudulent inducement (against all Defendants); breach of contract (against Coventry First); breach of implied covenant of good faith and fair dealing (against Coventry First); negligent misrepresentation (against Coventry First); breach of fiduciary duty (against Coventry First); aiding and abetting breach of fiduciary duty (against Montgomery Capital Inc., the LST entities, Alan Buerger, Reid Buerger, and Krista Buerger); and unjust enrichment (against all Defendants).  *See* Dkt. 119 at 1-2.

      On July 10, 2015, the Court granted summary judgment in favor of Lavastone on its breach of contract claim subject to the limits set forth in its Order and July 30, 2015 Memorandum Opinion; granted Constance Buerger's motion for summary judgment in its entirety, dismissing her from the case; and denied summary judgment to both parties on all remaining claims.

*****

      The following paragraphs are drafted by Plaintiff.  Defendants dispute the factual and legal merit of all of these claims and allegations.

      The trial in this matter will, therefore, be held on the following claims for relief, as alleged by Lavastone:

First Claim For Relief:  Violations of RICO (18 U.S.C. § 1962(c)) against all Defendants. Plaintiff believes the evidence will show that Defendants, through the coordinated activities of Alan Buerger, Reid Buerger and Krista Buerger and five affiliated entities that they own and manage, violated RICO by knowingly or recklessly engaging in a pattern of racketeering activity consisting, *inter alia*, of a scheme to misuse Lavastone's proprietary and confidential information to artificially inflate the purchase prices and broker's fees they charged Lavastone in connection with hundreds of Life Policies, obtain funds under the custody or control of financial institutions by means of false pretenses, and launder the proceeds through Coventry First, the LST Entities, and Montgomery Capital and into accounts under their control.  Plaintiff further alleges that Defendants also diverted irrevocable beneficiary interests in Life Policies sold to Lavastone without disclosing that those interests benefitted them.

Second Claim For Relief:  Conspiracy to violate RICO (18 U.S.C. § 1962(d)) against all Defendants.  Plaintiff believes the evidence will show that Defendants conspired to conduct the enterprise's affairs through a pattern of racketeering activity by knowing about and agreeing to facilitate the scheme described above, including by misusing Lavastone's proprietary and confidential information, artificially inflating purchase prices and broker's fees, obtaining funds under the custody or control of financial institutions by means of false pretenses, diverting irrevocable beneficiary interests, and laundering the proceeds of the unlawful scheme.

Third Claim For Relief:  Common law fraud against all Defendants.  Plaintiff believes the evidence will show that, in hundreds of Life Policy transactions and in response to certain inquiries, Defendants knowingly or recklessly made material misrepresentations and omissions, on which Lavastone reasonably relied.  The alleged material misrepresentations and omissions

concerned, *inter alia*, purchase prices, broker's fees, irrevocable beneficiary interests, and other characteristics of the Life Policies that Lavastone purchased.

Fourth Claim For Relief:  Fraudulent inducement against all Defendants.  Plaintiff believes the evidence will show that, in hundreds of Life Policy transactions and in response to certain inquiries, Defendants knowingly or recklessly made material misrepresentations and omissions, on which Lavastone reasonably relied, thereby inducing Lavastone to purchase hundreds of Life Policies, and to continue doing business with Coventry First.  The alleged material misrepresentations and omissions concerned, *inter alia*, purchase prices, broker's fees, irrevocable beneficiary interests, and other characteristics of the Life Policies that Lavastone purchased.

Fifth Claim For Relief:  Breach of contract against Coventry First.  As noted above, this Court has granted summary judgment to Lavastone on its breach of contract claim subject to the limits set forth in its July 10, 2015 Order and July 30, 2015 Memorandum Opinion.  In particular, the Court held that the Origination Agreement "prohibits marking up policies where Lavastone waived the eligibility criteria and issued a POR [*i.e.*, pre-offer review] approval prior to Coventry First's purchase of the policy from the original seller," Dkt. 119 at 6, and it therefore "granted summary judgment in favor of plaintiffs on the issue of whether Coventry First breached the Origination Agreement by marking up prices of policies, for which it had obtained a POR approval from Lavastone and then purchased from the seller with the expectation that Lavastone would buy the policy," *id*. at 9.  In addition, because "the parties do not dispute that the Origination Agreement does not permit exclusive, or in-the-box, policies to be sold at a markup," the Court "grant[ed] plaintiff's motion for summary judgment on the breach of contract claim with regard to any exclusive policies that were, in fact, sold at a marked-up price."  *Id*. at 4

n.3.  Finally, the Court found that Coventry First's practice of "seek[ing] reimbursement for broker costs that did not match the broker costs associated with the sale of [a particular] policy" is "at odds with the plain language of the contract," but denied summary judgment on this aspect of Lavastone's breach of contract claim because it found a "genuine issue of fact as to whether Lavastone suffered any damages as a result of this practice[.]"  *Id*. at 10-11.  The Court denied summary judgment on the remaining contractual issues in the case.  *Id.* at 21.

Accordingly, the remaining issues for trial on Plaintiff's breach of contract claim are: (1) the amount of damages, if any, caused by Coventry First's breaches of the Origination Agreements, *id*. at 9-10; (2) whether whether Lavastone suffered any damages in connection with Coventry First's brokers' fees practices and, if so, the amount of such damages, *id*. at 10-11; and (3) whether Coventry First breached the parties' Servicing Agreements, as Plaintiff claims, by selling Life Policies to Lavastone after diverting irrevocable beneficiary interests in those Life Policies and, if so, the amount of damages (if any) caused by such breach.

Sixth Claim For Relief:  Breach of the implied covenant of good faith and fair dealing against Coventry First.  Plaintiff believes the evidence will show that Coventry First exploited the confidential information with which it was entrusted in order to advance its own competing interests and the competing interests of its affiliates, thereby depriving Lavastone of the benefit of its bargain.

Seventh Claim For Relief:  Negligent misrepresentation against Coventry First.  Plaintiff believes the evidence will show that, in hundreds of Life Policy transactions, Coventry First was, at the very least, negligent in making material misrepresentations and omissions to Lavastone about purchase prices, broker's fees, irrevocable beneficiary interests, and other characteristics of

the Life Policies that Lavastone was purchasing, and Lavastone reasonably relied on Coventry First's misrepresentations and omissions.

Eighth Claim For Relief:  Breach of fiduciary duty against Coventry First.  Plaintiffs believes the evidence will show that Coventry First solicited and secured a position as Lavastone's trusted fiduciary in the life settlements business, and then abused this role to further its own interests by, *inter alia*, exploiting Lavastone's confidential information, engaging in self-dealing, marking up Life Policies, and charging phantom broker's fees.

Ninth Claim For Relief:  Aiding and abetting breach of fiduciary duty against Montgomery Capital, LST I, LST II, LST Holdings, Alan Buerger, Reid Buerger, and Krista Buerger.  Plaintiff believes the evidence will show that Montgomery Capital, LST I, LST II, LST Holdings, Alan Buerger, Reid Buerger, and Krista Buerger each had knowledge of Coventry First's fiduciary duties to Lavastone and each assisted Coventry First's breaches of those duties.

Tenth Claim For Relief:  Unjust enrichment against all Defendants.  Plaintiff believes the evidence will show that Coventry First, LST I, LST II, and LST Holdings have been enriched by the payment of inflated purchase prices and broker's fees to those entities as a result of Defendants' fraudulent scheme.  Plaintiff believes the evidence will show that the remaining Defendants were each unjustly enriched when the profits of Defendants' scheme were then transferred to them as a central feature of the scheme to defraud Lavastone.

## B.    Particularized Description Of Defenses

The following paragraphs are drafted by Defendants.  Plaintiff disputes the factual and legal merit of these claims and allegations:

Defendants will raise a number of defenses at trial, including without limitation each affirmative defense set forth in their Answer (Dkt. 58, at 72-77).[3]  For example:

With respect to Lavastone's RICO, fraud, and/or misrepresentation claims (Counts I, II, III, IV, and VIII), Defendants believe the evidence will show:  (1) the absence of any scheme to defraud Lavastone; (2) the lack of any material false statement or omission; (3) the lack of fraudulent intent or any other requisite state of mind; (4) the absence of a special relationship between Lavastone and Coventry First; (5) the lack of any knowledge of or agreement among Defendants to pursue any allegedly unlawful aim; (6) the knowledge and consent of Lavastone to the contested transactions; (7) Lavastone's failure to establish the elements of the RICO statute, including RICO "persons" distinct from the alleged enterprise, any RICO predicate acts, a "pattern of racketeering" activity (and the requisite continuity of any such pattern), "operation or management" of any enterprise, and RICO conspiracy; (8) Lavastone's failure to establish reasonable or justifiable reliance; (9) Lavastone's failure to establish causation or damages (including specifically a lack of RICO proximate cause); (10) that all or part of Lavastone's claims are barred by the applicable statutes of limitations; and (11) that these claims are duplicative of Plaintiff's contract claims.

With respect to Lavastone's fiduciary duty claims (Counts X and XI), Defendants believe the evidence will show:  (1) the absence of a fiduciary relationship; (2) the absence of any breach of the alleged fiduciary relationship; (3) the knowledge and consent of Lavastone to the contested transactions; (4) Lavastone's failure to establish that other Defendants knowingly induced or participated in any breach; (5) Lavastone's failure to establish causation or damages; and (6) that all or part of Lavastone's claims are barred by the New York statute of limitations.

---

[3] Defendants expressly preserve each of those defenses and incorporate them herein by reference.

With respect to Lavastone's breach of good faith and fair dealing claim, Defendants believe the evidence will show:  (1) Lavastone's failure to establish the existence of any obligation independent of the contracts at issue; (2) the absence of any breach; (3) the knowledge and consent of Lavastone to the contested transactions; (4) Lavastone's failure to establish causation or damages; and (5) that all or part of Lavastone's claims are barred by the New York statute of limitations.

With respect to Lavastone's unjust enrichment claim, Defendants believe the evidence will show:  (1) Lavastone's failure to establish circumstances such that in equity and good conscience Defendants should return any money or property to Lavastone; (2) the knowledge and consent of Lavastone to the contested transactions; (3) Lavastone's failure to establish causation or damages; and (4) that all or part of Lavastone's claims are barred by the New York statute of limitations.

Finally, as to Lavastone's breach of contract claim (Count V), Defendants believe the evidence will show:  (1) the absence of a breach of contract with regard to brokers' fees, irrevocable beneficiary interests, servicing obligations, and confidentiality; (2) breaches by Lavastone excusing Coventry's performance under the relevant contracts; (3) Lavastone's failure to establish causation or damages as to some or all of the contested transactions; (4) Lavastone's failure to provide Coventry with timely notice of its allegations of breach; (5) other offsets to damages, including defenses preserved by the Court's July 10, 2015 Order and July 30, 2015 Memorandum Opinion; and (6) that all or part of Lavastone's claims are barred by the New York statute of limitations.

Defendants also believe the evidence will show that Lavastone is entitled to no equitable relief on any of its claims, including but not limited to unwinding or rescinding the contracts

between the parties.  Defendants assert that Lavastone's claims for equitable relief are barred by, among other things, (1) the absence of any material breach or Coventry's substantial performance of its obligations under the relevant contracts; and (2) the affirmative defenses set forth in Defendants' Answer (Dkt. 58, at 72-77).

Coventry First also contends that it is entitled to attorney's fees and other professional fees and expenses incurred in connection with the defense of this suit pursuant to Section 8.03 of the Origination Agreements.  *See* Dkt. 58, at 77.

## III.    Particularized Statement of Facts on Which the Parties Agree

### A.    The Life Settlements Industry

1.    A life settlement transaction generally involves the sale of a Life Policy to a third-party buyer for an amount less than the Life Policy's face value, but greater than the net cash surrender value.  The buyer (or a downstream buyer) becomes responsible for paying the future premiums and, upon the death of the insured, receives the Life Policy's death benefits.

2.    In the 2000s, the life settlements market grew as more capital became available from investors, primarily in the form of institutional investors looking for alternative sources of returns, particularly those that were not correlated to other traditional asset classes.

### B.    The Parties

#### i.   Lavastone

3.    Lavastone, formerly AIG Life Settlements LLC, is a Delaware limited liability company with its principal place of business at 80 Pine Street, New York, NY 10005.  Lavastone is a wholly owned subsidiary of Graphite Management LLC, which was formerly known as AIG LS Holdings LLC.  Lavastone is an indirect subsidiary of American International Group, Inc. ("AIG").  Lavastone is in the business of, among other things, investing in Life Policies.

11

4.      Lavastone owns the Life Policies at issue in this case through U.S. Bank N.A. ("U.S. Bank") and Wells Fargo Bank, N.A. ("Wells Fargo"), as Securities Intermediaries.

### ii.  Alan Buerger

5.      Alan Buerger resides and works in Pennsylvania.

6.      In September 1998, Alan and Constance Buerger founded Coventry Financial LLC.

7.      Alan Buerger began working in the life settlements industry in 1998.

8.      Alan and Constance Buerger co-founded Coventry First.  Coventry First was founded to be a life settlement provider and buy and then resell Life Policies.

9.      Alan Buerger is Chairman, Chief Executive Officer, and Treasurer of Coventry First.

10.     Alan Buerger is Chief Executive Officer and serves on the Board of Managers of LST I and LST II.

### iii.  Reid Buerger

11.     Reid Buerger resides and works in Pennsylvania.

12.     Reid Buerger is the son of Alan and Constance Buerger.  He is married to Krista Buerger.

13.     Reid Buerger received his bachelor's degree from the John M. Olin School of Business at Washington University in St. Louis in 1998.

14.     Reid Buerger is Executive Vice President of Coventry First.  He also serves on Coventry First's Board of Managers.

15.     He is also Executive Vice President and serves on the Board of Managers of both LST I and LST II.

### iv.  Krista Buerger

16.     Krista Buerger resides and works in Pennsylvania.

17.     Krista Buerger's maiden name was Krista Lake.  Krista Buerger married Reid Buerger in June 2002.

18.     Krista Buerger began working for life settlements businesses beneficially owned in whole or in part by Alan and Constance Buerger in 1999.

### v.  The Entity Defendants

19.     Coventry First, LST I, LST II, LST Holdings, and Montgomery Capital are distinct, affiliated entities.

20.     The relationships among and between Montgomery Capital, Coventry First, LST I, LST II, and LST Holdings are formalized by written agreements.

21.     Montgomery Capital, Coventry First, LST I, LST II, and LST Holdings record and maintain separate accounting records, and obtain separate, written consents for their significant corporate transactions.

22.     Montgomery Capital, Coventry First, LST I, LST II, and LST Holdings are each separately governed by their own set of bylaws, LLC agreements, or articles of association.

23.     LST I, LST II, and LST Holdings (the "LST Entities") do not commingle their assets with each other or with those of Coventry First.  LST I, LST II, and LST Holdings maintain and control their own bank accounts separate from the other entities.

24.     LST I and LST II's LLC Agreements specify that each entity shall ensure at all times that none of the entity's assets will be commingled with those of Coventry First.

### 1.  Montgomery Capital

25.     Montgomery Capital is a Delaware S corporation that was incorporated on August 26, 1999.  Montgomery Capital's principal place of business is 7111 Valley Green Road in Fort Washington, Pennsylvania 19034.

26.     Montgomery Capital wholly owns and is the sole member of Coventry First, LST I, and LST II.

27.     Montgomery Capital's voting shares are owned by Alan Buerger, Constance Buerger, Reid Buerger, and a trust.  Alan, Constance, and Reid Buerger are directors of Montgomery Capital.

28.     Montgomery Capital provides management services to the companies that it owns, including Coventry First, LST I, and LST II, for a fee.  It also holds board meetings and maintains meeting minutes.

### 2.  Coventry First

29.     Coventry First is a Delaware limited liability company, initially formed on March 23, 1999 under the name Montgomery Capital LLC.  Coventry First's principal place of business is 7111 Valley Green Road in Fort Washington, Pennsylvania 19034.

30.     Coventry First is a wholly owned subsidiary of Montgomery Capital.

31.     Coventry First neither has an ownership interest in nor the ability to control LST I, LST II, or LST Holdings.

32.     Coventry First has Life Policy purchase agreements with LST I, LST II, and LST Holdings, including:  (a) an Amended and Restated Life Settlement Policies Origination Agreement among Coventry First, LST I and U.S. Bank, dated October 11, 2005; (b) a Life Settlement Policies Origination agreement among Coventry First, LST I and Wells Fargo, dated

November 25, 2008; (c) a Life Settlement Policies Origination Agreement among Coventry First, LST II, and Wells Fargo, dated March 16, 2010; (d) a Life Settlement Policies Origination Agreement among Coventry First, LST Holdings, and U.S. Bank, dated March 30, 2009; (e) an Amended and Restated Life Settlement Policies Origination Agreement among Coventry First, LST Holdings, and Wells Fargo Bank, dated December 21, 2010.  Coventry First sells Life Policies to the LST Entities pursuant to those agreements, among others.

33.     Coventry First is a regulated life settlement provider.  Coventry First currently holds licenses to purchase and sell life settlements in 48 states.

34.     Coventry First's principal businesses are to (a) originate and (b) service Life Policies.

35.     Between 2001 and 2012, Coventry First sold more than 6,900 Life Policies to Lavastone, with a total face value of approximately $20 billion.

### 3.  LST I

36.     LST I is a Delaware limited liability company that was formed on May 17, 2005. LST I's principal place of business is 7111 Valley Green Road in Fort Washington, Pennsylvania 19034.

37.     LST I is a wholly owned subsidiary of Montgomery Capital.

38.     LST I receives management services from Montgomery Capital.

39.     LST I's principal business is to purchase Life Policies from Coventry First or third parties and to hold the policies as investments until maturity or sale to another party.

40.     Purchasing Life Policies for investment generally was not part of Coventry First's business model before LST I was created.

41.     LST I is a legitimate company created by Montgomery Capital for sound business reasons.  LST I was formed in part because accounting rules required Life Policies to be booked at their cash surrender value, which was always less than Coventry First paid.  If Coventry First held Life Policies, it would have had to immediately take a significant write-down on Life Policies it purchased, which would have negatively impacted its net worth.  LST I was better able to hold policies because it was not subject to minimum net worth requirements like Coventry First.

### 4.  LST II

42.     LST II is a Delaware limited liability company that was formed on April 7, 2006. LST II's principal place of business is 7111 Valley Green Road in Fort Washington, Pennsylvania 19034.

43.     LST II is a wholly owned subsidiary of Montgomery Capital.

44.     LST II receives management services from Montgomery Capital.

45.     LST II's principal business is to purchase Life Policies from Coventry First or third parties and to hold the policies as investments until maturity or sale to another party.

46.     LST II is a legitimate company created by Montgomery Capital for sound business reasons.  LST II was formed in part because accounting rules required Life Policies to be booked at their cash surrender value, which was always less than Coventry First paid.  If Coventry First held policies, it would have had to immediately take a significant write-down, which would have negatively impacted its net worth.  LST II was better able to hold policies because it was not subject to minimum net worth requirements like Coventry First.

### 5.  LST Holdings

47.     LST Holdings is an Irish corporation that originally was incorporated under the name LST Financial Holdings Limited on November 4, 2008.  That entity was renamed LST Holdings Limited on April 6, 2009.  LST Holdings's registered principal place of business is Fourth Floor, 3 George's Dock, I.F.S.C., Dublin 1.

48.     LST Holdings's principal business is to acquire Life Policies for investment purposes.

### C.     The Agreements

49.     From 2001 to 2011, Coventry First agreed to sell to Lavastone certain Life Policies, and Lavastone agreed to purchase from Coventry First certain Life Policies.

### i.  The Origination Agreements

50.     In October 2001, predecessors to Coventry First and Lavastone entered into a Life Settlement Policies Origination Agreement dated October 2, 2001 among Montgomery Capital LLC (Coventry First's predecessor), as Originator and Seller, Coventry Life Settlements Trust (Lavastone's predecessor), as Purchaser, and U.S. Bank, as Trustee.

51.     On July 1, 2003, Coventry First, as Originator and Seller, Coventry Life Settlements Trust, as Purchaser, and U.S. Bank, as Trustee, entered into an Amended and Restated Life Settlement Policies Origination Agreement.

52.     On June 29, 2006, A100 LLC, as Purchaser, Coventry First LLC, as Originator and Seller, and U.S. Bank, as Fiscal Agent, entered into a Life Policies Origination Agreement ("A100 Origination Agreement").

53.     On June 29, 2006, Coventry First, as Originator and Seller, AIG Life Settlements LLC, as Purchaser, and U.S. Bank, as Fiscal Agent, entered into a Life Policies Origination Agreement.

17

54.      On July 1, 2008, Coventry First, as Originator and Seller, AIG Life Settlements LLC, as Purchaser, and Wells Fargo, as Fiscal Agent, entered into a Life Policies Origination Agreement.

55.      On January 30, 2009, Coventry First, as Originator and Seller, AIG Life Settlements LLC, as Purchaser, and U.S. Bank, as Fiscal Agent, entered into a Life Policies Origination Agreement.

56.      On February 12, 2010, Coventry First, as Originator, Lavastone, as Purchaser, and Wells Fargo, as Fiscal Agent, entered into an Amended and Restated Life Settlement Policies Origination Agreement.

57.      On February 12, 2010, Coventry First, as Originator, Lavastone, as Purchaser, and U.S. Bank, as Fiscal Agent, entered into an Amended and Restated Life Settlement Policies Origination Agreement.

58.      On December 17, 2013, Coventry First, as Originator and Seller, Lavastone, as Purchaser, and U.S. Bank, as Fiscal Agent, entered into an Amended and Restated Life Policies Origination Agreement.

### D.  The Servicing Agreements

59.      On June 29, 2006, AIG Life Settlements LLC, as Purchaser, Coventry First, as Servicer, and U.S. Bank, as Fiscal Agent, entered into a Servicing and Monitoring Agreement.

60.      On July 1, 2008, Lavastone, as Purchaser, Coventry First, as Servicer, and Wells Fargo, as Fiscal Agent, entered into a Servicing and Monitoring Agreement.

61.      On January 30, 2009, Fieldstone Securitization I LLC, as Issuer, and Coventry First, as Servicer, entered into a Servicing and Monitoring Agreement.

62.     On February 12, 2010, Lavastone, as Purchaser, Coventry First, as Servicer, and Wells Fargo, as Fiscal Agent, entered into an Amended and Restated Servicing and Monitoring Agreement.

63.     On February 12, 2010, Lavastone, as Purchaser, Coventry First, as Servicer, and U.S. Bank, as Fiscal Agent, entered into an Amended and Restated Servicing and Monitoring Agreement.

64.     On December 17, 2013, Lavastone, as Purchaser, Coventry First, as Servicer, and U.S. Bank, as Fiscal Agent, entered into an Amended and Restated Servicing and Monitoring Agreement.

## E.  The Confidentiality Agreements

65.     The 2006, 2009, 2010, and 2013 Origination Agreements between Lavastone and Coventry First contained confidentiality provisions.

66.     On February 12, 2010, Lavastone and Coventry First entered into an Origination Confidentiality Agreement, which was incorporated into the 2010 Origination Agreements.

## F.  The Fiscal Agency Agreements

67.     U.S. Bank is a party to the Fiscal Agency Agreement between AIG Life Settlements LLC, as Purchaser, and U.S. Bank, as Fiscal Agent, dated June 29, 2006.

68.     Wells Fargo is a party to the Fiscal Agency Agreement between AIG Life Settlements LLC, as Purchaser, and Wells Fargo, as Fiscal Agent, dated July 1, 2008.

## G.     The Origination Process
### i.  The Medical Underwriting Process

69.     Between 2001 and 2011, Coventry First typically obtained an insured's medical records, along with policy data, and provided that information to Lavastone or other buyers, which were evaluating the potential purchase of the policyholder's Life Policy.

70.     Coventry First typically sent the insured's medical records to American Viatical Settlements ("AVS") for a medical underwriting evaluation.  AVS provided, among other things, a life expectancy estimate for the insured life.  In 2001 and 2002, Lavastone exclusively used AVS medical underwriting to price policies it purchased from Coventry First.  From 2003 forward, Lavastone used its own medical underwriting to price policies.

71.     Other Life Policy buyers sometimes considered AVS medical underwriting in their evaluation of potential Life Policy purchases.

72.     Using the information in the medical record file, Lavastone's in-house medical underwriters calculated a mortality rating, which they then applied to a mortality table.  This process generated a life expectancy for the insured.

73.     A mortality table is a chart that contains probabilities of death based on age and other factors.

74.     Lavastone provided its life expectancy estimate ("LE") and mortality rating to Coventry First.

75.     Kenneth Zinn was the head of Lavastone's medical underwriting department between 2001 and 2011.  The life expectancy generated by Lavastone's medical underwriters was known by the parties as the "Ken Zinn Life Expectancy," "Ken Zinn LE," or "KZ LE," among other things.

### ii.  Pre-Offer Review Process

76.     For each Life Policy that potentially might be sold to Lavastone, Coventry First's financial analysis group sent Lavastone a Pre-Offer-Review ("POR") submission.  The POR submission set forth certain information that Lavastone requested for use in determining its pricing for the underlying Life Policy and to assess its liabilities with respect to that Life Policy.

77.    POR submissions were sent to Lavastone prior to Lavastone's purchase of the Life Policy, and often several months prior to Lavastone's purchase.

78.    Lavastone's underwriters reviewed the POR submissions to assess whether the Life Policy met Lavastone's Eligibility Criteria, to determine its pricing for the Life Policy, and to decide whether to issue a POR Approval for the Life Policy.

79.    Early POR submissions typically included, *inter alia*, an insurance carrier rating, a pricing sheet, a probability of survival calculation, Lavastone's life expectancy calculation, AVS's life expectancy calculation, and a copy of the pricing illustration.

80.    The pricing illustration in the POR submission contained various statistics related to the Life Policy, including expected premium streams, that were used by Lavastone and Coventry First to assess pricing the Life Policy.

81.    The pricing sheet in the POR submission contained information about the insured and the Life Policy, including potential acquisition costs at different internal rates of return ("IRRs").

82.    Lavastone's financial underwriters were responsible for reviewing, approving, and rejecting POR submissions.  In certain circumstances, Lavastone's financial underwriters were required to seek approval from other Lavastone officers or employees.

### iii.  Transmission Of Sales Documents To The Fiscal Agents

83.    Either U.S. Bank or Wells Fargo acted as a Fiscal Agent for, among other things, the sale of each Life Policy to Lavastone.

84.    For every purchase by Lavastone of a Life Policy for which U.S. Bank or Wells Fargo acted as Fiscal Agent, an individual acting on behalf of the entity that sold the Life Policy

to Lavastone transmitted a Disbursement Schedule, Trustee Funding Package (also known as a Sale Documentation Package), and associated documents to U.S. Bank or Wells Fargo.

85.     The Trustee Funding Package, Disbursement Schedule, and related documents were transmitted to the appropriate Fiscal Agent before the Fiscal Agent released funds to effectuate Lavastone's purchase of the relevant Life Policy.

86.     The Trustee Funding Package included a Tripartite Entitlement Order, an underlying Purchase Agreement, and other documents that provided information regarding a particular Life Policy, including Funding Method Requests and Disclosure Statements and Seller Acknowledgements.

### iv.  Fees

87.     Lavastone paid Coventry First, over more than ten years, more than $1 billion in fees under the parties' contracts.  Lavastone purchased almost 7,000 Life Policies originated by Coventry First.

88.     Coventry First's origination fee for the sale of a Life Policy to Lavastone was calculated based on a specified percentage of the Life Policy's net death benefit.

89.     Coventry First's front-end incentive fee for the sale of a Life Policy to Lavastone was a percentage of the difference between the rate of return at which Lavastone bought a Life Policy and Lavastone's target rate of return.  If Lavastone's purchase IRR was below the target rate of return, Coventry First would not receive a front-end incentive fee but instead would pay a subsidy to Lavastone based on the difference between the purchase price and the target price.

90.     Coventry First's servicing fees were calculated as a percentage of the aggregate net death benefit of the Life Policies in Lavastone's portfolio on an annual basis.

### v.  Life Policies At Issue

91.     Except where noted, the parties agree to the facts contained in the chart attached hereto as Exhibit 1 with respect to the Life Policies at issue.  Lavastone does not agree that the information contained in the columns marked "Zmijewski" is accurate or relevant to any issue in this case.  Defendants dispute that the "Total Gain (Loss) on Sale" data in Exhibit 1 can appropriately be used to calculate Plaintiff's alleged damages in this matter.  Defendants contend that numerous policies included in Exhibit 1 should be excluded from the calculation of Plaintiff's alleged damages, and they reserve the right to present evidence of additional offsets or setoffs to alleged damages.

### H.     Audits of Coventry First and the Fiscal Agents

### i.  Audits of Coventry First

92.     Throughout the parties' relationship, AIG's audit group typically conducted annual audits of Coventry First.

93.     Beginning in 2004, AIG's auditors assigned ratings to its audits of Coventry First. Each audit given a rating was rated by AIG's auditors as "satisfactory."  The three possible ratings were "satisfactory," "needs improvement," and "unsatisfactory."

94.     Since at least 2007, AIG's auditors selected a random sample of policies sold within a limited frame to test during the audits.  The standard number of policies tested as part of an audit was typically 60.

95.     AIG's auditors sometimes reported their preliminary findings to Lavastone and/or Coventry First and obtained responses from one or both.   The responses were sometimes included in the audit report for that audit.  For example, the report of AIG's audit of Coventry First in 2008 included a "Division Response."

23

### ii. Audits of the Fiscal Agents

96.     Since at least 2007, AIG conducted annual audits of Lavastone's Fiscal Agent U.S. Bank.   AIG also conducted audits of Lavastone's Fiscal Agent Wells Fargo beginning in 2009.

97.     AIG's auditors assigned ratings to its annual audits of the Fiscal Agents.   Each audit of the Fiscal Agents was rated as "satisfactory."

98.     AIG's auditors typically selected a random sample of policies that Lavastone had purchased within a limited time frame to test during the audits.   The standard number of policies tested as part of an audit was 60.

99.     AIG's auditors sometimes reported its preliminary findings to Lavastone and/or Coventry First and obtained responses.   The responses were sometimes included in the audit report for that audit.

### I.     Answer, Responses to Requests for Admission, and Stipulation

100.     The parties reserve the right to use undisputed facts in prior pleadings or stipulations, consistent with applicable law related to the use of such documents.   The parties further attach the following documents outside the pleadings, which contain various admissions and stipulations:

> a.   The parties' Stipulation Regarding the Transmittal of Certain Documents to the Fiscal Agents, attached hereto as Exhibit 2.
>
> b.   Defendants' Objections and Responses to Plaintiff's Requests for Admissions, attached hereto as Exhibit 3.
>
> c.   Lavastone's Responses and Objections to Coventry First's Requests for Admissions, attached hereto as Exhibit 4.

The parties reserve all rights to argue that particular admissions of facts in the documents above, or any pleading or other court filing, are not relevant to the matters to be tried before the Court.

**IV.    Particularized Statement of Injunctive Relief, Declaratory Relief, and/or Damages Claimed (Including Amounts) for Each Claim and to Be Tried**

This section was drafted by Plaintiff without input from Defendants.  Defendants deny that Plaintiff is entitled to any relief requested below.

Lavastone claims, and intends to seek at trial, recovery of the following damages (including amounts):

1.      Overcharges for purchase prices on Origination Policies, identified by Kevin M. Glowacki, in an amount of at least $139 million to $165 million, together with corresponding prejudgment interest through judgment of at least $73 million to $86 million, which interest shall be determined more precisely following trial.  These damages are sought for all claims.

2.      Overcharges on broker's fees for a population of 6,242 policies, in an amount of at least $19 million, together with prejudgment interest through judgment (for a total of at least $36 million), which interest shall be determined more precisely following trial.  These damages are sought for all claims.

3.      The diminished value of policies identified by Mr. Glowacki for which there was a diverted irrevocable beneficiary interest, in an amount of at least $500,000, together with prejudgment interest through judgment of at least $170,000, which interest shall be determined more precisely following trial.  These damages are sought for all claims.

4.      Trebling under RICO of the damages set forth in the preceding paragraphs 1 through 3, which trebling shall be done after the Court determines a base amount of damages. These damages are sought for the violation of RICO and conspiracy to violate RICO claims.

5.      Disgorgement of fees paid in an amount of at least $91 million to $965 million, together with corresponding prejudgment interest through judgment of at least $48 million to $616 million, which interest shall be determined more precisely following trial.  These damages

25

are sought for the breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment claims.

6.      Reasonable attorneys' fees and costs and expenses.  Recovery of these costs and expenses is sought for the violation of RICO and conspiracy to violate RICO claims.

7.      Punitive damages in an amount to be determined by the Court.  These damages are sought for all claims.

Lavastone claims, and intends to seek at trial, the following non-monetary relief:

1.      Declaratory relief, including a declaration that Lavastone's obligations and Coventry's rights, if any, under the Origination Agreements, Servicing Agreements, and Confidentiality Agreement are terminated as a result of Coventry's breaches.

2.      Equitable relief, including the unwinding of the parties' relationship and the release of Lavastone from its obligations, if any, under the Origination Agreements, Servicing Agreements, and Confidentiality Agreement.

## V.    Witnesses the Parties Intend to Call

### A.    Witnesses Lavastone Intends to Call

This section was drafted by Lavastone without input from Defendants.

Lavastone intends to call, in the likely order of appearance, the following witnesses to testify live at trial.  Lavastone does not include the names below of those witnesses whose testimony will be put in evidence through deposition designations, which Lavastone understands is a separate process pursuant to the Court's rules.

1.      David Fields

2.      Martin Scherzer

3.      Kevin Glowacki

4.      Connie Anderson Yilmaz

26

5.      William Taylor*

6.      Raymond Ludwicki

7.      Edward Stroz

8.      Philip Stark

9.      Alan Buerger

10.     Russell Mosley or another corporate representative of U.S. Bank, N.A. (if necessary and available)

11.     Mohan Rao

*Subject to resolution of Defendants' Motion *in Limine*

Lavastone objects to Defendants' witness list below as not providing proper notice of those witnesses it intends to "call" at trial to testify live "without qualifications or reservations" in accordance with the Court's rules.

### B.      Witnesses Defendants Intend to Call

This section was drafted by Defendants without input from Plaintiff.

This court's Individual Rules of Practice provide, "A witness whose name appears on the list of more than one party will testify only once but may be examined at that time by all parties on all relevant matters." *See* Individual Rules of Practice, 4(b)(vi).  Accordingly, Plaintiff will dictate the order in which Defendants will examine many witnesses, including each individual Defendant and many of Defendants' own witnesses whom Plaintiff has asked to call in its case-in-chief.  Based on Plaintiff's list, Defendants provide the following list of the names of the witnesses (both fact and expert witnesses) that Defendants intend to call, either live or through deposition excerpts (written or video/audio), in the likely order of appearance:

1.      Alan Buerger

2.      William Taylor

3.      Connie Anderson

4.      Reid Buerger

5.      Dave Beckelman

6.      Edward O'Leary

7.      Peggy Lyon

8.      Robert Gruchacz

9.      Neal Jacobs

10.     James Dodaro

11.     Raymond Ludwicki

12.     Dan Passage

13.     Amy Murphy

14.     Michael Harris

15.     Krista Buerger

16.     Mark Zmijewski (Expert)

By agreement of the parties, Defendants intend to call the following witnesses through deposition excerpts (written or video/audio).  These excerpts will be read or played at any appropriate time during Defendants' case.

1.      Richard Zalocki

2.      Diane McGovern

3.      Eileen Decker

4.      Martin Scherzer

Defendants dispute that the above list does not provide Lavastone with the notice to which it is entitled under the Court's rules.

## VI.    Exhibit Lists and Objections

Attached hereto as Exhibit 5 is a list of all exhibits Plaintiff intends to offer in its case in chief, together with Defendants' particularized objections thereto.

Attached hereto as Exhibit 6 is a list of all exhibits Defendants intend to offer in their case in chief, together with Plaintiff's particularized objections thereto.

Attached hereto as Exhibit 7 is a list of all exhibits that both Plaintiff and Defendants intend to offer at trial.  Neither the Plaintiff nor the Defendants object to these exhibits.

**VII.     Probable Length of Trial**

The parties continue to estimate that the trial will last approximately 10-15 days,

assuming a typical trial day of 9:00 AM to 5:00 PM.

Dated:   August 20, 2015

GIBSON, DUNN & CRUTCHER LLP                    WILLIAMS & CONNOLLY LLP

By:_____/s/ *Randy M. Mastro*_____    By:_____/s/ *Kenneth J. Brown*_____
          Randy M. Mastro                                            Kenneth J. Brown
          Reed Brodsky                                               Heidi K. Hubbard
          Caitlin J. Halligan                                          Joseph G. Petrosinelli
          James L. Hallowell                                        William P. Ashworth
          Alexander H. Southwell
          Jefferson E. Bell
          Akiva Shapiro
          Ashley S. Boizelle (appearing *pro hac vice*)

          200 Park Avenue                                          725 Twelfth Street N.W.
          New York, New York 10166                         Washington, DC 20005
          Tel.:  (212) 351-4000                                   Tel.:  (202) 434-5000
          Fax:  (212) 351-4035                                   Fax:  (202) 434-5029
          *Attorneys for Plaintiff*                                 *Attorneys for Defendants*