UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAVASTONE CAPITAL LLC,

          Plaintiff,

     -against-

COVENTRY FIRST LLC et al.,

         Defendants.

14 Civ. 7139 (JSR)

## **LAVASTONE'S OPENING POST-TRIAL MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ........................................................................................ 7

I.    Defendants Intended To Deceive Lavastone. ..................................... 8

       A.    Defendants Knew They Were Obligated To Sell All Policies That Satisfied The Eligibility Criteria Directly To Lavastone At Cost.......... 8

       B.    Defendants' Purported Belief That They Could Mark Up POR-Approved OTB Policies Cannot Be Reconciled With The OA Or Their Own Contemporaneous Descriptions Of The Arrangement......................................... 10

       C.    Defendants Used Misleading Sales Documents To Perpetrate Their Scheme.................................................................... 13

       D.    Defendants Took Advantage Of A Conversation Between Alan Buerger And Dave Fields About A Small Subset Of Policies To Conceal And Expand Their Mark-Ups Of POR-Approved Policies. ......................................... 15

       E.    Defendants Unilaterally Removed Or Redacted Purchase Price Information In Order To Conceal The Mark-Ups.................................... 17

       F.    In Response To Lavastone's Inquiries, Defendants Repeatedly Offered False Assurances And Stonewalled Rather Than Disclosing The Mark-Ups. .......................................................... 18

II.    Lavastone Did Not Know And Had No Basis For Knowing About The Mark-Ups. ....... 20

       A.    The Sale Documentation Packages Did Not Alert Lavastone To Mark-Ups. .................................................................... 20

       B.    The Annual Audits Were Limited In Scope And Did Not Reveal Defendants' Mark-Up Scheme. ............................................ 21

       C.    Lavastone's Witnesses Confirmed That They Did Not Know About The Mark-Up Scheme................................................. 24

       D.    Contrary Testimony From Defense Witnesses Lacks Any Credibility. ............... 25

ARGUMENT .............................................................................................. 28

I.    Defendants Schemed To Defraud Lavastone And To Obtain Bank Property Under False Pretenses, And Then Laundered The Profits, In Violation Of RICO..................... 28

       A.    Defendants Conducted The Enterprise By Participating In Its Operation Or Management................................................... 29

## TABLE OF CONTENTS
(continued)

Page

B. Defendants Engaged In Racketeering Activity, Including Mail Fraud, Wire Fraud, Bank Fraud, And Money Laundering, By Committing Thousands Of Predicate Acts Over A Period Of Years. ....................... 31

    1. Defendants Committed Mail Fraud And Wire Fraud. ............. 31

    2. Defendants Committed Bank Fraud.................................... 36

    3. Defendants Committed Money Laundering............................. 37

C. Defendants' Racketeering Activity Formed A Pattern. ......................... 38

D. Lavastone's Reasonable Reliance Is Not Required For The Mail Fraud, Wire Fraud, Bank Fraud, Or Money Laundering Statutes, *Nor* For RICO Itself. ....................... 38

E. Defendants Caused Lavastone's Damages. ......................... 39

II. Even If Defendants Did Not Violate RICO, They Are Liable For Conspiracy. ............... 40

III. Defendants Are Liable For Common Law Fraud And Fraudulent Inducement. .............. 40

A. Defendants Knowingly Or Recklessly Made Material Misrepresentations And Omissions, On Which They Intended Lavastone To Rely......................... 41

B. Lavastone Reasonably Relied On Defendants' Misstatements And Omissions In Entering Into Transactions And Funding The Purchase Of Policies.................................... 43

IV. Coventry Systematically Breached Its Fiduciary Duties With The Knowing Assistance Of The Buergers, The LST Entities, And Montgomery Capital.................... 46

A. Coventry And Lavastone Had A Fiduciary Relationship. .................... 46

B. Coventry Breached Its Fiduciary Duties.............................. 48

C. The Buergers, The LST Entities, And Montgomery Capital Knowingly Aided And Abetted Coventry's Breaches Of Its Fiduciary Duties...................... 49

V. Coventry Breached The Plain Language Of The Parties' Agreements And The Implied Covenant Of Good Faith And Fair Dealing. ......................... 50

VI. The Non-Coventry Defendants Were Unjustly Enriched At Lavastone's Expense. ........ 52

VII. The Court Should Award Lavastone Money Damages And Equitable Relief. ............... 52

# TABLE OF CONTENTS
### (continued)

Page

A. Coventry Is Liable For Breach Of Contract Damages Of $254.3 Million............ 52

 1. Lavastone Overpaid By $139.4 Million For Origination Policies............ 52

 2. Lavastone Overpaid By $18.9 Million In Broker Compensation Mark-Ups Through The Prepaid Account. ................................................. 53

 3. Lavastone Was Deprived Of $557,274 In Policy Value Due To Fraudulently Designated IB Interests........................................................ 54

 4. Prejudgment Interest Is Mandatory........................................................ 54

B. All Defendants Are Jointly And Severally Liable, Or Are Subject To Execution Of Any Judgment Through Veil-Piercing. ........................................... 55

C. There Should Be No Reduction Of Damages. ..................................................... 56

 1. No Statute Of Limitations Diminishes Lavastone's Recovery. ................ 56

 2. Setoffs Are Not Available........................................................................ 56

 3. Defendants' Attempted Carve-Outs Are Not Available. .......................... 57

D. RICO Requires Trebling Of Compensatory Damages, For A Total Of $572 Million, Plus Attorney's Fees. .................................................................... 58

E. The Court Should Disgorge Defendants' $1.2 Billion Of Ill-Gotten Fees. .......... 59

F. The Court Should, In Its Discretion, Award Punitive Damages......................... 59

G. The Servicing Agreement Should Be Unwound................................................. 60

CONCLUSION..................................................................................................................... 60

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
 888 F. Supp. 2d 431, 444 (S.D.N.Y. 2012) ............................................................ 43

*Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*,
 2013 WL 628533, at *13 (S.D.N.Y. Feb. 15, 2013) ............................................. 45

*Andersen v. Weinroth*,
 849 N.Y.S.2d 210, 220, 222 (1st Dep't 2007) ...................................................... 45

*Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*,
 224 F. Supp. 2d 679, 684-86 (S.D.N.Y. 2002) ............................... 41, 42, 43, 44

*Aniero Concrete Co. v. N.Y.C. Constr. Auth.*,
 308 F. Supp. 2d 164, 190-91 n.17 (S.D.N.Y. 2003) ............................................ 57

*Antonios A. Alevizopoulos & Assocs. v. Comcast Int'l Holdings, Inc.*,
 100 F. Supp. 2d 178, 188 (S.D.N.Y. 2000) .......................................................... 47

*Anwar v. Fairfield Greenwich Ltd.*,
 728 F. Supp. 2d 372, 421 (S.D.N.Y. 2010) .......................................................... 59

*Arch Ins. Co. v. Precision Stone, Inc.*,
 584 F.3d 33, 40-42 (2d Cir. 2009) ........................................................................ 57

*Atlantica Holdings., Inc. v. Sovereign Wealth Fund Samruk-Kazyna*,
 2 F. Supp. 3d 550, 561-62 (S.D.N.Y. 2014) ........................................................ 45

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*,
 1996 WL 609439, at *4 (S.D.N.Y. Oct. 23, 1996) .............................................. 42

*Bd. of Mgrs. of Fairways at N. Hills Condo. v. Fairway at N. Hills*,
 603 N.Y.S.2d 867, 869 (2d Dep't 1993) ............................................................... 46

*Beck v. Prupis*,
 529 U.S. 494, 506-07 (2000) .................................................................................. 40

*Bestolife Corp. v. Am. Amicable Life*,
 774 N.Y.S.2d 18, 23 (1st Dep't 2004) .................................................................. 48

*Bingham v. Zolt*,
 66 F.3d 553, 559, 565 (2d Cir. 1995) ............................................................. 55, 59

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Boyle v. United States,*
556 U.S. 938, 944-46 (2009) .................................................... 29

*Bridge v. Phoenix Bond & Indem. Co.,*
553 U.S. 639, 652, 655-56 (2008) ............................................. 32, 39

*Buyers & Renters United to Save Harlem v. Pinnacle Grp. N.Y. LLC,*
575 F. Supp. 2d 499, 502-03, 508-12 & n.3 (S.D.N.Y. 2008) ...................... 29, 30, 36

*Carpenter v. United States,*
484 U.S. 19, 25-28 (1987) ...................................................... 31, 32

*Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.,*
392 F. Supp. 2d 621, 628 (S.D.N.Y. 2005) ..................................... 57

*Cedric Kushner Promotions, Ltd. v. King,*
533 U.S. 158, 161 (2001).......................................................... 29

*Chevron Corp. v. Donziger,*
974 F. Supp. 2d 362, 568-69, 589 (S.D.N.Y. 2014) ........................... 28, 33

*Childers v. N.Y. & Presbyterian Hosp.,*
36 F. Supp. 3d 292, 307, 311 (S.D.N.Y. 2014) ................................ 47, 49

*City of N.Y. v. Bello,*
579 F. App'x 15, 17 (2d Cir. 2014) ........................................... 40

*Clorox Int'l Co. v. Int'l Trade Expo, Inc.,*
1995 WL 106104, at *4 (S.D.N.Y. Mar. 9, 1995) ............................. 42

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,*
187 F.3d 229, 241 (2d Cir. 1999) ............................................. 34, 42

*Cohen v. SAC Trading Corp.,*
711 F.3d 353, 361 (2d Cir. 2013) ............................................. 56

*Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.,*
524 F. Supp. 2d 412, 424-25 (S.D.N.Y. 2007) ................................ 57

*Cox v. Microsoft Corp.,*
778 N.Y.S.2d 147, 149 (1st Dep't 2004).......................................... 52

*Daelim Trading Co. v. Giagni Enters., LLC,*
2014 U.S. Dist. LEXIS 165544, *11 (S.D.N.Y. Nov. 12, 2014)............................ 55

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*David v. Mast,*
    1999 WL 135244, at *3 (Del. Ch. Mar. 2, 1999) .................................................. 55

*Deangelis v. Corzine,*
    998 F. Supp. 2d 157, 182-83 (S.D.N.Y. 2014) .................................................. 50

*DeFalco v. Bernas,*
    244 F.3d 286, 309 (2d Cir. 2001) .................................................. 31

*Diamond Servs. Mgmt. v. Fable Jewelry Co.,*
    2012 WL 5871616, at *5 (S.D.N.Y. Nov. 20, 2012) .................................................. 57

*Eaves v. Designs for Fin., Inc.,*
    785 F. Supp. 2d 229, 257 n.21 (S.D.N.Y. 2011) .................................................. 56

*Empresas Cablevision, S.A.B. de CV v. JPMorgan Chase Bank, N.A.,*
    680 F. Supp. 2d 625, 632 (S.D.N.Y. 2010) .................................................. 51

*First Keystone Consultants, Inc.. v. Schlesinger Elec. Contractors, Inc.,,*
    871 F. Supp. 2d 103, 122 (E.D.N.Y. 2012) .................................................. 33

*Fund of Funds, Ltd. v. Arthur Anderson & Co.,*
    545 F. Supp. 1314, 1360-61 (S.D.N.Y. 1982) .................................................. 43, 45

*GLM Corp. v. Klein,*
    665 F. Supp. 283, 286 (S.D.N.Y. 1987) .................................................. 48

*Greenfield v. Prof. Care, Inc.,*
    677 F. Supp. 110, 117 (E.D.N.Y. 1987) .................................................. 59

*H.J. Inc. v. N.W. Bell Tel. Co.,*
    492 U.S. 229, 239 (1989) .................................................. 38

*Hemi Grp., LLC v. City of N.Y.,*
    559 U.S. 1, 9-12 (2010) .................................................. 39

*Howe v. Bank of N.Y. Mellon,*
    783 F. Supp. 2d 466, 485 (S.D.N.Y. 2011) .................................................. 50

*Hughes v. BCI Int'l Holdings, Inc.,*
    452 F. Supp. 2d 290, 304 (S.D.N.Y. 2006) .................................................. 52

*Hyosung Am., Inc. v. Sumagh Textile Co.,*
    137 F.3d 75, 78 (2d Cir. 1998) .................................................. 45

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Manshul Constr. Corp.*,
   2000 WL 1228866, at *56 (S.D.N.Y. Aug. 30, 2000) .............................................. 56

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) .......................................................... 42

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   2011 WL 1330847, at *10 (S.D.N.Y. Mar. 30, 2011) ............................................. 45

*J.P. Morgan Chase Bank v. Winnick*,
   350 F. Supp. 2d 393, 396, 409 (S.D.N.Y. 2004) ................................................... 44

*Johnson v. Nextel Commc'ns, Inc.*,
   660 F.3d 131, 138, 142 (2d Cir. 2011) ........................................................... 46, 49

*Johnston v. Norton*,
   886 F. Supp. 403, 404 (S.D.N.Y. 1995) ............................................................... 49

*JPMorgan Chase Bank, N.A. v. IDW Grp.*,
   2009 WL 321222, at *12 (S.D.N.Y. Feb. 9, 2009) ............................................ 47, 48

*Kern v. Robert Currie Assocs.*,
   632 N.Y.S.2d 75, 76 (1st Dep't 1995) .................................................................. 46

*Kimmell v. Schaefer*,
   89 N.Y.2d 257, 265 (1996) ................................................................................... 49

*Koch v. Greenberg*,
   14 F. Supp. 3d 247, 258 (S.D.N.Y. 2014), *aff'd* 2015 WL 5711578 (2d Cir. Sept. 30,
   2015) ..................................................................................................................... 41

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
   179 F. Supp. 2d. 118, 152 (S.D.N.Y. 2000) ......................................................... 48

*Leviton Mfg. Co. v. Reeve*,
   942 F. Supp. 2d 244, 267-68 (E.D.N.Y. 2013) ..................................................... 43

*Lind v. Vanguard Offset Printers, Inc.*,
   857 F. Supp. 1060, 1067-68 (S.D.N.Y 1994) ....................................................... 42

*Loughrin v. United States*,
   134 S. Ct. 2384, 2387, 2388-89, 2394-95 & n.5 (2014) .............................. 36, 37, 39

*Marini v. Adamo*,
   995 F. Supp. 2d 155, 193, 201, 203 (E.D.N.Y. 2014) .................................. 42, 47, 49

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,*
500 F.3d 171, 181 (2d Cir. 2007) ......................................................................... 41

*Metro. Transp. Auth. v. Contini,*
2005 WL 1565524, at *5 (E.D.N.Y. July 6, 2005) ............................................... 33

*Morris v. Windsor Tr. Co.,*
213 N.Y. 27, 29-30 (1914) .................................................................................... 56

*Motorola Credit Corp. v. Uzan,*
202 F. Supp. 2d 239, 244 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.3d 130 (2d
Cir. 2003) ............................................................................................................... 60

*Muscarello v. Winnebago Cnty. Bd.,*
702 F.3d 909, 912 (7th Cir. 2012) .......................................................................... 3

*N.Y. Dist. Council of Carpenters Pension Fund v. Forde,*
939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013) ......................................................... 40

*Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson,*
73 N.Y.2d 417, 425 (1989) ................................................................................... 49

*Ostano Commerzanstalt v. Telewide Sys., Inc.,*
794 F.2d 763, 766 (2d Cir.1986) .......................................................................... 41

*Palatkevich v. Choupak,*
2014 WL 1509236, at *16, *18, *22 (S.D.N.Y. Jan. 24, 2014) .................. 30, 35, 40

*People v. Coventry First LLC,*
13 N.Y.3d 108, 115-16 (2009) .............................................................................. 48

*Philip Morris Inc. v. Heinrich,*
1997 WL 781907, at *12 (S.D.N.Y. Dec. 18, 1997) ............................................ 50

*Philip Morris, USA, Inc. v. Otamedia Ltd.,*
331 F. Supp. 2d 228, 246 (S.D.N.Y. 2004) ......................................................... 60

*Proctor & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,*
879 F.2d 10, 19 (2d Cir. 1989) ............................................................................. 38

*Quintel Corp. v. Citibank, N.A.,*
606 F. Supp. 896, 909-10 (S.D.N.Y. 1985) ......................................................... 42

*Ravo v. Rogatnick,*
70 N.Y.2d 305, 310 (1987) ................................................................................... 55

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Resnick v. Resnick,*
    763 F. Supp. 760, 767 (S.D.N.Y. 1991) ........................................................... 59

*Reves v. Ernst & Young,*
    507 U.S. 170, 179, 183 (1993) ......................................................................... 29

*Salinas v. United States,*
    522 U.S. 52, 62, 65-66 (1997) .................................................................... 28, 40

*Sargiss v. Magarelli,*
    12 N.Y.3d 527, 532 (2009) ............................................................................. 56

*SEC v. Contorinis,*
    743 F.3d 296, 308 (2d Cir. 2014) ................................................................... 59

*Sergeants Benev. Ass'n Annuity Fund v. Renck,*
    796 N.Y.S.2d 77, 78 (1st Dep't 2005) ............................................................ 52

*Serin v. N. Leasing Sys., Inc.,*
    2009 WL 7823216, at *8, *14 (S.D.N.Y. Dec. 18, 2009) ............................ 39, 40

*Simonds v. Simonds,*
    45 N.Y.2d 233, 242 (1978) ............................................................................. 52

*St. John's Univ. v. Bolton,*
    757 F. Supp. 2d 144, 186-87 (E.D.N.Y. 2010) ............................................... 56

*Staub v. Proctor Hosp.,*
    562 U.S. 411, 419 (2011) ................................................................................ 39

*Suez Equity Inv., L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87, 105 (2d Cir. 2001) ..................................................................... 39

*In re Sumitomo Copper Litig.,*
    995 F. Supp. 451, 455 (S.D.N.Y. 1998) .......................................................... 31

*United States v. Thomas,*
    377 F.3d 232, 242-43 (2d Cir. 2004) .............................................................. 34

*United States ex rel. O'Donnell v. Countrywide Fin. Corp.,*
    83 F. Supp. 3d 528, 532, 534-35 (S.D.N.Y. 2015) .................................. 32, 33, 34

*United States v. Allen,*
    2015 WL 5022524, at *2 & n.1 (S.D.N.Y. Aug. 18, 2015) ............................. 34

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Angelilli*,
   660 F.2d 23, 26-28, 36 (2d Cir. 1981) ......................................................... 32

*United States v. Autuori*,
   212 F.3d 105, 115 (2d Cir. 2000) ............................................................... 31

*United States v. Bank of N.Y. Mellon*,
   941 F. Supp. 2d 438, 463-64, 469-71 (S.D.N.Y. 2013) ............................. 32, 33, 34

*United States v. Bortnovsky*,
   879 F.2d 30, 36 (2d Cir. 1989) ................................................................... 35

*United States v. Carlo*,
   507 F.3d 799, 802-03 (2d Cir. 2007) .......................................................... 35

*United States v. Chestman*,
   947 F.2d 551, 568-69 (2d Cir. 1991) ....................................................... 6, 46

*United States v. Cuti*,
   720 F.3d 453, 462-63 (2d Cir. 2013) ....................................................... 33, 35

*United States v. Gole*,
   158 F.3d 166, 168 (2d Cir. 1998) ............................................................... 35

*United States v. Graham*,
   477 F. App'x 818, 824-25 (2d Cir. 2012) ............................................. 34, 38, 39

*United States v. Guadagna*,
   183 F.3d 122, 129 (2d Cir. 1999) ............................................................... 33

*United States v. Huezo*,
   546 F.3d 174, 178-79, 181-82 (2d Cir. 2008) ............................................. 38

*United States v. Jackson*,
   935 F.2d 832, 840 (7th Cir. 1991) ............................................................. 38

*United States v. Miller*,
   116 F.3d 641, 672-73 (2d Cir. 1997) .......................................................... 30

*United States v. O'Hagan*,
   521 U.S. 642, 654 (1997) ........................................................................... 46

*United States v. Pizzonia*,
   577 F.3d 455, 462 n.4 (2d Cir. 2009) ......................................................... 40

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Rastelli,*
   870 F.2d 822, 832 (2d Cir. 1989) ......................................................... 40

*United States v. Rodolitz,*
   786 F.2d 77, 79-81 (2d Cir. 1986) .......................................... 32, 33, 34

*United States v. Sampson,*
   371 U.S. 75, 77-78 (1962) .................................................................. 32

*United States v. Schmuck,*
   489 U.S. 705, 710-11 (1989) .............................................................. 36

*United States v. Stitsky,*
   536 F. App'x 98, 108-09 (2d Cir. 2013) .............................................. 33

*United States v. Szur,*
   289 F.3d 200, 211 (2d Cir. 2002) ....................................................... 47

*United States v. Teitler,*
   802 F.2d 606, 614 (2d Cir. 1986) ................................................. 33, 40

*United States v. Thorn,*
   317 F.3d 107, 133 (2d Cir. 2003) ....................................................... 37

*United States v. Valasquez,*
   55 F. Supp. 3d 396, 396-99 (E.D.N.Y. 2014) ................................ 38, 39

*United States v. Valdez,*
   522 F. App'x 25, 28 (2d Cir. 2013) ..................................................... 38

*United States v. Walker,*
   191 F.3d 326, 337 (2d Cir. 1999) ....................................................... 33

*United States v. Ward,*
   197 F.3d 1076, 1083 (11th Cir. 1999) ................................................ 38

*United States v. Weisberg,*
   2011 WL 4345100, at *2 (E.D.N.Y. Sept. 15, 2011) ........................... 37

*United States v. Yannotti,*
   541 F.3d 112, 128-29 (2d Cir. 2008) .................................................. 40

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP,*
   348 F. Supp. 2d 255, 271-72 (S.D.N.Y. 2004) ................................... 41

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Waldman v. New Chapter, Inc.*,
   714 F. Supp. 2d 398, 404 (E.D.N.Y. 2010) ................................................................. 52

*Watts v. Jackson Hewitt Tax Serv. Inc.*,
   579 F. Supp. 2d 334, 352-53 (E.D.N.Y. 2008) ................................................... 41, 42

*Wechsler v. Hunt Health Sys., Ltd.*,
   330 F. Supp. 2d 383, 404 (S.D.N.Y. 2004) ............................................................. 50

*Wendt v. Fischer*,
   243 N.Y. 439, 443 (1926) ................................................................................... 49

*Westinghouse Credit Corp. v. D'Urso*,
   278 F.3d 138, 149 (2d Cir. 2002) ........................................................................ 57

*Westwoods Aviation, LLC v. Atl. Aviation Flight Servs., Inc.*,
   2007 WL 2454115, at *2 (S.D.N.Y. Aug. 27, 2007) ....................................... 6, 46

*Wiener v. Lazard Freres & Co.*,
   672 N.Y.S.2d 8, 14-15 (1st Dep't 1998) ............................................................. 47

*Zimmer-Masiello, Inc. v. Zimmer, Inc.*,
   552 N.Y.S.2d 935, 937 (1st Dep't 1990) ............................................................. 49

## Statutes

18 U.S.C. § 1956(a) ............................................................................................... 37, 38

18 U.S.C. § 1956(c) ..................................................................................................... 37

18 U.S.C. § 1961(1) ..................................................................................................... 31

18 U.S.C. § 1961(3) ..................................................................................................... 29

18 U.S.C. § 1962(c) ..................................................................................................... 29

18 U.S.C. § 1964(a) ..................................................................................................... 60

18 U.S.C. § 1964(c) ............................................................................................... 28, 58

N.Y. C.P.L.R. § 5001(a) ............................................................................................. 54

# TABLE OF AUTHORITIES
(continued)

Page(s)

## Other Authorities

Irene Lynch Fannon & Karole Cuddihy,
  *Corporations and Partnerships in Ireland* 54 (2010)............................................. 55

Jed S. Rakoff & Howard W. Goldstein,
  *RICO: Civil and Criminal Law and Strategy* § 4.02[1] (2015)................................. 57

Restatement (Second) of Torts § 435B...................................................................... 40

W. Keeton et al., Prosser & Keeton on Torts § 8, p.37 & n.27 (5th ed. 1984)............................ 40

## PRELIMINARY STATEMENT

In granting summary judgment to Lavastone on its breach of contract claim, this Court held that construing the parties' Origination Agreement ("OA") to permit mark-ups on policies that Lavastone had already committed to buy would produce "an absurd result that is commercially unreasonable and contrary to the reasonable expectations of the parties."  Dkt. 119 ("MSJ Op.") at 9.  Remarkably, Defendants insist—as they must in order to defend against the other claims against them—that for the entire decade they were originating policies for Lavastone, they honestly believed they could do just that.  Yet they cannot point to a single contemporaneous document evidencing that belief.  Nor can they explain away the overwhelming documentary evidence showing that they crafted misleading documents to cover up their mark-ups, broker's fee overcharges, and irrevocable beneficiary interests, and then deliberately stonewalled Lavastone whenever it raised questions that threatened to expose Defendants' misconduct.  And when confronted with the array of evidence implicating them in a brazen mark-up scheme, the Buergers and other witnesses now under their control repeatedly gave false testimony to this Court, removing any doubt that the misdeeds at issue here—which at the outset of this litigation this Court determined would constitute RICO violations, common law fraud, fiduciary breach, and other violations of law if proven—have now been firmly established.

The evidence confirms that Defendants' fraud proceeded in several steps.  First, Defendants solicited and obtained Lavastone's pre-offer review ("POR") approval to purchase policies on Lavastone's behalf as its exclusive originator.  *See, e.g.*, Tr. 96:19-97:4.  But instead of selling policies to Lavastone for contractually-set origination and incentive fees that were intended to align the parties' interests in acquiring policies for low prices, they purchased the policies for themselves and diverted them to an LST affiliate for a short period of time.  *See, e.g.*, PX-1002B1; PX-1032B.  Then, at Alan or Reid Buerger's direction, Tr. 1541:22-1543:5,

1998:15-17; JX-8473, Defendants used Lavastone's confidential information to calculate the maximum price it would pay, marked up the purchase price to approach or reach that amount, and pocketed the gains.  *See, e.g.*, Tr. 773:4-25; PX-1002B1; PX-1033B; Tr. 784:10-25. Defendants devised misleading documents to hide their self-dealing and took other deceptive measures to conceal the lower price actually paid to the original policyholder. *See infra* pp. 13-15, 17-18.  Finally, Defendants laundered their illicit gains by transferring the profits to Coventry First ("Coventry") and the LST affiliates through a labyrinth of bank accounts and entities to Montgomery Capital ("Montgomery"), which, in turn, distributed hundreds of millions of dollars to the Buergers personally, all at the Buergers' own direction.  *See infra* pp. 37-38.  Defendants overcharged Lavastone on hundreds of policies through this sophisticated racketeering scheme.  PX-1007B; Tr. 549:21-550:2.  All told, Defendants took Lavastone for approximately $139 million in policy price overcharges, in addition to reaping over $760 million in fees that Lavastone paid Coventry to serve as its trusted originator and servicer of life policies while Defendants were, at the same time, fraudulently marking up policies.  *See infra* pp. 52-54, 59.

　　　　Defendants also fraudulently marked up the broker's fees they collected from Lavastone.  *See* Tr. 606:21-617:23.  Coventry accumulated these overcharges in a so-called "prepaid account," purportedly for the purpose of "advancing" broker's fees and later "recovering" them through overcharges, at the direction of Alan and Reid Buerger.  *See, e.g.*, Tr. 613:2-616:11, 713:9-717:11, 1691:19-1693:9, 2069:10-20; JX-11002 at 321:21-322:4; PX-252 at 1; PX-253 at 18, 23; PX-282 at 1; JX-15.  In practice, however Coventry was collecting a surplus, with the sum of all entries for overcharged broker's fees totaling $23 million or more.  *See* DX-298. Defendants treated the account as a slush fund, using the heading "Prepaid Compensation," JX-15 at 1, to charge Lavastone for expenses unrelated to broker compensation and typically

rounded to the nearest thousand dollars, including $10,000 for a "Las Vegas Conference," *id.* at 4; $25,000 for a "Holiday/Retreat," *id.* at 2; dozens of entries with labels as vague as "miscellaneous" or "per RSB"; and a final entry simply taking a seven-figure sum into "income," *id.* at 18.[1]  Even worse, Defendants manipulated sale documentation packages ("SDPs") to secure these payments, shifting overcharged amounts from the broker compensation line on Disbursement Schedules ("DS") to the purchase price line, and vice versa.  *See, e.g.*, Tr. 701:22-704:15, 712:16-714:20, 716:14-717:11; PX-163 at 1.  None of this was known to Lavastone, which believed that it was reimbursing what Coventry actually paid in broker's fees.  *See, e.g.*, Tr. 210:10-211:12, 281:25-282:17, 360:15-361:4, 789:16-790:3, 1869:19-23; PX-536; PX-537.

Defendants further defrauded Lavastone by designating Irrevocable Beneficiary ("IB") interests in favor of the Healthcare Education Trust—an entity Alan Buerger created to benefit a personal charity—*after* Coventry had acquired the relevant policies with Lavastone's POR approval.  *See, e.g.*, Tr. 529:15-542:4, 900:18-901:21, 1600:1-5, 1602:13-22, 1608:12-15, 1784:6-17, JX-11000 at 241:04-241:15.  To fund the trust, Alan directed that four policies be placed briefly into LST and encumbered with IB interests before their sale to Lavastone.  In violation of the parties' Servicing Agreement ("SA") and in a blatant act of fraud, Defendants then sold these policies to Lavastone without disclosing that they had created the IB interests themselves to benefit an entity affiliated with the Buergers.  *See* Tr. 542:5-22, 900:25-902:15, 1904:9-1906:5; JX-11006 at 259:21-25.

---

[1]  A single page of the prepaid account shows entries for "Misc production bonus per RSB" for $100,000; "Misc per RSB" for $100,000; "Misc per RSB" for $75,000; "Per RSB" for $100,000; and "Misc." for $10,000.  JX-15 at 7.  Of the "prepaid" transactions between $10,000 and $100,000, more than 40% were for exact multiples of $10,000.  JX-15.  For each of those charges, "[t]he number is suspiciously round, and unexplained."  *Muscarello v. Winnebago Cnty. Bd.*, 702 F.3d 909, 912 (7th Cir. 2012) (Posner, J.).

There is no credible dispute that Defendants' scheme satisfies the elements of RICO and common law fraud.  Instead, Defendants claim that they did not intend to steal Lavastone's money or that Lavastone was aware of the fraud, but the evidentiary record shuts the door on both defenses.  There is no dispute that Coventry could not mark up the prices of so-called "in-the-box" ("ITB") policies.  Yet Coventry did so approximately 100 times or more, at the Buergers' explicit direction.  That many mark-ups could not possibly have been a "mistake," no matter what the Buergers now claim.  *See infra* pp. 8-10.  Defendants also insist that there was a "misunderstanding" as to whether the OA allowed them to mark up POR-approved "out-of-the-box" ("OTB") policies.  To the contrary, and as this Court already found, the OA "unambiguously does not permit Coventry First to mark up prices on non-exclusive policies, for which it had received a POR approval from Lavastone and then purchased the policy from the policyholder with the expectation that Lavastone would purchase it."  MSJ Op. 3; *see also id.* at 9 n.5 (addressing Coventry's compensation).  Indeed, the OA explicitly covered *all* "eligible life policies," meaning any policy as to which Defendants had Lavastone's POR approval in advance, whether ITB or OTB.  *See id.* at 3-4 (citing OA at 1 & Ex. D-9).

Defendants' internal contemporaneous documents confirm that they well knew they could not mark up policies for which Lavastone had already issued a binding POR approval.  *See infra* pp. 10-13.[2]  That is why, for the first five years of the parties' relationship, Defendants *did*

---

[2]  Lavastone's expert termed all policies that had to be sold to Lavastone at cost (ITB or OTB) "Origination Policies" (also referred to herein as "POR-approved policies").  *See* Tr. 484:3-20, 508:17-24.  Coventry bore no risk of ownership for these policies because Lavastone had committed to purchase them.  *See, e.g.*, Tr. 85:4, 91:11-92:18, 1061:20-22, 1079:10-14, 1364:1-1365:9.  In contrast, "Investment Policies," which did not have to be sold at cost, were OTB policies that Coventry acquired *before* Lavastone's POR approval, and for which Coventry thus bore the risk of ownership.  *See, e.g.*, Tr. 201:17-21, 373:12-374:16, 506:4-15, 1079:15-

not mark up a single POR-approved policy.  *See* Tr. 1554:23-1555:1, 1882:16-20, 2026:8-11.  Not until late 2006—as Coventry lost its other institutional investor clients, Tr. 1587:18-1588:10, 1884:10-18, and received word from Lavastone that it was considering taking its premium lending business elsewhere, Tr. 2131:14-18—did Defendants begin using the LST entities as a pass-through to add illicit "gains on sale."  Tr. 1989:16-20.  And in the ensuing years, Defendants greatly expanded the scope of their fraud.[3]  *See* PX-1042B.

By contrast, Lavastone did not know about Defendants' scheme until it was over.  Lavastone occasionally found isolated price discrepancies and raised them with Defendants, but those inquiries were met with dissembling, obstruction, and stonewalling.  *See infra* pp. 18-20.  Not once did Defendants simply tell Lavastone that they were permitted to take mark-ups or believed the OA allowed them to do so.  *See id.*  Instead, Defendants tried to cover their tracks by sending misleading documents that obscured critical pricing information and by removing evidence of the original purchase price from the SDPs.  *See id.*  Those facts alone are telling.  If Defendants actually believed mark-ups were permitted, they surely would have told Lavastone so at some point over the parties' decade-long relationship.  But the contemporaneous evidence shows the opposite.  Lavastone's employees periodically asked about potential mark-

---

18.  *Compare* PX-523 at 2, *with* PX-524 at 2 (Alan Buerger noting, "if do not have POR for out of box, we bear entire risk").  Investment Policies are not at issue in this case.

[3]  In 2006, Defendants marked up only two POR-approved policies.  JX-189 at 1.  In 2007, there was a slight uptick, but still fewer than 20.  *Id.* at 1-2.  In 2008, when Lavastone was Coventry's only remaining institutional investor, Defendants ramped up.  In September 2008, following revelations about AIG's financial turmoil, Tr. 1625:23-1626:7, and right after the stock market crashed, Alan and Reid Buerger directed a coordinated "push" to sell as many policies in Coventry's inventory to Lavastone as quickly as possible, for fear AIG "may have purchased its last policy," Tr. 1625:8-13, 1639:3-1641:13; PX-294; PX-286; PX-288; PX-296.  Their efforts paid off.  In November 2008, Coventry had its highest sales month ever, largely due to selling $575 million in policies to Lavastone and inflating broker's fee amounts, to the Buerger family's great pleasure and financial benefit.  *See* PX-331; *see also* PX-332; PX-333.

ups right up until 2013, which would make no sense if Lavastone had known about Defendants'

scheme all along.  Indeed, Lavastone's witnesses all candidly testified that that they did not

know about Defendants' mark-up scheme and never would have stood for it because it would

have been "completely inconsistent" with the core tenets of the parties' bargain.  *See infra* pp.

10-11, 24-25.  When Lavastone's witnesses finally uncovered Defendants' scheme, they were

"surprised and stunned."  *See, e.g.*, Tr. 211:18-21.  Lavastone immediately sought to vindicate its

rights by formally "noticing" Defendants' breach and then bringing this lawsuit.  PX-675.

Defendants' scheme is all the more egregious given that Coventry served as Lavastone's

trusted fiduciary.  Under the OA, Coventry was Lavastone's exclusive originator of life policies,[4]

controlled access to the policyholders and their brokers,[5] negotiated purchase prices,[6] was

entrusted with Lavastone's maximum price, and controlled the information that Lavastone

received about policies, *see infra* pp. 47-48.  And as Alan Buerger repeatedly testified, Coventry

was effectively "managing" Lavastone's nine-figure "facility," meaning its money, and wanted

Lavastone to be "happy" with the results.  Tr. 236:3-9, 1560:2-7, 1561:13-21, 1562:1-2, 1564:4-

14; DX-287.  As this Court has made clear, one acts in a "fiduciary capacity" when "the business

which he transacts, or the money or property which he handles, is not his own or for his own

benefit, but for the benefit of another person" to whom he stands in a relationship of "confidence

and trust."  *Westwoods Aviation, LLC v. Atl. Aviation Flight Servs., Inc.*, 2007 WL 2454115, at

*2 (S.D.N.Y. Aug. 27, 2007) (quoting *United States v. Chestman*, 947 F.2d 551, 568-69 (2d Cir

---

[4] *See, e.g.*, ASF ¶¶ 49-58; JX-106 §§ 2.01(b), 2.02(a), 3.04(b), 4.01, 5.01 & Ex. D-14; Tr. 73:14-74:8, 76:19-77:8, 323:13-20.

[5] *See* JX-106 § 3.04(b); Tr. 77:24-78:21, 342:25-343:10, 788:24-789:9, 1799:22-1800:6.

[6] *See, e.g.*, Tr. 322:19-323:1, 347:8-348:3, 499:8-23, 1279:10-1280:9; PX-21 at 1; PX-23 at 1-2; PX-24 at 1; PX-41 at 1.

1991) (quotation marks omitted)).  Coventry cannot credibly now claim that it had an "arm's length relationship" with Lavastone when the facts are so plainly to the contrary.[7]

Back in 2010, Alan Buerger wrote to himself that "[i]f we want to game [Lavastone] we could do so on in or out of the box."  PX-524 at 2.  The evidence at trial has conclusively established that the Buergers and the companies they control did just that for years before, during, and after that admission—knowingly and willfully perpetrating a massive fraud against Lavastone to mark up policies and overcharge Lavastone for broker's fees.  In closing argument, Defendants complained that they were being vilified as "racketeers," and suggested that the victim here was somehow less deserving of justice because it is a large corporation.  To be sure, the charges leveled against these Defendants are very serious, but the record amassed at this trial amply supported them.  And there is obviously no "safe harbor" under RICO for wrongdoers simply because the target of their scheme happens to have been a large corporation and its many stakeholders.  As the victim of Defendants' massive fraud, Lavastone seeks a just remedy.  It therefore respectfully urges this Court to enter judgment in Lavastone's favor holding Defendants liable for their RICO, fraud, fiduciary breach and other offenses; to award Lavastone the damages to which it is entitled to the full extent permissible under the law; and to grant equitable relief that unwinds the parties' current relationship, relieving Lavastone of any obligation to continue to do business with the very parties who defrauded it.

## **BACKGROUND**

Defendants do not dispute that they marked up hundreds of life policies, redacted and removed purchase price information, and overcharged Lavastone for broker's fees—all without

---

[7] *See, e.g.*, PX-32 at 1; PX-2 at 1; PX-100; PX-102; PX-18 at 1; Tr. 81:15-82:2, 84:20-90:7, 102:14-20, 312:11-19, 315:13-16, 1139:24-1140:2.

ever asserting, in even one contemporaneous document, that they believed they could mark up the policies at issue.  Nor do they dispute the existence of a RICO enterprise, its operation and management by at least some of the Defendants, intent to obtain funds under the custody and control of a bank, or the use of interstate mails and wires in furtherance of the mark-up scheme, which caused Lavastone to pay more than $150 million in overcharges.

Instead, Defendants claim to have made inadvertent "mistakes" or acted in good faith, and they assert that their misconduct should be excused because Lavastone purportedly knew about the fraud.  But the overwhelming contemporaneous documentary evidence, Defendants' own actions and writings, and the testimony of *both parties'* witnesses amply proves that the mark-ups were not mere errors and that Lavastone did not know it was being defrauded.  To the extent Defendants' witnesses spun a different story at trial, that testimony cannot be credited.

## I.   Defendants Intended To Deceive Lavastone.

### A.   Defendants Knew They Were Obligated To Sell All Policies That Satisfied The Eligibility Criteria Directly To Lavastone At Cost.

Defendants "concede[] that the [OA] required that [Coventry] sell in-the-box policies to Lavastone at cost."  Dkt. 66 ("MTD Op.") at 5 n.2; *see also* MSJ Op. 4; Tr. 1519:19-23, 1551:9-1552:15, 1575:3-13, 2197:7-10.  They contend that any mark-ups on ITB policies were mere "mistakes."  Tr. 1554:17-22, 1575:3-13, 2093:4-9.  But the notion that Defendants made a "mistake" in marking up over 120 ITB policies—and pocketing $48,602,746 in gains—without ever disclosing this to Lavastone is absurd, and the contemporaneous documents confirm that.[8]

Defendants try to persuade the Court that many of these policies were not actually (or were not believed at the time to be) ITB.  They point to several factors that are not among the

---

[8]   *See* PX-1029B; PX-1002B1; *compare* PX-201 & PX-220, *with* Tr. 1574:18-1575:2; *see also* PX-296 at 12; Tr. 1636:4-8.

OA's Eligibility Criteria—such as liens, carrier concentration limits, advance rates, and the timing of POR approval—which they claim nullified Lavastone's purchase obligation.[9]  But as this Court held, the OA provides that Coventry's obligation to offer policies directly to Lavastone (and Lavastone's obligation to purchase) was triggered when a policy satisfied the enumerated Eligibility Criteria, regardless of any other possible contingencies.[10]  *See* MSJ Op. 4 ("in-the-box" refers to any policy "that met the [OA's] eligibility criteria," and therefore "had to be sold to Lavastone at cost"); *see also* JX-106 § 2.01(b), Ex. D, D-5.  Defendants' contention that they understood otherwise is not credible.  Indeed, it was apparently invented sometime after the motion to dismiss argument—when Defendants admitted that "'the contract defined a certain limited category of policies that met 13 different eligibility criteria that we did have to sell at cost and those are the so-called in-the-box,'" MTD Op. 5 n.2 (quoting Jan. 16, 2015 Tr. 6:11-13).  In

---

[9]   Nor does it make sense to treat these factors as if they were Eligibility Criteria.  The existence of a lien was irrelevant because those transactions were structured to satisfy each lien from the sale proceeds, so that policies transferred to Lavastone were not subject to liens.  Tr. 577:5-18; PX-445; DX-771 at 33; JX-3415 at 37, 44.  As to carrier concentration limits and advance rates, the OA permitted Lavastone to impose these "contingenc[ies]" if it determined there was additional risk associated with a purchase.  JX-106 § 4.01(a).  With respect to policies that met all Eligibility Criteria but for which Lavastone waited longer than 2 or 3 days to issue a POR approval, the OA did not distinguish these "deemed disapproved" policies from other ITB policies, as this Court has determined, Dkt. 129 at 5-6, and Defendants knew that Lavastone would purchase policies regardless of whether it issued the POR approval within 2-3 days.  *See* PX-90; PX-118; PX-350.

[10]   Defendants argue, *post hoc*, that certain policies lost ITB status for additional reasons, including that they were purchased by Lavastone after an amendment to the exclusivity period.  That amendment did not affect Lavastone's obligation to purchase all policies that satisfied the Eligibility Criteria until December 30, 2011, *see* JX-116; JX-117; JX-106 § 2.01(b), and no marked-up ITB policies were purchased by Lavastone after that date, *see* PX-1002B1.  Nor is the existence of a waiver determinative of whether a policy was ITB, Tr. 515:19-516:2, and policies in the grace period at the time of Coventry's acquisition did not fail the "lapse pending" eligibility criteria if a premium payment was made prior to the Escrow Release Date associated with Coventry's acquisition.  JX-106 at Ex. D-6.  And any policy that met the heightened minimum IRR sometimes imposed by Lavastone necessarily satisfied the Eligibility Criteria's minimum IRR threshold.

any event, Alan Buerger admitted that he knew Lavastone understood ITB policies to include all policies that met the Eligibility Criteria, Tr. 1762:24-1763:19, and it is undisputed that he never told Lavastone about his purported (contrary) interpretation, Tr. 1906:17-1907:12.  These admissions make clear that there was no miscommunication.  *Contra* Tr. 2839:12-23.

> **B.      Defendants' Purported Belief That They Could Mark Up POR-Approved OTB Policies Cannot Be Reconciled With The OA Or Their Own Contemporaneous Descriptions Of The Arrangement.**

While Defendants acknowledge that they knew ITB mark-ups were prohibited, they claim to have reasonably believed that the OA allowed them to mark up OTB policies, even when they had a POR approval in hand before they purchased the policy for themselves.  As this Court held, while Coventry had no obligation to *offer* an OTB policy to Lavastone, once it did so and Lavastone issued a POR approval, Coventry was prohibited from charging Lavastone more than its own cost for the policy.  MSJ Op. 8.  The OA detailed Coventry's compensation for both ITB and OTB policies,[11] *id.* at 9 n.9; JX-106 § 5.04 & Ex. D; Tr. 356:18-357:14, 1523:17-25, 1525:18-1526:6, 1558:2-9, and both parties understood that this structure was designed to align the parties' interests by incentivizing Coventry to secure policies for Lavastone at the best possible price, Tr. 81:11-23, 88:5-89:22, 91:1-10, 374:23-375:14, 768:9-770:15, 1136:15-22, 1143:2-1144:11, 1522:3-7, 1525:9-13, 1530:18-21, 1586:16-1587:1; *see also* PX-2 at 1.[12]  As Dave Fields testified, permitting mark-ups on POR-approved policies would be "[c]ompletely inconsistent" with that structure, Tr. 92:25-93:16, and would "destroy[] the whole alignment of

---

[11]  The compensation structure was not changed at any point in the parties' relationship to allow for additional compensation through a gain on sale.  Tr. 90:3-7.  *Compare* JX-30, JX-45, JX-59, JX-62, JX-75, JX-87, JX-105, JX-106, *and* JX-127.

[12]  Defendants represented to Lavastone that the parties' interests were in fact aligned, Tr. 83:25-85:23, 767:15-769:21, 1142:10-13, 1143:16-1144:15; PX-32 at 1; PX-43 at 3, and never made any representation to the contrary, Tr. 124:15-125:22, 999:7-12, 1143:21-1144:7.

interest," Tr. 132:9-133:16; *see also* Tr. 357:15-358:4 (Scherzer stating that mark-ups were "contrary to the nature of the deal").

Defendants' contemporaneous descriptions of the parties' compensation arrangement explicitly recognized that the fees it detailed were an alternative to "gains on sale."  For example, a September 2007 internal Coventry "Finance" manual expressly described Coventry's business agreement with Lavastone as a "cost plus arrangement," whereby "revenue can be generated through three pieces of the sale:  Origination Fees (Revenue), Underwriting Fees (Revenue), [and] Incentive fees."  PX-166 at 3-5.  That manual went on to describe a different type of compensation structure called the "contractually-specified sales price" arrangement.  *Id.* at 5-6.  Under that arrangement, Coventry would "immediately sell the policies at cost to LST," and then offer the policies for purchase at "a contractually specified rate of return," *i.e.*, a gain on sale.  *Id.* But as that manual acknowledged:  "There are presently no agreements to sell policies pursuant to this methodology."  *Id.* at 5.  There is no way Defendants could possibly have believed the OA permitted them to take "gain on sale" on eligible policies sold to Lavastone when their internal "Finance" manual at the time said the opposite.[13]  Alan and Reid Buerger's own notes, which

---

[13]  Defendants assert, based solely on the suspect testimony of Alan Buerger, that Coventry's 2007 "Finance" manual was supposedly a draft, and claim further, based on no record evidence whatsoever, that a different financial procedure guide, dated May 2010, was supposedly the "final."  Tr. 2849:4-5.  *Compare* PX 166, *with* DX-771.  But nothing in the 2007 document indicates that it is a draft, and DX-771 was not circulated until three years later.  Moreover, Defendants fail to note that DX-771 references "gain on sale" within a section of that 2010 document that discusses the policies Coventry "will hold for its own account or later sell"— meaning Investment Policies not at issue here, for which a "gain on sale" was permitted.  DX-771 at 17 (describing "Coventry Entity Life Settlements" as the "[o]ccasion[s]" when "Coventry purchases policies that it will hold for its own account or later sell"); *see also id.* at 19-22 (cited in Defendants' closing discussing the same sales of "Coventry Entity Life Settlements to CHARTIS").  In contrast, that same 2010 document elsewhere describes the fees associated with Coventry's "[o]riginations" of "eligible" policies sold to Chartis (a/k/a Lavastone) under the heading, "CHARTIS Life Settlements"—meaning policies for which Coventry obtained

make clear that that the OA's compensation structure was based on origination and incentive fees and make no mention of "gain on sale," confirm this point.  *See* PX-1379 at 3 (Reid's notes describing compensation structure as "origin fee and incentive fee"); PX-474 at 2 ("Move from origination and incentive fee to set IRR"); PX-479 (same); *see also* PX-489 at 2 ("change fee to margin"); PX-482 at 2 ("switch from o-fee structure to buy at set IRR").[14]

As part of their effort to convince the Court that they had a contrary view all along, Defendants claim that they had no firm expectation Lavastone would purchase POR-approved policies because the POR was merely an "indication of interest."  Tr. 1662:21-24, 2025:9-16. That testimony is contrary to the unambiguous terms of the OA.  *See* MSJ Op. 5 n.4, 8.  It also is contradicted by abundant contemporaneous documentary evidence from Defendants.  *See, e.g.*, PX-440 at 2 (Coventry employee explaining that "once a POR is approved, it cannot be later declined until it expires"); PX-350 ("much more risky for us to put offers out on policies before getting a POR"); PX-209 (POR serves to "lock in pricing"); PX-213 (same); PX-208 (POR "lock[s] in economics").  Similarly, Lavastone's current and former employees testified uniformly that a POR approval represented Lavastone's binding purchase commitment.[15]  And

---

Lavastone's POR approval in advance of purchase from the original policyholder.  While providing a very specific description of compensation in that circumstance, that section of the document says nothing about permitting any "gain on sale" in such transactions.  *Id*. at 14-16.

[14]  Alan Buerger himself testified that a "contractually-specified sales price" arrangement "would be like the Ritchie deal," under which Coventry did not receive an origination or incentive fee.  Tr. 1616:15-1617:18.  Alan also testified that Lavastone and Coventry considered changing their agreement to a Ritchie-like model, but ultimately rejected the idea.  Tr. 1620:17-23.  In contrast, Reid Buerger testified in the *Ritchie* trial that Coventry sold policies to Lavastone at the same price it paid to acquire the policies.  Tr. 2091:13-2092:6.

[15]  *See* Tr. 97:5-99:2, 146:17-18, 284:15-19, 336:14-337:13, 344:10-11, 407:22-25, 771:1-773:3, 785:17-23, 855:22-23, 1056:11-15, 1059:21-25, 1169:10-13, 1214:14-18, 1281:18-23, 2607:18-2608:5; JX-11006 at 65:14-15, 115:13-116:7, 118:23-119:4, 119:15-20, 120:12-16.  *See also* PX-556 at 3; PX-557 at 1; Tr. 1658:14-22.

Alan Buerger knew that Coventry bore the "entire risk" of purchase if it did "not have [a] POR for [an] out of box," PX-524; *see also* Tr. 1664:19-1666:13, 1667:11-15, and he directed Coventry to keep track of POR approval dates, PX-296; Tr. 1656:1-7; *contra* Tr. 2843:22-23 (asserting "miscommunication" between the parties about import of POR approval).

Defendants also attempt to justify mark-ups based on Lavastone's purported desire for greater policy volume. But Lavastone consistently told the Buergers that its priority was to purchase policies at the best price possible, *see infra* pp. 24-25, and Alan could not recall anyone at Lavastone telling him to prioritize volume at the expense of the lowest possible price. Tr. 1588:16-1589:10. Bill Taylor's contemporaneous notes and Dave Beckelman's trial testimony confirm that they understood that Lavastone's priority was "attractive yields," "not chasing production." PX-529; *see also* Tr. 2614:16-17 ("[W]e didn't want to chase yields and make a mistake for volume sake"). On the other hand, Coventry was sorely in need of greater volume. In 2006, it had other institutional investor clients with "gain on sale" arrangements, but between 2007 and 2010, when most mark-ups occurred, those relationships had ended and Coventry's only major institutional investor was Lavastone. Tr. 1884:19-24; PX-627 at 12-22; *but see* Tr. 2102:25-2103:20 (Reid claiming affiliate LST was an "institutional investor" in Coventry, and admitting there were no others during that time period).

C.     **Defendants Used Misleading Sales Documents To Perpetrate Their Scheme.**

In order to conceal their scheme, Defendants made hundreds of misrepresentations in the sales documents, foreclosing any claim that they believed their conduct was permissible. Each of these documents—the DSs, Funding Certifications ("FCs"), and acknowledgment emails—hid the fact that Defendants were marking up policies that Coventry acquired after obtaining

13

Lavastone's purchase commitment.[16]  The Buergers supervised each transaction and, at trial, provided contrived answers in trying to explain away these clearly misleading and deceptive documents.  Tr. 2005:19-24, 2006:19-20, 2439:7-21.

The DS I set forth all of the amounts to be paid in connection with the purchase of a policy (including fees to the Originator and FA and the price paid to the Seller), and the FA relied on it to disburse funds.  JX-106 §5.04 & Ex. D, D-1, D-5, D-9, D-19; JX-11003 at 315:3-14.  It was misleading in several respects.  At the top of each DS I, the "Purchase Price" was listed a few lines below the name of the "Insured."  *See, e.g.*, JX-8471 at 5.  At the bottom of the page, the same "Purchase Price" was listed again, under the heading, "Dollar Amount Payable to LST."  *Id.*  DS I thus misrepresented that the "Purchase Price" Lavastone was paying to LST was the same "Purchase Price" that had been paid to the "Insured" (or an entity affiliated with the insured like a trust).[17]  DS I also misrepresented the "Total Amount Payable to Originator" by enumerating fees paid to Coventry, but excluding the "gain on sale" that it concealed in the total acquisition cost.  *See* JX-8471 at 5; PX-1064 at 3; Tr. 2003:9-15.  Finally, DS I misrepresented the amount of "Broker's Fees" by listing, in many cases, an amount other than that Coventry had paid in connection with the policy.  *See, e.g.*, JX-5844; JX-5847; JX-5846; Tr. 612:1-614:25.

The FCs, which were created by Coventry at the behest of the FAs to verify payment to the original seller, *see* DX-88A at 2; PX-862, also were materially misleading.  The FCs certified

---

[16]  Before Lavastone's purchase of marked-up policies, Coventry sent to Lavastone's FA a DS I and DS II, which were attached to and referenced in the Tripartite Entitlement Order, and an SDP, which included an FC.  *See, e.g.*, JX-8471; JX-8492 at 84; Tr. 793:19-24.  Coventry also sent the DS I and DS II directly to Lavastone.  *See* Tr. 793:19-24; JX-11001 at 125:16-194.  Starting in 2008, Coventry sent an "acknowledgment email" to Lavastone when it transferred a policy from an LST entity, which Lavastone then acknowledged.  *See* JX-8477; JX-11; Tr. 2406:10-2408:8.

[17]  *See* Tr. 522:13-19, 567:11-568:2, 570:13-21; 2003:22-2004:2; JX-8472 at 4; PX-1064 at 3.

14

that "the Purchase Price to the Seller ha[d] been disbursed as directed," and that "the amounts . . . listed below [were] correct and complete."  *See, e.g.*, JX-8492 at 84.  However, the amount "listed below" was *not* the same price that had been paid to the "Seller," *see* JX-8472 at 4— which the FCs expressly defined as the *underlying seller*—but rather the marked-up price that Lavastone was paying to an LST entity.  *See* JX-8492 at 84; Tr. 522:13-19, 567:11-568:2, 571:1-10; *see also* PX-1064 at 3.  And the FCs were doubly misleading when read in conjunction with DS II, which triggered release of Lavastone's payment to the seller.  The FCs certified the correctness and completeness of the amounts on the DS II.  *See, e.g.*, JX-8492 at 84.  In turn, DS II listed the "Purchase Price Payable to *Seller*."  *See, e.g.*, JX-8471 at 7.  However, that price was not the price paid to the underlying seller, *see* JX-8472 at 4, as defined in the FCs, but rather the marked-up price that Lavastone was paying to an LST entity.  *See* JX-8471 at 7; Tr. 522:13-19, 567:11-568:2, 570:4-12; *see also* PX-1064 at 2.

Finally, Defendants used misleading acknowledgment emails to hide their self-dealing. These emails listed the "Purchase Price" directly below the policyholder's name, *see, e.g.*, JX-8477, thus falsely suggesting that the "Purchase Price" listed was the same price paid to the policyholder, when the policyholder had been paid a materially lower price.  *See* JX-8472 at 4; PX-1064 at 2; Tr. 522:13-19, 567:11-568:2.[18]

**D.    Defendants Took Advantage Of A Conversation Between Alan Buerger And Dave Fields About A Small Subset Of Policies To Conceal And Expand Their Mark-Ups Of POR-Approved Policies.**

Dave Fields testified that Alan Buerger approached him in late 2007 about "a handful of

---

[18] Defendants either created the template or had principal control in drafting the sales documents they used when transferring policies to Lavastone from LST.  PX-862; JX-11; Tr. 2406:10-2408:8, 2002:6-16, 2004:3-10.  Even assuming Lavastone had some hand in the process—a disputed point—that does not make the documents any less misleading.  Defendants indisputably put misleading information into the documents before they were sent to the FAs or Lavastone.

policies that he wanted to be able to transfer over to [Lavastone] at an amount that was different than they had acquired the policies for from the seller, that they had held onto . . . for a while." Tr. 131:7-12.  Alan assured Fields that Defendants had purchased and held these policies and were "at risk [for] these policies for a considerable period of time," and that "the amounts paid . . . to the original seller" were therefore no longer relevant (meaning Defendants had paid costs to keep the policies in force and "had some risk").  Tr. 133:21-25, 192:20-25, 200:16-202:14. Alan's assurance confirmed to Fields that Coventry had acquired and held these policies on its books *before* obtaining Lavastone's POR approval.  Tr. 131:13-133:16, 254:17-24.  And it makes clear that Alan did *not* in fact believe at the time that Defendants were permitted to mark up OTB policies at will, because Alan would have no reason to seek permission if he believed Coventry was always permitted to take a gain on sale.  *See* Tr. 80:24-81:10, 83:22-85:17.  Alan told Fields that in this situation, he did not think the amount Coventry paid to the original seller was relevant to the later sale to Lavastone, and asked to withhold those amounts.  Tr. 133:17-134:13, 1714:12-16, 1720:10-13.  Fields agreed to buy this narrow group of policies at a mark-up, without disclosure of Coventry's purchase price.[19]

Following this conversation, Coventry dramatically increased the sales to Lavastone of marked-up ITB and POR-approved OTB policies, PX-1042B, using the conversation as cover when confronted with a price discrepancy.  In fact, Defendants almost immediately began to unilaterally remove Exhibits As from all LST sales.  *See supra* p. 17 n.20.  Taylor—at Fields'

---

[19]  Fields's memory of the 2007 conversation is corroborated by Jim Dodaro's 2008 e-mails noting that Alan went to Fields about a set of policies in "December 2007."  PX-337 at 1; PX-308 at 1.  In addition, Alan admitted that he recalled speaking to Fields before the 2008 audit.  Tr. 1714:24-1715:13.  He also testified that he had a conversation with Fields during or after the 2008 audit, Tr. 1719:24-1720:3, but Fields did not recall any conversations during that audit, Tr. 135:22-137:3, 259:8-10.

request—followed up with Reid Buerger about a policy identified in the 2008 audit as one for which Lavastone paid more than Coventry had paid the underlying seller (policy 30889).  PX-308 at 1; JX-12 at 3.  Reid exchanged emails about the policy with Coventry employee Jim Dodaro, and then forwarded the emails to Alan saying, "Let's discuss."  PX-308 at 1.  After two months, Dodaro reassured Lavastone (at Reid's behest) that Coventry held the policy on risk and that it was part of the "block of policies" about which Alan had gone to Fields "in late December 2007."  PX-337 at 1.  In fact, the policy was one Coventry had purchased and marked up having never assumed the risk of ownership.  PX-1002B1 at 1.

### E. Defendants Unilaterally Removed Or Redacted Purchase Price Information In Order To Conceal The Mark-Ups.

In spring 2008, at Reid Buerger's direction and with Alan and Krista Buerger's knowledge, Coventry unilaterally began withholding Exhibit As—which contained the purchase price paid by Coventry to the underlying seller—from SDPs sent to Lavastone's Fiscal Agent ("FA") for *all* life policies sold from LST to Lavastone.[20]  Several months later, Defendants redacted the purchase price paid to the underlying seller from the files for sample policies reviewed during Lavastone's 2008 audit of Coventry, even though only some of those policies fell within the scope of Fields's limited authorization.  *See* PX-237 at 1; PX-241 at 1; Tr. 2034:3-8, 2159:8-13, 2386:20-2387:15; *compare* JX-10 at 4, *with* PX-740.  On July 2, 2008, in response to auditors' queries, Krista Buerger notified Alan and Reid, in an email marked "High" importance, that Lavastone "[didn't] understand why they [couldn't] see the dollar amounts from an original sale."  PX-247 at 2.  Reid eventually responded to Krista and Alan that he could "either call Bill and tell him no or we can have krista deliver [sic] message," to which Alan

---

[20]  Tr. 2157:21-2158:10; *see also* Tr. 1707:13-19, 1723:19-21, 2028:17-23, 2376:3-5; PX-567; PX-279; PX-417; PX-359 at 1.

responded, "Reid should call Bill."  PX-247 at 1; Tr. 1712:16-1714:6.  Coventry never made the

original purchase price available to Lavastone during the audit.  Tr. 1714:7-11.  And when

Lavastone reached out to Coventry after deciphering the original purchase price on a policy from

a Funding Method Request ("FMR"), Neal Jacobs forwarded the email to Reid and told him that

the responsible Coventry employee would be "talking to her team about redacting FMR[s] for

LST to [Lavastone] cases if it lists the amount going to the seller" going forward.  PX-445 at 2.[21]

### F.    In Response To Lavastone's Inquiries, Defendants Repeatedly Offered False Assurances And Stonewalled Rather Than Disclosing The Mark-Ups.

The extensive record in this case is notably devoid of a single contemporaneous plain

statement that the OA entitled Coventry to mark up OTB policies at will.  Indeed, Coventry said

nothing about what it now trumpets as its "good faith belief" even in the face of specific

inquiries from Lavastone about price discrepancies.  In each instance, Coventry either provided

an excuse for the mark-up or simply ignored Lavastone's repeated requests for information.

For example, Bill Taylor and Connie Anderson both testified that when Taylor asked

Reid about a price discrepancy, Reid indicated that the mark-up was a "mistake"—an

explanation that Taylor accepted.  Tr. 1245:3-15, 994:3-8, 995:2-8; *cf.* Tr. 2093:4-9.  And from

December 2009 through April 2010, Anderson inquired repeatedly about a marked-up policy that

Coventry purchased after receiving Lavastone's POR approval (policy 43977), with no response

from Coventry.  PX-445; PX-442; PX-457; PX-487; PX-499; PX-1002B1 at 2.  In May 2010,

she enlisted Taylor, who also emailed Coventry, to no avail.  PX-500.  After Taylor assured her

---

[21]  When Lavastone later requested certain Exhibit As, Defendants directed Lavastone to the FA, even though Defendants knew they had withheld the Exhibit As from the SDP sent to the FA. PX-279 ("We don't provide an Exhibit A to US Bank, so they won't be able to obtain that, and I expect that they might be calling us back on that one."); PX-417 ("These were transferred policies, so I'm not authorized to send [the Exhibit As].").

that he had received a satisfactory response from Coventry, she stopped pursuing the issue.  Tr. 841:21-842:6, 995:2-8.  Likewise, in 2011, when Anderson asked for the purchase date and name of the underlying seller for certain policies, PX-551 at 2, Defendants stonewalled while they gathered information about whether the policies had mark-ups and in what amount—despite Anderson having only asked for the purchase dates and names of the underlying sellers, PX-549; PX-550; PX-546; PX-547; PX-551; PX-553; JX-19—and then reviewed the response they had given Taylor and Anderson about 43977 when they had previously inquired about it, PX-548.  Jacobs emailed Alan to ask whether he could send Lavastone the requested information.  *Id.* at 1.  Alan responded with an email containing only his phone number, *id.*; and Jacobs delayed in sending Lavastone the data and did not provide Anderson with the purchase price information he had collected.  *Compare* JX-19 at 1 *with* PX-551 at 1; *see also* Tr. 1737:6-1752:13.

Even worse, when AIG's Managing General Agent audit group ("MGA Audit") asked Coventry—at Anderson's request—to see the Exhibit As so they could verify the purchase price paid to the policyholder on certain policies selected for the 2012 audit, Peggy Lyon lied, telling them that they could verify the purchase prices by reviewing the acknowledgment e-mails.  PX-663.  According to Lyon, the auditors were "fine with that explanation and this afternoon they told me that they were able to reconcile the purchase prices on all those cases."  *Id.*

Defendants also stonewalled Anderson in 2012 and 2013 when she discovered, while looking into policies that were associated with three indicted brokers, that Defendants had removed or redacted the purchase price information for several ITB policies.  Tr. 876:25-878:1, 879:12-885:13, 917:9-16; PX-643.  From December 2012 through March 2013, Anderson asked Coventry for the Exhibit As for those policies; Defendants finally told Lavastone that Anderson could review the policy files at Coventry's offices in April 2013.  Tr. 888:19-891:23; DX-441;

19

JX-22.  When she saw them, Anderson discovered that Defendants had marked up the purchase price on those policies and that four policies had IB interests in favor of the Healthcare Education Trust ("HET").  Tr. 900:8-12, 901:13-21.  The lengths to which Defendants went to conceal their mark-up scheme contradict their retrospective assertion of "good faith."

## II.    Lavastone Did Not Know And Had No Basis For Knowing About The Mark-Ups.

Defendants insist that Lavastone knew about their fraud, but the evidence forecloses that contention.  Defendants cannot point to any contemporaneous documents in which they told anyone at Lavastone that mark-ups on POR-approved OTB policies were permitted, nor any document establishing that anyone at Lavastone understood such mark-ups were occurring—a point that all of Defendants' key witnesses (Alan, Reid, and Taylor) conceded at trial.[22]  Given that absence, any contrary testimony lacks credibility.  Defendants also fail to explain why, if they thought Lavastone knew about the mark-ups, Defendants continued to conceal them.  Indeed, Reid Buerger expressly conceded that Defendants hid the mark-ups because if they had been revealed, Lavastone would have been "more inclined to renegotiate."  Tr. 2029:14.

### A.    The Sale Documentation Packages Did Not Alert Lavastone To Mark-Ups.

Defendants claim that Lavastone knew about or should have ferreted out their scheme by comparing documents occasionally buried within the voluminous SDPs that were sent to the FAs.  But the FAs only reviewed the SDP for specific data points to complete an Eligibility Certificate and "a documentation checklist," which "ensure[d] that all of the documents that were supposed to be included in the [SDP] had actually been delivered and purportedly signed by the appropriate party."  Tr. 793:25-794:2-6; *see also* PX-411; Tr. 797:1-798:5.  Neither document

---

[22]  Tr. 1598:7-1599:5, 2152:18-23, 2155:1-2157:13, 2164:7-19, 2169:2-11, 2176:12-18, 2184:20-24, 2239:2-7; *see also* Tr. 1083:12-20, 1206:6-11.

required the FAs to check that the Exhibit A was included in the SDP, compare the purchase

price paid to the underlying seller with the price Lavastone paid, or compare the POR approval

date with the date on which Coventry acquired the policy.  PX-415 at 1; PX-411; Tr. 795:15-

19.[23]  Indeed, the FAs were not required "to make any investigation into the facts or matters

stated in any resolution, certificate, statement, instruction, opinion, report, notice, request,

direction, consent, order, bond, note or other paper document."  JX-58 § 4.1(n); JX-76 § 4.1(n).

Defendants knew that the scope of the FAs' review was limited.  Tr. 2006:14-21; PX-

411.  Reid agreed that the FAs used a checklist to confirm that certain documents were included

in the SDP and acknowledged that the FAs checked only specified data.  Tr. 2006:14-21.  He

concededly had no expectation that the FAs would examine all of the details included in the

SDP, Tr. 2006:14-21, which underscores just how calculated the mark-up scheme was.

### B.    The Annual Audits Were Limited In Scope And Did Not Reveal Defendants' Mark-Up Scheme.

Defendants maintain that Lavastone's annual audits[24] should have alerted them to the

scheme—a position as far-fetched as their insistence that the FAs should have combed through

documents comparing purchase prices.  Only the 2008 audit identified any discrepancies

---

[23]  There is no basis to claim the FAs should have uncovered the mark-up scheme through the
limited number of transactions in which the underlying purchase price could have theoretically
been calculated from information on the FMR.  Reid admitted that he "hadn't focused on" the
FMR, and had no reason to dispute the assertion that if he "didn't focus on it, [there was] no
reason why [the FAs] would focus on it."  Tr. 2032:22-2033:9.  Reid also did not dispute that to
ascertain the purchase price paid to the policyholder, the FAs would have had to add multiple
numbers together and then compare that total to the purchase price on the DS.  Tr. 2008:11-18.

[24]  MGA Audit conducted annual audits of Coventry and the FAs that were limited in scope.
Tr. 361:5-362:16.  As a general matter, the auditors had only a limited understanding of the
contracts between Coventry and Lavastone, JX-11004 at 113:15-114:14, and the life settlement
business, JX-1104 at 13:3-5, and their review of policy files was limited to the information
necessary to complete the audit worksheets, which did not require review of the Exhibit A or
comparisons of the price that Coventry paid to the underlying seller with the price Lavastone
paid.  See JX-11004 at 59:25-63:2; JX-11005 at 144:20-145:13; DX-646.

21

between the purchase prices paid to underlying sellers and the prices paid by Lavastone.  *See, e.g.*, DX-88A (2007 U.S. Bank); JX-12 (2008 Coventry First); DX-75 (2009 Coventry First); DX-187B (2009 FA); DX-107 (2010 FA).  And Defendants responded with misleading explanations, which gave Lavastone no reason whatsoever to suspect fraud.

**2007 USB audit**.  During the 2007 U.S. Bank audit, auditors noted that Lavastone had paid LST for some sales and recommended that the FA verify that the original seller had been "paid correctly and timely by Coventry."  DX-88A at 2.  The FA responded that Coventry so certified in the FC.  *Id.* at 2; Tr. 796:18-23; *supra* pp. 14-15.  This in no way suggested that LST was marking up policies for which Lavastone had previously issued a POR approval.  DX-88A.

**2008 Coventry audit**.  During the 2008 Coventry audit, MGA Audit noted that the purchase price paid to the policyholder had been redacted by Coventry for fourteen policies in the auditors' sample.  JX-12 at 3; Tr. 2033:19-2034:2.  The original purchase price paid by Coventry was legible for one policy, and was lower than the price paid by Lavastone to Coventry.  JX-12 at 3 (policy 30889).[25]  With regard to these 14 policies, the final audit report noted that they "were initially purchased by Coventry in a life settlement transaction, and then subsequently offered and resold to AIG."  *Id.* at 3.  Fields understood these 14 policies to be "the handful of policies that [he] had spoken with Alan Buerger about in 2007," Tr. 191:21-192:2, and Risk Finance responded accordingly to the auditors, JX-12 at 3-4.  As memorialized in the audit report, Fields agreed to allow Coventry not to provide the purchase price for those policies because "Coventry purchases and holds each of these policies," and "must pay premiums and fees in order to keep these policies in force," so "just comparing the two seller amounts is not a

---

[25] The auditors were also eventually able to identify two price discrepancies—one in Coventry's favor and one in Lavastone's favor—both associated with policies that had been held by Coventry for over 90 days, *see* DX-83; *see also* Tr. 264:2-10.

fair comparison." JX-12 at 4; *see also* Tr. 200:24-201:19. This statement, which according to Defendants' counsel was drafted by now-Miravast employee Ed O'Leary, Tr. 56:9-22, provided an entirely innocuous reason for any price discrepancies.[26] It certainly gave Lavastone *no* reason to believe Coventry was engaged in a widespread scheme to mark up POR-approved policies.

The auditors also suggested that the parties implement a procedure by which Coventry "notifies and discloses to AIG the amounts paid to the seller for all policies purchased by them prior to reselling the policies to AIG." JX-12 at 3. Following the audit, Defendants created and sent the "acknowledgment emails" to Lavastone, which they made sure was "not an approval process per se, but more of a documentation process." JX-11; Tr. 2406:10-2408:8. Defendants used these emails to further mislead Lavastone and hide their mark-ups. *See supra* p. 15.

**2007 and 2009 Coventry audits**. The audits did not warn Lavastone about Coventry's fraudulent broker's fee overcharges, either. The 2007 preliminary audit findings identified 14 instances in which the broker's fee reported on the DS was not consistent with the amount paid. DX-110 at 4. While looking into the audit findings, Krista Buerger recognized that Coventry's prepaid account was a "mess" because, rather than tying debits and credits for each policy Lavastone purchased, everything was "dumped" into one slush fund account. PX-140 at 1.[27] This meant, for example, that there was "no way to designate that a $50k payment from prepaid was made up of $25k from case A, and $25k from case B." *Id.*; *see also* PX-141; Tr. 2492:4-11. Yet she gave the auditors documents purporting to show that the overcharges were used to recover prepaid broker compensation where Coventry had "advanced the difference." DX-110 at

---

[26] While O'Leary was on Defendants' witness list, they opted not to call him at trial.

[27] As the "point person" for the audits, Krista Buerger had considerable experience coordinating and responding to Lavastone's auditors on Coventry's behalf. *See, e.g.*, Tr. 2310:19-2311:3, 2313:17-2314:4, 2398:25-2399:3, 2393:18-25, 2487:17-20.

7; PX-145; Tr. 2492:21-2495:8.  Nowhere did she disclose that Coventry was charging wholly unrelated expenses—including "bonuses" per Reid—to its prepaid account.

The 2009 preliminary audit findings indicated that in five cases, the auditors "were unable to reconcile the amount paid to the broker per the pricing sheet with the actual check paid to the broker."  DX-84 at 2.  Rather than being forthright about the nature of Coventry's "prepaid account" and informing Lavastone that it could not be reconciled, Krista and Reid Buerger debated how to describe the account, ultimately scrubbing references to "prepaid" in favor of the more sanitized "compensation previously paid."  PX-422; PX-426; PX-427; Tr. 2484:19-2486:5, 2496:1-4.  Again, Krista Buerger explained away the discrepancies, telling the auditors they were attributable to payments made for multiple policies and in one instance, to recovery of "compensation previously paid."  DX-121 at 3.  Nothing in her response suggested Coventry was in fact maintaining a slush fund—let alone profiting from overcharges.  Instead, she repeatedly assured Lavastone's auditors that broker's fee payments were being reconciled on a monthly basis.  *See* JX-10 at 7; DX-160 at 6; Tr. 2476:13-2480:25.

### C.    Lavastone's Witnesses Confirmed That They Did Not Know About The Mark-Up Scheme.

Lavastone's witnesses uniformly testified that they were not aware that Coventry was marking up POR-approved policies,[28] or profiting from broker's fees reimbursements, Tr. 210:23-211:6, 360:15-17, 789:16-20.  That testimony is confirmed by evidence that Lavastone's employees continually believed that Defendants were negotiating on Lavastone's behalf for the lowest price possible, and Defendants knew that to be the case and never told anyone at Lavastone otherwise.  PX-18; PX-21; PX-23; PX-24; PX-30; PX-32; PX-36; PX-40; PX-41; PX-

---

[28]  Tr. 148:7-12, 175:10-14, 178:22-179:2, 180:3-8, 381:12-17, 357:15-23, 358:20-359:9, 374:17-375:14, 902:23-903:3, 783:10-785:12, 1004:20-1005:10; JX-11006 at 277:20-278:4.

259; PX-395; Tr. 90:8-25, 124:24-126:6, 347:21-349:4, 1172:22-1173:1, 1586:16-20.[29]

### D. Contrary Testimony From Defense Witnesses Lacks Any Credibility.

In the face of overwhelming evidence that Lavastone did not know—and had no reason

to suspect—that Defendants were marking up POR-approved OTB policies, Defendants rely on

the testimony of Bill Taylor, Alan Buerger, Reid Buerger, and Dave Beckelman. Much of their

testimony is directly undermined by contemporaneous documents, and none of it shows

Lavastone knew about Defendants' mark-up scheme.

*Bill Taylor*. Although Taylor conceded that no one at Coventry ever told him directly

that Defendants were marking up POR-approved policies, he nonetheless testified that he

"knew" Defendants were doing so based on two alleged conversations with Reid Buerger.[30]

Tr. 1065:22-1068:14. As was evident at trial, Taylor has every reason to ally himself with the

Buergers, on whom he depends for his livelihood.[31] And his testimony was flatly contradicted by

his own contemporaneous statements. In 2008, Taylor asked Reid about a policy (30889) that

Defendants had sold to Lavastone after "holding it for only 28 days," PX-308 at 1, and in 2010,

---

[29] Lavastone employees believed Coventry and its affiliates could—and did—purchase policies for their inventory *before obtaining* a POR approval, and later resell them to Lavastone at a price reflecting Coventry's additional costs and risk. *See, e.g.*, Tr. 428:1-10, 8998-9, 899:19-25.

[30] Taylor did not document these alleged conversations concerning a key aspect of the parties' business relationship, despite his admittedly routine practice of documenting "dozens and dozens" of conversations with Reid Buerger. Tr. 1083:12-20, 1087:18-1088:9.

[31] Taylor owns a 7.5% equity interest in Reid's company, Miravast, Tr. 1023:20-21, and he reports to Reid, Tr. 1010:12-14; PX-1317 at 1. In fact, Reid loaned Taylor the money to purchase that equity interest, Tr. 1042:23-1043:24, 1045:1-5; PX-696 at 1, and currently pays Taylor's $450,000-per-year salary, Tr. 1023:3-11, and provided funding to Miravast from a multi-million dollar credit line the day before Taylor testified, Tr. 1020:17-1021:3, 2232:17-2233:22. Remarkably, Taylor admitted that he was unfamiliar with the contents of his sworn declaration because Josh May, counsel for both Coventry and Miravast, drafted it. Tr. 1248:6-1250:16. Indeed, Taylor admitted that he only knew certain information in his declaration "[b]ecause Josh [May] or somebody told me" about it in connection with this litigation. Tr. 1252:8-1253:2.

Taylor asked Reid and Alan about a mark-up on another policy (43977) that Defendants had sold to Lavastone just one month after acquiring it, commenting "I suspect it was just a mistake." PX-499 at 1.  In 2011, Taylor was even more explicit, telling Anderson that mark-ups on POR-approved policies "can't happen" under the OA.  PX-572 at 1; *see also* Tr. 1214:19-24, 1218:9-16, 1369:22-25.  None of these communications would make *any* sense if he believed Coventry could mark up policies at will.  Finally, Taylor's testimony about the number, timing, and substance of his purported conversations with Reid was riddled with inconsistencies, which is reason enough to discredit it.  Tr. 1061:23-1062:11, 1063:16-1064:8, 1068:15-1069:3, 1103:7-1104:25, 1105:8-23 (describing two conversations with Reid despite prior testimony that only one conversation occurred and a declaration that did not mention any conversation).[32]

*Alan Buerger*.  Alan conceded that he never told Dave Fields Defendants were marking up ITB or POR-approved OTB policies.  *See* Tr. 1598:19-1599:5,1719:12-24.  The contemporaneous documents suggest that this omission was intentional.  For example, Alan clearly knew that it was essential to have a POR approval in advance of Coventry's acquisition of a policy.  In his own 2010 notes, he wrote that "if [we] do not have POR for out of box, we bear entire risk."  PX-524 at 2.  He also wrote that "[i]f we want to game them we could do so on in or out of the box."  *Id.*  In fact, Defendants were doing just that.

*Reid Buerger*.  Reid's testimony that he discussed aspects of the mark-up scheme in no fewer than seven conversations with Lavastone employees is directly inconsistent with the

---

[32]  Even if Taylor had known about the mark-ups, he lacked authority to approve them, Tr. 174:24-175:9, 287:19-288:11, 379:12-22, 381:7-11, 1352:16-19, 1137:12-14, and he admitted that he never told Fields that he purportedly believed Coventry could mark up POR-approved OTB policies, Tr. 1084:3-1085:4, 1137:12-14.  Defendants were on notice that Taylor did not have authority to change Coventry's compensation terms.  *See* PX-25 at 1-2; PX-28 at 1; PX-29; PX-43 at 1; PX-45; PX-57 at 1; PX-58; PX-73; PX-211.

testimony of other witnesses (including Taylor), contradicted by contemporaneous documents, and cannot be credited.[33]  Reid testified that he had multiple conversations with Taylor in 2006, 2008, and 2010, in which he suggested that Coventry took a "gain on sale" on OTB policies sold to Lavastone from Coventry's inventory—including policies for which Coventry already had Lavastone's POR approval.  *See, e.g.*, Tr. 2026:13-2028:7, 2035:5-2036:12, 2041:5-2042:23, 2047:4-2049:17.  He also testified that he spoke with Anderson in 2009 about Coventry's practice of marking up POR-approved policies and that she "thanked" him for the information.  Tr. 2176:19-21:78:9.  But Taylor and Anderson's documented beliefs, as late as 2011, that mark-ups were *not* allowed on POR-approved OTB policies make clear that Reid never suggested, let alone clearly informed them of, any contrary view.  PX-572 at 1; PX-308 at 1; PX-445 at 2; PX-487 at 1; PX-500 at 1; PX-444 at 1; PX-259 at 1; PX-462 at 1; PX-504.  Indeed, Reid had no explanation for why Taylor and Anderson continued to inquire about a specific mark-up (on policy 43977) for months after he allegedly told them that Coventry could mark up POR-approved OTB policies.  *See* PX-444 at 1; PX-457 at 1; PX-459; PX-487 at 1; PX-500 at 1.

Critically, although Reid plainly sought to document business decisions to avoid "misunderstanding[s],[34] he could not point to documentation of any of these alleged conversations.  Tr. 2246:4-12.  There *is* documentation, however, of Taylor and Anderson's

---

[33]  Reid's intransigent demeanor on the stand confirms that his testimony should not be credited. For example, when confronted with a document including comments that he wrote regarding a due diligence inquiry that failed to mention "gain on sale" as part of Coventry's compensation, Reid first testified that he did not think the comments were his.  Tr. 2117:4-22.  Only after Alan and Krista Buerger were eliminated as authors and it was established that the timing of the relevant email made it virtually impossible for the comments to have been added by someone else did Reid admit they were his.  *See* PX-1379 at 3; PX-451; PX-1382 at 1; Tr. 2120:16-2122:17, 2194:22-2195:4.

[34]  For example, Reid asked Marty Scherzer for a written amendment to the OA's non-solicitation provision to cover Lavastone employees who joined Miravast despite the fact that the non-solicitation provision arguably did not affect Miravast.  Tr. 2148:19-2149:17.

consistent understanding that mark-ups were *not permitted*.  *See, e.g.*, PX-572; PX-500 at 1.

 ***Dave Beckelman***.  Beckelman—another witness now employed by Miravast and allied with the Buergers[35]—admitted at trial that he never had any personal knowledge, while at Lavastone or thereafter, that Coventry marked up POR-approved policies.  Tr. 2615:2-12. Although he claimed that Anderson brought marked-up policies to his attention in 2010 (which he was "surprised" to learn about), Tr. 2558:6-2559:7, he did not recall essential details about that alleged conversation, and he agreed with the Court that he was "reconstructing" its details. Tr. 2594:12-2599:13.  In sum, after months of discovery and trial, overwhelming evidence confirms that Defendants successfully concealed their illicit mark-ups on POR-approved policies, broker's fee overcharges, and IB interests from Lavastone until 2013.

## ARGUMENT

 In covertly marking up hundreds of policies and pocketing the difference, Defendants violated RICO, committed fraud under New York law, breached their fiduciary duties and the parties' contract, and were unjustly enriched at Lavastone's expense.  This Court should find Defendants liable, award damages and disgorgement, and unwind the parties' relationship.

**I.**   **Defendants Schemed To Defraud Lavastone And To Obtain Bank Property Under False Pretenses, And Then Laundered The Profits, In Violation Of RICO.**

 A preponderance of the evidence confirms that Defendants participated in "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity," *Salinas v. United States*, 522 U.S. 52, 62 (1997), thereby injuring Lavastone in its business and property, 18 U.S.C. § 1964(c); *see, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 568 (S.D.N.Y. 2014).

---

[35]  Beckelman admitted that he did not draft his declaration, allowed Alan Buerger to "mark up a draft," did not review any documents before signing the declaration, and was uncertain about details in his declaration but did not reach out to anyone at Lavastone to verify his account. Tr. 2578:21-23, 2593:9-17, 2594:17-2599:13.

Defendants committed thousands of acts of wire, mail, and bank fraud and money laundering, over many years, through the coordinated activities of the Buergers and their affiliated entities. The Court should hold them liable under RICO.

> **A.  Defendants Conducted The Enterprise By Participating In Its Operation Or Management.**

A RICO "enterprise" includes any "group of individuals," with a common "purpose, relationships among [its members], and longevity sufficient to permit [them] to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 944-46 (2009).  Here, the enterprise consists of the Buergers and their affiliated entities, who coordinated for more than a decade to build and profit from their life settlement business.  *See, e.g.*, ASF ¶¶ 5-48; JX-186.  Nothing more is required.  *See Buyers & Renters United to Save Harlem v. Pinnacle Grp. N.Y.*, 575 F. Supp. 2d 499, 502-03, 509-12 (S.D.N.Y. 2008).[36]

Each Defendant participated in the enterprise's "operation or management" by playing "some part in directing [its] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Alan Buerger was Chairman, CEO, and Treasurer of Coventry, CEO and Manager of LST, and a Director of Montgomery, *see* ASF ¶¶ 9-10, 26-27; Tr. 1579:3-8; Reid Buerger was Executive Vice President and Manager of Coventry and LST, and a Director of Montgomery, *see* ASF ¶¶ 14-15, 26-27; Tr. 1539:22-1540:2; JX-11000 at 55:18-56:14; Krista Buerger was Executive Vice President of Coventry and an LST officer, *see* Tr. 2302:22-2303:5, 2324:22-2325:10, 2349:6-9; and Alan and Reid (with Constance Buerger and trusts they controlled) owned

---

[36]  Lavastone must "prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise.'" *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  Defendants admit that they are "each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c)." Ans. ¶ 266.  They also conceded the allegations this Court relied upon to find distinctness. *Compare* MTD Op. 14-15, *with* Ans. ¶¶ 268-270; ASF ¶¶ 19-24, 31-32, 41, 46.

Montgomery, which owned Coventry and LST, ASF ¶¶ 26-27; JX-186; Tr. 1539:5-14, 1559:7-8;

*see also Palatkevich v. Choupak*, 2014 WL 1509236, at *16 (S.D.N.Y. Jan. 24, 2014).[37]

The Buergers also controlled the enterprise's day-to-day operations.  They served as

Coventry's officers and its Executive Committee, *see, e.g.*, Tr. 2329:9-16; JX-11000 at 87:4-

88:2; JX-132 at 7; retained authority to approve invoices and sign checks, *see, e.g.*, Tr. 2354:23-

2357:16; PX-1397; and approved audit procedures, PX-1408 at 1; PX-241 at 1-2; JX-10 at 1, and

audit responses, *see, e.g.*, Tr. 2316:24-2317:7; PX-422; PX-427; PX-663 at 1.  Moreover, Reid

was intimately familiar with the SDPs and reviewed them before audits, Tr. 2002:6-2004:2;

2396:18-2397:1; and Alan and Reid made all decisions about policy sales, including pricing,[38]

and directed the flow of funds as owners of Montgomery, *see, e.g.*, Tr. 1644:14-25.  *See also*,

*e.g.*, Tr. 1425:5-8; *United States v. Miller*, 116 F.3d 641, 672-73 (2d Cir. 1997).

The entity Defendants also played a critical role in the enterprise.  As originator,

Coventry was responsible for "day-to-day operations," negotiating purchases and sales with

investors, and billing to recover its costs.[39]  *See Pinnacle*, 575 F. Supp. 2d at 511-12.  LST

---

[37]   Krista Buerger held leadership positions in the enterprise.  *See, e.g.*, Tr. 2349:6-11, 2354:15-20.  As "vice-president of operations," she was involved in and managed Coventry's "contract services" department, Tr. 2322:6-10, 2328:18-20, 2352:5-8; PX-46, which compiled SDPs, removed Exhibit As, and reviewed pricing information in sales documents, Tr. 2322:11-21, 2376:6-8, 2306:15-2307:6.  She was a "point" of contact for the audits, Tr. 2310:20, 2383:17-23, 2487:17-20; prepared responses, Tr. 2316:24-25, 2363:13-16, "on behalf of the company," Tr. 2363:21-2405:16; and read, understood, and signed fraudulent sales documents as a Coventry officer, *see, e.g.*, Tr. 2308:14-22, 2309:12-18, 2425:24-2426:3, 2430:3-6, 2441:25-2442:6.

[38]   *See, e.g.*, Tr. 72:21-73:13, 825:6-11, 1705:14-1707:9, 2074:1-8; JX-11002 at 72:21-74:8, 78:14-17, 88:22-89:7, 91:4-16, 104:7-15, 200:21-201:24, 219:16-25; PX-180 at 45; PX-354 at 29; PX-201; PX-589; JX-2643; JX-7710; JX-7711; JX-7944; JX-7951; JX-8372; JX-8384.

[39]   *See, e.g.*, ASF ¶¶ 34-35; Tr. 307:17-19, 482:4-8, 1279:13-22; JX-11003 at 58:23-59:04.

coordinated with Coventry to buy and hold policies and sell them to other investors.[40]

Montgomery provided "management services," directing and facilitating the transfer of funds

throughout the enterprise to commingle and conceal them, and then to funnel them to the

Buergers.  *See, e.g.*, ASF ¶¶ 28, 38, 44; JX-11000 at 52:24-53:07; JX-52 §§ 8.01 & 6.03 (LST I

Agmt.); JX-57 §§ 8.01 & 6.03 (LST II Agmt.); *supra* p. 30; *infra* pp. 37-38.[41]

### B. Defendants Engaged In Racketeering Activity, Including Mail Fraud, Wire Fraud, Bank Fraud, And Money Laundering, By Committing Thousands Of Predicate Acts Over A Period Of Years.

Behind the facade of a legitimate business venture, Defendants were engaged in a

massive and sophisticated mail, wire, and bank fraud scheme to steal over $150 million and

launder those ill-gotten gains through a complex web of bank accounts and into the Buergers'

pockets.  Each of these offenses constitutes "racketeering activity" under 18 U.S.C. § 1961(1).

### 1. Defendants Committed Mail Fraud And Wire Fraud.

Mail and wire fraud require: "(1) the existence of a scheme to defraud involving money

or property; and (2) the use of the mails or wires in furtherance of the scheme."  *In re Sumitomo*

*Copper Litig.*, 995 F. Supp. 451, 455 (S.D.N.Y. 1998).  A "scheme to defraud" is a scheme with

fraudulent intent and materiality.  *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).

### a. Defendants Executed A "Scheme To Defraud" Lavastone.

A fraud "scheme" includes any plan to take "something of value by trick, deceit, chicane

or overreaching," *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (quotation mark and

citation omitted), and can be proven through circumstantial evidence, *Autuori*, 212 F.3d at 115.

---

[40]  *See, e.g.*, ASF ¶¶ 39-41, 45-46, 48; Ans. ¶ 270; Tr. 594:5-9, 1543:15-25, 1548:1-7, 1985:9-13; JX-11003 at 98:25-99:12.

[41]  Because the enterprise's members in Pennsylvania sold policies to Lavastone in New York and then funneled proceeds through federally insured banks, the enterprise was "engaged in or affect[ed] interstate . . . commerce."  *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001).

Defendants executed a paradigmatic scheme to defraud, colluding to mark up purchase prices and then using affiliated entities to cover their tracks.[42]  At its core, their plot was like a front-running racket by a broker, or a "shill bidding" scheme in which an auction house uses affiliates to run up prices when it knows in advance the maximum price a buyer will pay. Defendants also used their "prepaid" account as a slush fund to manipulate the prices Lavastone paid and to overcharge Lavastone for broker's fees, in addition to diluting the value of policies Lavastone had already approved by diverting IB interests at Lavastone's expense.  *See supra* pp. 1-3.  Then, when Lavastone on occasion found inconsistencies, Defendants made false assurances to conceal the scheme.  *See United States v. Sampson*, 371 U.S. 75, 77-78 (1962).[43]

Under the federal mail and wire fraud statutes, "the indictable act . . . is *not the fraudulent misrepresentation*, but rather the use of the mails [or wires] with the purpose of executing or attempting to execute a scheme to defraud."  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 652 (2008) (emphasis added); *see also* MTD Op. 9 (rejecting Defendants' contrary position).  Defendants' deceptive conduct above certainly constitutes a "scheme to defraud," but as discussed below, *see infra* pp. 41-42, they went even further by making affirmative misrepresentations and omissions, which are sufficient to find a scheme to defraud under the

---

[42]  *See, e.g.*, *United States v. Angelilli*, 660 F.2d 23, 26-28, 36 (2d Cir. 1981) (in "shill bidding" scheme, mailing omitted that "collusion . . . had resulted in a fraudulently low price," as well as additional amounts stolen from the victim); *United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir. 1986) (scheme to transfer funds among various bank accounts to create "an appearance of 'arm's length' purchases" that allowed defendant to "'purchase' his own materials . . . at whatever price he chose to invoice them"); *United States O'Donnell v. Countrywide Fin. Corp.*, 83 F. Supp. 3d 528, 534 (S.D.N.Y. 2015) (scheme to "originate vast quantities of loans" and "pass them off . . . as investment quality," when they were "virtually guaranteed" not to be); *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 470-71 (S.D.N.Y. 2013) (scheme created "false impression that the clients were receiving the best available price").

[43]  To front run Lavastone's prices, Coventry and the Buergers also misappropriated Lavastone's confidential information as part of their scheme.  *See infra* pp. 46-47, 49; *Carpenter*, 484 U.S. at 25-28 (mail and wire fraud cover misappropriation of confidential information).

mail and wire fraud statutes.  *See, e.g.*, *Bank of N.Y. Mellon*, 941 F. Supp. 2d at 463.

> **b.      Defendants Intended To Defraud Lavastone.**

Intent for mail and wire fraud encompasses "intentional fraud," *Chevron*, 974 F. Supp. 2d at 589, "reckless indifference to the truth," *id.*, and "conscious avoidance," *United States v. Walker*, 191 F.3d 326, 337 (2d Cir. 1999).[44]  Intent may be proven through circumstantial evidence.  *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).

Here, the record is replete with evidence of Defendants' conscious intent to defraud:

- Manipulating Pricing:  Defendants marked up 95% of Origination Policies sold to Lavastone, Tr. 594:2-4; PX-1030B, roughly 70% of which were marked up to within 50 basis points of the maximum price, PX-1033B; Tr. 602:22-603:16.

- Suspicious Timing:  Although life settlements typically are not short-term investments, Tr. 601:1-23; *compare* PX-1032B, Coventry and LST often held policies for short periods to take advantage of predictable events that increased the price Lavastone paid.  *See* Tr. 582:20-585:15; 781:13-22; JX-11002 at 282:23-284:2; PX-159; PX-326; PX-332 at 3; PX-367; PX-621; *see also, e.g.*, *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 122 (E.D.N.Y. 2012).

- Evasive Methods:  Defendants used LST, an affiliated entity, to mark up policies rather than sell them directly from Coventry to Lavastone.  *See, e.g.*, *Rodolitz*, 786 F.2d at 79-81 (use of shell entities to create the "appearance of legitimate transactions").

- Misrepresentations and Omissions:  Defendants made numerous material misrepresentations and omissions.  *See infra* pp. 41-42; *see also, e.g.*, *United States v. Stitsky*, 536 F. App'x 98, 108-09 (2d Cir. 2013); *Guadagna*, 183 F.3d at 129.

- Experience and Involvement:  Defendants were officers of entities marking up policies, signed sales documents, and approved sales to LST and Lavastone.  *See supra* pp. 29-30; *see also, e.g.*, *United States v. Cuti*, 720 F.3d 453, 462-63 (2d Cir. 2013) ("former CFO and senior vice-president" was "immersed" in sham documents); *United States v. Teitler*, 802 F.2d 606, 614 (2d Cir. 1986) ("partner at the firm" knew its activities).

---

[44]   For the entity Defendants, Lavastone need only show that "the illegal conduct [] was known to and participated in by sufficiently high-level employees within [the] corporation."  *Metro. Transp. Auth. v. Contini*, 2005 WL 1565524, at *5 (E.D.N.Y. July 6, 2005); *see also Countrywide*, 83 F. Supp. 3d at 535.  The Buergers' actions plainly satisfy this standard.

- <u>Motive and Opportunity</u>:  Defendants' scheme not only redounded to the Buergers' benefit, but began when they were upset over the possible loss of major clients, including Lavastone.  *See supra* pp. 5, 13; *infra* pp. 37-38; *see also, e.g.*, *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 241 (2d Cir. 1999).

- <u>Consciousness of Guilt</u>:  Defendants engaged in a flurry of internal activity whenever Lavastone raised questions about mark-ups and related issues.  *See supra* pp. 17-19, 24; *see also, e.g.*, *Bank of N.Y. Mellon*, 941 F. Supp. 2d at 469-70.

- <u>Stonewalling</u>:  When Lavastone asked about price discrepancies, Defendants gave false assurances or did not answer.  *See supra* pp. 18-20, 23-24; *see also, e.g.*, *United States v. Graham*, 477 F. App'x 818, 825 (2d Cir. 2012) (defendant tried to "mollify victims").

- <u>Whitewashing</u>:  Defendants directed employees to redact pricing information and remove Exhibit As.  *See supra* pp. 17-18; *see also, e.g.*, *Countrywide*, 83 F. Supp. 3d at 535 (defendant restricted access to reports and removed information from presentation).

The complex and deceptive nature of Defendants' scheme itself confirms their intent. The only reason to craft fraudulent sales documents in such detail, remove and conceal information that might lead to discovery of the prices Coventry paid, and provide false assurances—while never once simply saying that mark-ups were permitted—is that Defendants intended to deceive.  *See Rodolitz*, 786 F.2d at 80 (inferring intent because there otherwise would have been no reason "to hatch a fraudulent scheme").  Nor is there any question that these machinations would have "deceive[d] a person of ordinary prudence and comprehension."  *Bank of N.Y. Mellon*, 941 F. Supp. 2d at 464 (quotation marks and citation omitted); *see also United States v. Thomas*, 377 F.3d 232, 242-43 (2d Cir. 2004).[45]

Defendants claim they believed in "good faith" that their conduct was permitted, even if it was not.  But Defendants were at least "aware of a *high probability* of the fact[s] in dispute"

---

[45]  Like intent, materiality requires an objective inquiry into whether a reasonable person would be deceived.  *United States v. Allen*, 2015 WL 5022524, at *2 & n.1 (S.D.N.Y. Aug. 18, 2015). A scheme is "material if it is capable of influencing the decisionmaker, no matter what the victim decides to do."  *Id.* at *2 (quotation mark and citation omitted).  That was clearly true here.  *See Countrywide*, 83 F. Supp. 3d at 532 (representations material where they could influence purchase and price decisions, even if victims could have "smell[ed] a rotten deal").

and "consciously avoided confirming" them.  *Cuti*, 720 F.3d at 463 (citation omitted).  For example, they claim they thought they were permitted to mark up POR-approved OTB policies, but they cannot dispute receiving numerous inquiries from Lavastone that informed them to a high probability that Lavastone believed otherwise.  Defendants also insist they believed they could mark up policies that met the OA's Eligibility Criteria but that they nevertheless thought to be "non-exclusive," but Alan Buerger admitted he was aware that Lavastone used a different definition of exclusivity and failed to address the issue with Lavastone.  *See supra* pp. 8-10.  And they claim they innocently misrepresented that broker's fees charged to Lavastone were reimbursements for fees paid by Defendants, but their "prepaid" account was, as they well knew, a "mess," did not link overcharges to undercharges, and was used as a slush fund.  *Supra* pp. 2-3, 23-24; *see United States v. Carlo*, 507 F.3d 799, 802-03 (2d Cir. 2007).  In any event, even if Defendants thought that mark-ups were allowed, they could not deceive Lavastone to obtain them.  *See United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998) (rejecting self-help defense).

### c. Defendants Caused Thousands Of Mailings And Wirings To Be Sent In Furtherance Of Their Scheme.

For mail and wire fraud, each use of the mails or wires is a separate offense.  *Palatkevich*, 2014 WL 1509236, at *18.  And Defendants need only have acted "with knowledge that [the mails and wires] will follow in the ordinary course of business, or where such can reasonably be foreseen."  *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989).

That showing is straightforward here.  Defendants admit that for "every purchase by Lavastone of a Life Policy" for which U.S. Bank or Wells Fargo acted as "Fiscal Agent," Coventry or LST, "located within Pennsylvania," transmitted the DSs and SDPs via mail, email, or electronic file transfer to U.S. Bank or Wells Fargo "outside Pennsylvania."  PTO, Ex. 2 at 2; *see also* Tr. 793:19-24, 795:6-14; JX-11001 at 125:16-19 (DSs to Lavastone).  Krista Buerger

typically signed them, and Alan and Reid approved their transmission. *See supra* p. 30; *see also* JX-2000-10688 (origination policy files); JX-719.001-.275 (FCs); JX-722.001-.283 (TEOs). Moreover, the Buergers, who worked and lived in Pennsylvania, regularly called and emailed Lavastone in New York. Tr. 136:4-11, 148:25-149:4, 311:18-23, 1580:11-21, 1597:19-22, 149:5-9, 314:19-24, 2373:18-2374:21; *see also supra* pp. 17-19, 23-24.[46]  These communications were "in furtherance" of the scheme, as each was "'incident to an essential part of the scheme,' or 'a step in the plot.'" *United States v. Schmuck*, 489 U.S. 705, 710-11 (1989) (citation omitted); *see, e.g.*, PTO, Ex. 2 (documents "transmitted . . . to effectuate Lavastone's purchase").

## 2.     Defendants Committed Bank Fraud.

For Defendants to have violated the bank fraud statute, they need only have (i) intended to obtain property "under the custody or control" of a bank, (ii) "by means of false or fraudulent pretenses, representations, or promises." *Loughrin v. United States*, 134 S. Ct. 2384, 2388-89 (2014). They plainly did so here. Lavastone's funds were held under the custody or control of two banks—U.S. Bank and Wells Fargo—and Defendants intended to obtain funds from them by sending instructions via DSs and SDPs to the FAs. PTO, Ex. 2; ASF ¶¶ 83-86.[47]  Those funds were obtained "by means of false or fraudulent pretenses," including "misrepresentation[s] to the

---

[46]  Defendants "caused" many other mailings and wirings that were reasonably foreseeable in the ordinary course of business. S*ee* Ans. ¶ 48, ASF ¶ 69, Tr. 96:2-12, 149:14-20, 339:14-22, 774:9-12 (medical records); ASF ¶ 76-77, Tr. 778:3-21; JX-11006 at 226:6-12 (POR requests); ASF ¶ 74, Tr. 774:13-21 (life expectancies and mortality ratings); Tr. 343:24-344:6, 775:9-10, 780:3-781:8, JX-11006 at 101:8-15; JX-725.001-.567 (POR approvals); PX-270 at 71, PX-273 at 22, JX-106 § 5.01(a) & (c), Tr. 796:6-12 (Eligibility Certificates and change of ownership forms); *supra* p. 15; JX-718.001-350 (acknowledgment emails). The Buergers' actions are imputed to the entity Defendants. *See, e.g.*, *Pinnacle*, 575 F. Supp. 2d at 508 & n.3.

[47]  U.S. Bank and Wells Fargo were FDIC-insured FAs for the origination of every policy sold to Lavastone, holding and transferring funds in escrow. Ans. ¶ 40; ASF ¶ 83; Tr. 1945:12-16, 1310:12-19. The FAs disbursed these funds in accordance with the amounts specified on the DS. JX-106 (OA § 5.01, .04 & Ex. D); Tr. 794:7-11; 2306:11-14.

bank itself" as to the purchase price. *Loughrin*, 134 S. Ct. at 2388-89; *see supra* pp. 13-15, 35-36. Any argument that Defendants lacked fraudulent intent is wholly irrelevant to bank fraud, which requires only an "intent to obtain bank property" by means of false or fraudulent pretenses—not an intent to defraud Lavastone. *Loughrin*, 134 S. Ct. at 2387, 2389.

### 3.     Defendants Committed Money Laundering.

After extracting more than $150 million from Lavastone, Defendants laundered that money through various entities and bank accounts into the Buergers' pockets. *See* 18 U.S.C. §§ 1956(a)(1), (c)(7)(A). Proceeds from specified unlawful activity (mail, wire, and bank fraud) were received by Coventry and LST bank accounts. PX-1108A at 1; PX-1117A; PTO, Ex. 3 at No. 58. Defendants knew these were the proceeds of unlawful activity, because they perpetrated the scheme themselves. *See supra* pp. 28-37. Once extracted from Lavastone, this "dirty money" was mixed with "clean money." PTO, Ex. 3 at No. 60; *United States v. Weisberg*, 2011 WL 4345100, at *2 (E.D.N.Y. Sept. 15, 2011). Defendants then consolidated the funds from these tainted accounts into Montgomery accounts, and commingled them.[48] Finally, Montgomery distributed the proceeds to the Buergers and to Coventry. Tr. 1452:17-1453:19, 1643:13-1644:25, 2235:23-2236:17, 2310:1-4, 2357:21-2361:10; PX-1109A at 1; PX-1119A; PX-1118A; PX-1110A at 1; PX-1109A at 1; PTO, Ex. 3 at Nos. 64-69.[49]

These transactions were conducted with intent to promote unlawful activity, and with knowledge that they were designed to conceal the nature, location, source, ownership, and control of the proceeds. Defendants' transactions were "essential" to completing the scheme by funneling its fruits to the Buergers. *United States v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003).

---

[48] Tr. 1547:14-21; 1643:13-18; 2235:16-20; PX-1109A; PX-1118A; PTO, Ex. 3 at Nos. 62-63.

[49] All of these transfers were "financial transactions" because they "affect[ed] interstate . . . commerce" and involved "financial institution[s]." 18 U.S.C. § 1956(c)(4).

The transfer of $48 million to Coventry to fund more marked-up policy purchases was paradigmatic "promotion money laundering."  *See, e.g.*, *United States v. Valasquez*, 55 F. Supp. 3d 391, 396-99 (E.D.N.Y. 2014).  And the massive size, scope, and duration of this scheme—spreading $150 million across numerous affiliates and accounts for nearly six years—confirm that Defendants "kn[ew] that the transaction[s were] designed in whole or in part" to conceal the proceeds.  18 U.S.C. § 1956(a)(1)(B)(i); *see also United States v. Huezo*, 546 F.3d 174, 178-79, 181-82 (2d Cir. 2008) ("complexity and scale" of scheme supported inference of knowledge); *United States v. Valdez*, 522 F. App'x 25, 28 (2d Cir. 2013) (intent inferred from "participation in a massive, diverse, and transnational money laundering scheme").[50]

### C.     Defendants' Racketeering Activity Formed A Pattern.

Defendants' mark-up scheme encompassed thousands of predicate acts over nearly six years.  *See, e.g.*, PTO, Ex. 1; PX-1042B.  This easily constitutes a "pattern" of racketeering—that is, "continuity plus relationship."  *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (citation omitted).  This Court has already found that the period over which Lavastone purchased marked-up policies "is sufficient to allege closed-end continuity."  MTD Op. 16.  And Defendants engaged in thousands of related predicate acts that "had the same purpose, that is, fleecing the same victims."  *Proctor & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 19 (2d Cir. 1989); *see* PX-1007B; PX-1029B; *see supra* pp. 35-36.

### D.     Lavastone's Reasonable Reliance Is Not Required For The Mail Fraud, Wire Fraud, Bank Fraud, Or Money Laundering Statutes, Nor For RICO Itself.

Reasonable reliance is not an element of mail fraud or wire fraud.  *Graham*, 477 F. App'x

---

[50]  Commingling itself, *see, e.g.*, PTO, Ex. 3 at Nos. 63, 66-67, permits an inference of intent "'to hide the source of ill-gotten gains,'" *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) (quoting *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir. 1991)).

at 824; *see also Loughrin*, 134 S. Ct. at 2395 n.5 (bank fraud); *Valasquez*, 55 F. Supp. 3d at 396

(money laundering).  Because the "fraud statutes criminalize 'the scheme to defraud,' rather than

the completed fraud," a person who "attempt[s] to execute a scheme" is "indictable . . . even if

no one relied . . . .'"  *Graham*, 477 F. App'x at 824 (citations omitted).  As for RICO, the "'mere

fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses'"

does not mean that the victim's "'reliance . . . is also incorporated as an element of a civil RICO

claim.'"  *Bridge*, 553 U.S. at 652-53 (citation omitted).  Therefore, Lavastone need not have

"reasonably relied" to prevail on its RICO claims, *Serin v. N. Leasing Sys., Inc.*, 2009 WL

7823216, at *8 (S.D.N.Y. Dec. 18, 2009), although it clearly did here, *see infra* pp. 43-45.

## E.     Defendants Caused Lavastone's Damages.

Proceeds from the fraud "would not have disbursed" if Defendants' scheme had "never

occurred," easily satisfying RICO's "but-for cause" requirement.  *Loughrin*, 134 S. Ct. at 2394.

As for proximate cause, RICO "requires only 'some direct relation between the injury asserted

and the injurious conduct alleged,' and excludes only 'those links that are too remote, purely

contingent, or indirect.'"  *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (quoting *Hemi Grp.,

LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010)).[51]  As an injured party, Lavastone's harm was not

"purely contingent," and there is no "better situated plaintiff."  *Hemi*, 559 U.S. at 9-12 (citation

omitted).  Defendants have repeatedly tried to repackage their reliance argument as a proximate

cause challenge, claiming that Lavastone was a "superseding" cause of its own injuries because

it was on notice of the fraud.  They are wrong.  *See Bridge*, 553 U.S. at 655-56 (rejecting attempt

to smuggle reasonable reliance "in through the back door" via RICO "proximate-cause").

---

[51]  For the same reasons, Lavastone proved causation for its state law claims.  *See Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 105 (2d Cir. 2001).

Lavastone was not on inquiry notice, *see infra* p. 45, and regardless, a victim's carelessness cannot sever the causal chain and excuse an intentional tortfeasor, including a fraudster.[52]

## II.    Even If Defendants Did Not Violate RICO, They Are Liable For Conspiracy.

This Court should find any Defendants "who might not themselves have violated one of the substantive provisions of § 1962" liable for RICO conspiracy. *Beck v. Prupis*, 529 U.S. 494, 506-07 (2000). "'The requirements for RICO's conspiracy charges . . . are less demanding' than those for substantive violations." *City of N.Y. v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (citation omitted); *Palatkevich*, 2014 WL 1509236, at *22. For example, the "operation or management" test does not apply to RICO conspiracy, *United States v. Pizzonia*, 577 F.3d 455, 462 n.4 (2d Cir. 2009), and the conspirator need not have engaged in any RICO predicate act, *United States v. Yannotti*, 541 F.3d 112, 128-29 (2d Cir. 2008). Instead, the conspirators need only have "kn[own] about and agreed to facilitate the scheme." *Salinas,* 522 U.S. at 65-66. And Defendants certainly did so here, given their own racketeering acts,[53] their positions at the very top of the enterprise,[54] their personal ties and involvement with one another, and their familiarity with their enterprise's affairs.[55] *See infra* pp. 28-38.

## III.    Defendants Are Liable For Common Law Fraud And Fraudulent Inducement.

Clear and convincing evidence also establishes that Defendants knowingly or recklessly

---

[52] *See, e.g.*, Restatement (Second) of Torts § 435B (liability "carried further" for "an intentionally wrongful act"); W. Keeton et al., Prosser & Keeton on Torts § 8, p.37 & n.27 (5th ed. 1984) ("For an intended injury the law is astute to discover even very remote causation.").

[53] *See, e.g.*, *United States v. Rastelli*, 870 F.2d 822, 832 (2d Cir. 1989) (predicate acts suffice).

[54] *See, e.g.*, *Teitler*, 802 F.2d at 614 (agreement inferred from, *inter alia*, defendant's partner status in the firm); *Serin*, 2009 WL 7823216, at *14 ("nature of [defendants'] positions").

[55] "[A]greement to join a conspiracy can 'be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing.'" *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013) (citation omitted).

misrepresented material facts, intending to induce Lavastone's reliance, and that Lavastone relied on the misrepresentations to its detriment.  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) (fraudulent inducement); *accord Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 224 F. Supp. 2d 679, 684 (S.D.N.Y. 2002) (fraud).

### A.    Defendants Knowingly Or Recklessly Made Material Misrepresentations And Omissions, On Which They Intended Lavastone To Rely.

**Material misrepresentations and omissions.**  Coventry, the Buergers, and the LST entities[56] made thousands of material misrepresentations in the DSs, FCs, and acknowledgment emails.  *See supra* pp. 13-15.  And in response to Lavastone's inquiries, Coventry and the Buergers made misrepresentations to conceal their fraud, claiming that a mark-up on a POR-approved policy was a "mistake"; a policy identified in the 2008 audit was an on risk policy part of the "block of policies" Fields had agreed to purchase in 2007; discrepancies in the 2007 and 2009 audits were due to recoupment of broker's fees; and the prepaid account was reconciled monthly.  *See supra* pp. 16-18, 23-24.  And even if this Court were to conclude that the documents at issue did not include blatant, affirmative misrepresentations, Coventry could not provide Lavastone with "only half of the truth."  *Koch v. Greenberg*, 14 F. Supp. 3d 247, 258 (S.D.N.Y. 2014), *aff'd* 2015 WL 5711578 (2d Cir. Sept. 30, 2015) (quotation marks omitted).[57]

---

[56]  Acknowledgment emails were sent "on behalf of" the LST entities.  And in final pricing emails, the LST entities misrepresented the "purchase price" and broker's fee amounts with the expectation that Lavastone would rely on that information when incorporated into DSs, FCs, and acknowledgment emails.  *See, e.g.*, *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 794 F.2d 763, 766 (2d Cir.1986) ("[A] fraudulent misrepresentation made with 'notice in the circumstances of its making' that the person to whom it was made would communicate it to third parties subjects the person making the misrepresentation to liability to the third party." (citation omitted)).

[57]  *See also Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 334, 352 (E.D.N.Y. 2008) ("partial and ambiguous representation of their [] fees" allegedly made where defendants provided only a single charge that failed to disclose "hidden fees"); *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 271-72 (S.D.N.Y. 2004) ("literally

Each Defendant also made countless fraudulent omissions.  Defendants never told Lavastone that they were marking up POR-approved policies and pocketing "gains on sale," rather than seeking the "best yield possible" for Lavastone, or that they purportedly had a different understanding of which policies were ITB or "exclusive."  *See supra* pp. 8-12, 15-26. They never told Lavastone that they were profiting from broker's fee overcharges or creating IB interests to benefit Alan Buerger.  *See supra* pp. 2-3, 23-24.  Defendants unquestionably had superior knowledge about these critical facts and knew this information was "not readily available" to Lavastone (indeed, they worked feverishly to conceal it), and therefore had a duty to disclose these facts to Lavastone.  *See Lind v. Vanguard Offset Printers, Inc.*, 857 F. Supp. 1060, 1067-68 (S.D.N.Y 1994) (defendant allegedly "possessed and concealed" its superior knowledge).[58]

**Intent or recklessness.**  In addition to Defendants' misrepresentations and omissions, overwhelming evidence establishes their fraudulent intent.  *See supra* pp. 33-34 (discussing evidence of motive and opportunity, evasive use of affiliated entities, stonewalling and false assurances, and concealment).[59]  Defendants' actions also unquestionably evince "conscious

---

accurate" statement in financial reports "could have misled" and "purposefully left [plaintiff] with the erroneous impression"); *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 WL 609439, at *4 (S.D.N.Y. Oct. 23, 1996) (defendant disclosed "only half of the truth").

[58]  The LST entities and Montgomery knew these facts based on their participation in the scheme, *see supra* pp. 1-2, 29-31, 37-38, and their knowledge is imputed through the Buergers, *see, e.g.*, *Marini v. Adamo*, 995 F. Supp. 2d 155, 201 (E.D.N.Y. 2014).  Montgomery was familiar with its wholly owned subsidiaries' "operations and, ultimately, [their] misconduct." *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006).

[59]  These types of evidence prove intent under New York law.  *See, e.g.*, *Cofacredit*, 187 F.3d at 241 (motive and opportunity); *Watts*, 579 F. Supp. 2d at 353 (concealment); *Anglo-Iberia*, 224 F. Supp. 2d at 686 (false assurances); *Clorox Int'l Co. v. Int'l Trade Expo, Inc.*, 1995 WL 106104, at *4 (S.D.N.Y. Mar. 9, 1995) (evasive use of entities for mark-ups); *Quintel Corp. v. Citibank, N.A.*, 606 F. Supp. 898, 909-10 (S.D.N.Y. 1985) (systematic misrepresentations).

misbehavior or recklessness," which suffices for common-law fraud.  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 444 (S.D.N.Y. 2012) (citation omitted); *see Anglo-Iberia*, 224 F. Supp. 2d at 685 ("'refusal to see the obvious'" or "'failure to investigate the doubtful'") (citation omitted); *see supra* p. 35.  Defendants each had access to critical facts concerning the misrepresentations and notice of the overwhelming indicia of fraud, and were at the very least reckless in misrepresenting information on which they intended Lavastone to rely. *See Leviton Mfg. Co. v. Reeve*, 942 F. Supp. 2d 244, 267-68 (E.D.N.Y. 2013).[60]

**B.     Lavastone Reasonably Relied On Defendants' Misstatements And Omissions In Entering Into Transactions And Funding The Purchase Of Policies.**

By misrepresenting and failing to disclose essential information regarding the terms of policy origination and sales, Defendants induced Lavastone to fund the acquisition of marked-up policies and to continue doing business with a partner who was covertly orchestrating a sweeping scheme to defraud it.  The sales documents blatantly misrepresented the compensation that Coventry received, indicating that it was collecting *only* origination and incentive fees when in truth it was taking gains on sale as well.  *See supra* pp. 14-15.  To hide those gains, Coventry misrepresented the purchase price paid by Lavastone as equal to the price paid to the original seller.  *See id*.  Lavastone relied on Defendants' misrepresentations and omissions each time it paid—and the FAs disbursed—the inflated, marked-up amounts listed on the sales documents, which failed to disclose Defendants' egregious self-dealing.  *See, e.g.*, Tr. 84:20-85:17; 132:12-133:5; 277:3-10, 374:23-16, 793:19-796:25, 2029:13-16, 2306:3-14.  Indeed, the parties'

---

[60]  Even if Defendants believed they could mark up policies at will, or that policies were exclusive only if they satisfied certain requirements on top of the Eligibility Criteria, they never disclosed those beliefs to Lavastone, despite knowing it had a different understanding.  *See Fund of Funds, Ltd. v. Arthur Anderson & Co.*, 545 F. Supp. 1314, 1360 (S.D.N.Y. 1982) ("failure to clarify the parties' differing conceptions of the relationship and pricing arrangement").

contract and other agreements expressly prescribed reliance on those documents.  *See, e.g.*, PTO, Ex. 2; Ans. ¶ 40; JX-12; JX-34B; JX-35B; JX-58; JX-76; JX-106 §§ 4.01, 5.01, 5.04, 8.21 & Ex. D-1, D-5, D-9, D-17; PX-862; DX-88A; Tr. 2407:22-2408:3.[61]

Lavastone relied on the representations in those documents and related communications, *see supra* pp. 41-42, not just in approving policy purchases and payments, JX-106 §§ 4.01, 5.01, 5.04, 8.21 & Ex. D, but more broadly in agreeing to do business with Coventry—to share its confidential pricing information, authorize Coventry to act on its behalf in originating policies, and agree not to communicate directly with policyholders and brokers.[62]  *See, e.g.*, Tr. 1532:24-13:12, 351:19-352:3, 782:25-783:9; *supra* pp. 6-7.  As Fields testified, the "core tenet" of the parties' business relationship was their "alignment of interests":  Lavastone's goal was to "acquire the policy at its lowest possible price, ensuring that the return on our investment would be a maximum yield, and whenever that yield was larger [Lavastone] would share some component of it with Coventry, creating alignment."  Tr. 85:6-10; *see also* Tr. 81:11-82:2, 83:22-85:17.  The fees prescribed by the OA were designed precisely to lock in this objective, *see supra* pp. 10-13, and it is these fees, along with, *inter alia*, the purchase price, that the sales documents and related communications misrepresented.  As Fields explained, Coventry's scheme to mark up policies and pocket the gains on sale completely subverted the parties' alignment and "destroy[ed] the predicate of there being an origination agreement that has an

---

[61]  Section 8.21 of the OA provides that "[e]ach party . . . is *intentionally inducing the other party to rely to its detriment* upon each notice of Pre-Offer Review or Pre-Funding Review . . . *and agrees that such reliance is reasonable*."  JX-106 § 8.21 (emphases added).  Further, the FC certified that the purchase prices listed in the FC and DS II were "correct and complete."  *See, e.g.*, JX-6675 at 46.  In assessing the reasonableness of a plaintiff's reliance, courts afford significant weight to provisions such as these, which are designed to safeguard the plaintiff.  *See, e.g.*, *J.P. Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 396, 409 (S.D.N.Y. 2004).

[62]  *See Anglo-Iberia*, 224 F. Supp. 2d at 686 (plaintiff's reliance reasonable where *inter alia*, "all communication was to be conducted through [defendants]").

incentive fee."  Tr. 132:12-133:5; *see also* Tr. 146:11-21; 147:17-20.  For that reason, had

Lavastone discovered Defendants' fraud, it would have "take[n] action to stop it."  Tr. 277:3-10.

That is surely why Defendants went to such great lengths to conceal their self-dealing.

Defendants claim Lavastone must have known about the mark-ups because in some

instances the underlying purchase price was included in Exhibit As.  But as Defendants were

well aware, Lavastone did not receive SDPs (which contained Exhibit As), *see supra* p. 20; nor

was Lavastone "required to guess that [Defendants] were not disclosing key terms" of the

purchases, *Fund of Funds*, 545 F. Supp. at 1361.  And the FAs cannot be charged with

knowledge of scraps of information which were, on limited occasions, "buried in scattershot

fashion" in "tome-length" SDPs, *Atlantica Holdings., Inc. v. Sovereign Wealth Fund Samruk-

Kazyna*, 2 F. Supp. 3d 550, 561-62 (S.D.N.Y. 2014)—especially because, as Defendants knew,

the FAs had neither a duty nor a reason to look for them, *see Hyosung Am., Inc. v. Sumagh

Textile Co.*, 137 F.3d 75, 78 (2d Cir. 1998) (jury could conclude plaintiff was "not put on notice

to review" files); *supra* pp. 20-21.

Far from disclosing their fraud, Defendants undertook "concerted efforts to conceal" it.

*Andersen v. Weinroth*, 849 N.Y.S.2d 210, 220, 222 (1st Dep't 2007) (reliance reasonable where

defendant undertook "concerted efforts to conceal" wrongdoing).  On the limited occasions when

price discrepancies slipped through the cracks, Defendants "reassured [Lavastone] rather than

warn [it]."  *In re Merrill Lynch Sec. Litig.*, 2011 WL 1330847, at *10 (S.D.N.Y. Mar. 30, 2011).

Finally, Lavastone was entitled to rely on the representations of Coventry as its fiduciary, *see

infra* pp. 46-48, and "could properly assume that [Coventry] would disclose all material

information."  *Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, 2013 WL 628533,

at *13 (S.D.N.Y. Feb. 15, 2013).

45

**IV.    Coventry Systematically Breached Its Fiduciary Duties With The Knowing Assistance Of The Buergers, The LST Entities, And Montgomery Capital.**

Lavastone has proven by a preponderance of the evidence that Coventry breached its fiduciary duties.[63]   *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (elements of a claim for breach of a fiduciary obligation are: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom").

**A.    Coventry And Lavastone Had A Fiduciary Relationship.**

The evidence conclusively establishes that the parties had a fiduciary relationship. Coventry handled Lavastone's money and property and transacted business on Lavastone's behalf, thereby "'implying and necessitating great confidence and trust on [Lavastone's] part and a high degree of good faith on [Coventry's] part.'"  *Westwoods Aviation*, 2007 WL 2454115, at *2 (quoting *Chestman*, 947 F.2d at 568-69); *accord Bd. of Mgrs. of Fairways at N. Hills Condo. v. Fairway at N. Hills*, 603 N.Y.S.2d 867, 869 (2d Dep't 1993).  Coventry managed Lavastone's nine-figure facility, which included pricing policies in a manner that aligned with Lavastone's goals and ensuring that Lavastone was "pleased" with its overall portfolio performance.  *Supra* p. 6.  By issuing a POR approval, Lavastone entrusted Coventry with its confidential maximum price, *see infra* p. 47 & n.66; *cf. United States v. O'Hagan*, 521 U.S. 642, 654 (1997) (confidential information qualifies as property), and committed to funding the purchase of the policy, *see Kern v. Robert Currie Assocs.*, 632 N.Y.S.2d 75, 76 (1st Dep't 1995) (plaintiffs "entrusted [defendants] with their money for the purpose of procuring furnishings that defendants helped plaintiffs select" and defendants acted as "middleman"); *supra* pp. 12-13. Such "handling of money [and] property" on Lavastone's behalf is "the hallmark of a fiduciary

---

[63]   Lavastone's breach of fiduciary duty claim is against Coventry only; Lavastone has asserted an aiding and abetting breach of fiduciary duty claim against all non-Coventry Defendants.

relationship." *Childers v. N.Y. & Presb. Hosp.*, 36 F. Supp. 3d 292, 307 (S.D.N.Y. 2014).[64]

Moreover, under the OA, "[t]he availability of information between the parties was inherently uneven."  MTD Op. 23; *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, 2009 WL 321222, at *12 (S.D.N.Y. Feb. 9, 2009).  Lavastone was contractually barred from purchasing life policies from other sellers, JX-106 § 2.01(a) & (b); Tr. 333:24-334:5, or communicating with brokers, JX-106 § 3.04(b); Tr. 78:14-21, 342:23-343:10, 788:24-789:9, and lacked the requisite licenses and connections to broker the transactions itself.  *See Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 15 (1st Dep't 1998).[65]  Simultaneously, Lavastone gave Coventry confidential information, including its life-expectancy estimate ("LE"), mortality rating, mortality table, and maximum price, *see, e.g.*, ASF ¶ 74; Tr. 150:2-151:8, 207:14-209:17, 350:18-351:21, 495:14-22, 520:23-521:7, 556:23-558:25, 625:4-25, 778:22-782:3,[66] so that Coventry could negotiate for Lavastone, *see, e.g.*, Tr. 372:5-13.  Coventry was Lavastone's exclusive representative in the marketplace, *Wiener*, 672 N.Y.S.2d at 14-15, *supra* p. 6, and Lavastone was "completely dependent" on Coventry to act on its behalf, *Antonios A. Alevizopoulos & Assocs. v. Comcast*

---

[64]  Coventry's broker-like role gave rise at a minimum to a duty to disclose information relevant to the affairs with which it was entrusted.  *Cf. United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) ("[E]ven in the absence of any general fiduciary duty resulting from discretionary authority, . . . [defendant] was under a duty to disclose these exorbitant commissions because the information would have been relevant to a customer's decision to purchase the stock.").

[65]  Despite claiming at trial to be a fledgling business, Tr. 1499:15-16, 1970:8, during the course of the relationship, Coventry and the Buergers trumpeted their unparalleled experience in the identification and acquisition of life policies, and induced Lavastone to "rel[y] on their expertise" and credentials in those areas—which Lavastone lacked.  *Compare, e.g.*, PX-44; PX-273 at 4-15; PX-334 at 115-16, 123, 237-39; PX-512; PX-702, PX-737; Tr. 323:13-324:2, 1497:24-25, 1502:10-20, *with* PX-334 at 123, 234; Tr. 74:9-12, 308:10-13, 323:2-12; *cf. Marini*, 995 F. Supp. 2d at 193 (plaintiff's sophistication assessed in terms of the specific capacity at issue).

[66]  *See also, e.g.*, PX-270 at 59; Tr. 1585:20-1586:7; JX-11002 at 247:6-10, 271:7-21, 272:17-273:4; JX-11003 at 201:6-16, 201:19-202:10, 202:8-203:2; ASF ¶¶ 72-75.  As Defendants knew, Lavastone expected that this information would be kept confidential.  *See, e.g.*, Tr. 152:15-153:12, 340:15-23, 351:22-352:3, 782:13-783:9, 1358:3-1359:7, 1548:12-18.

*Int'l Holdings, Inc.*, 100 F. Supp. 2d 178, 188 (S.D.N.Y. 2000).

Coventry impressed upon Lavastone that it would always strive for the best possible price. PX-32; PX-18 at 1; Tr. 1142:14-19; *see People v. Coventry First LLC*, 13 N.Y.3d 108, 115-16 (2009) ("[a] promise to obtain for a client the 'highest possible' offer . . . would, if made in a manner that could be reasonably relied upon by the client, suggest a fiduciary duty"); *see also supra* pp. 24-25, and fostered the impression that the parties' interests were aligned, *see, e.g.*, Tr. 81:15-82:2, 84:20-90:7.[67] As a result, Lavastone "placed a great deal of trust" in Coventry's decision-making, *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d. 118, 152 (S.D.N.Y. 2000), and frequently deferred to Coventry's judgment, *see, e.g.*, PX-21; PX-23; PX-24; PX-41. The overwhelming evidence thus establishes that Lavastone placed in Coventry "a higher level of trust than normally present in the marketplace . . . ." *JP Morgan*, 2009 WL 321222, at *12 (quotation marks omitted).

## B.     Coventry Breached Its Fiduciary Duties.

In breach of its fiduciary obligations, Coventry routinely acted "in a manner calculated to significantly decrease" Lavastone's profits to Defendants' own "substantial benefit" by marking up the prices Lavastone paid and pocketing the difference. *GLM Corp. v. Klein*, 665 F. Supp. 283, 286 (S.D.N.Y. 1987); *see Bestolife Corp. v. Am. Amicable Life*, 774 N.Y.S.2d 18, 23 (1st Dep't 2004) (despite knowing transaction was "overpriced," and "further negotiation would increase plaintiff's [] costs," defendant allegedly "advanced the purchase" to "secure fees for itself and the [other] defendants"). Coventry even exploited Lavastone's confidential information to further its own competing interests and those of the LST entities. *See, e.g.*,

---

[67] *See supra* pp. 10-11. Coventry also billed itself as Lavastone's "partner." *See, e.g.*, PX-2 at 1; PX-100; PX-102; Tr. 311:24-312:14, 315:9-16.

*Zimmer-Masiello, Inc. v. Zimmer, Inc.*, 552 N.Y.S.2d 935, 937 (1st Dep't 1990).[68]  Finally,

Coventry violated its duty of full disclosure by misrepresenting and failing to disclose

information, including its inherent conflicts of interest.  *See, e.g.*, *Marini*, 995 F. Supp. 2d at 203

(fiduciary "violated Justice Cardozo's often repeated rule that, '[if] dual interests are to be

served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation,

. . . .'" (quoting *Wendt v. Fischer*, 243 N.Y. 439, 443 (1926))); *supra* p. 42.[69]

### C.    The Buergers, The LST Entities, And Montgomery Capital Knowingly Aided And Abetted Coventry's Breaches Of Its Fiduciary Duties.

The evidence conclusively establishes that the Buergers, the LST entities, and

Montgomery aided and abetted Coventry's fiduciary breaches.  *See Johnson*, 660 F.3d at 142

(claim for aiding and abetting breach of fiduciary duty requires:  "(1) a breach by a fiduciary of

obligations to another, (2) that the defendant knowingly induced or participated in the breach,

and (3) that [the] plaintiff suffered damage as a result").

Each of these Defendants knowingly aided Coventry's breaches by participating in the

---

[68]  Defendants used Lavastone's proprietary life-expectancy and pricing information when determining whether to transfer a policy to an LST affiliate rather than to Lavastone, and then whether and at what price to sell the policy from LST to Lavastone.  *See* PX-126 at 1-2; PX-326; PX-342; PX-354 at 36; PX-371; PX-439 at 2; PX-514; PX-515; PX-516; PX-1033B; Tr. 561:13-22, 575:15-576:4, 578:9-580:13, 582:20-583:23, 587:1-589:14, 602:22-603:16, 625:4-13, 625:20-627:13, 1997:18-1998:17; JX-11002 at 306:3-307:3; JX-11003 at 114:22-115:3.

[69]  Coventry is also liable for negligent misrepresentation.  *See Johnston v. Norton*, 886 F. Supp. 403, 404 (S.D.N.Y. 1995).  The record confirms that the parties had a "special relationship," both because they were in privity of contract, *see* MTD Op. 26, and as a result of the relationship itself, *see supra* pp. 46-48; *Childers*, 36 F. Supp. 3d at 311; Tr. 1139:24-1140:2.  Indeed, in addition to providing Lavastone with inaccurate information about purchase prices and other critical facts, Coventry affirmatively misled Lavastone, *see supra* pp. 41-42, and induced Lavastone to rely on its superior knowledge, expertise, and connections in the life settlement industry, *see Kimmell v. Schaefer*, 89 N.Y.2d 257, 265 (1996); *supra* pp. 46-48.  As gatekeeper of all information regarding the underlying transactions, Coventry "could not possibly have failed to be aware" that its representations would be relied upon by Lavastone.  *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 425 (1989); *supra* pp. 43-46.

scheme to defraud Lavastone.  *See Deangelis v. Corzine*, 998 F. Supp. 2d 157, 182-83 (S.D.N.Y. 2014) (officers and directors aided defendant's fiduciary breach by misusing customer funds); *see also Philip Morris Inc. v. Heinrich*, 1997 WL 781907, at *12 (S.D.N.Y. Dec. 18, 1997) (participation in bid-rigging scheme "sufficient to constitute substantial assistance" to fiduciary breach); *see supra* pp. 1-2, 29-31.  Moreover, each of these Defendants helped conceal Coventry's self-dealing.  *See, e.g.*, *Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 485 (S.D.N.Y. 2011); *see supra* pp. 1-2, 13-24, 29-31, 37-38.[70]  Thus, the non-Coventry Defendants are liable for aiding and abetting Coventry's breaches.

## V.   Coventry Breached The Plain Language Of The Parties' Agreements And The Implied Covenant Of Good Faith And Fair Dealing.

This Court has already held that: (1) Coventry breached the parties' OA by "marking-up prices on life policies sold to Lavastone that defendants acquired after Lavastone had provided a commitment to purchase the policy," Dkt. 114 ("MSJ Order") at 2; and (2) Coventry's practice of seeking reimbursements for broker's fees "that did not match the broker costs associated with the sale of [a] policy" was "at odds with the plain language of the contract," MSJ Op. 10.  The evidence at trial confirms that Coventry also breached the plain language of the SA by selling to Lavastone policies with IB interests that had not been designated by the "related Seller" as a condition of its sale to Coventry.[71]

---

[70]  There is no doubt that the non-Coventry Defendants "consciously avoid[ed]" confirming facts that would have demonstrated the fraudulent nature of the endeavor they substantially furthered. *Deangelis*, 998 F. Supp. 2d at 182.

[71]  Under New York law, the elements of breach of contract are:  (1) the existence of an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.  *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 404 (S.D.N.Y. 2004).  Here, Defendants do not contest the validity of the SA or the adequacy of Lavastone's performance.  Accordingly, the only issues in dispute are whether Coventry breached the SA, and whether Lavastone was damaged as a result.

The SA provides that Coventry will not "sell," "create," or "suffer to exist any Lien on any interest in any Conveyed Life Policies." JX-104 & JX-107 § 5.03(b). A narrow exception permits the existence of "the rights of each IB Beneficiary to the related IB Benefits." *Id.* The SA defines "IB Beneficiary" as "each person designated as a beneficiary for a specified portion of the proceeds of such IB Policy," and "IB Policy" as "a Life Policy as to which *the related Seller* designated an irrevocable beneficiary . . . *as a condition of its sale of such Life Policy to an Originator*." JX-104 Ex. A-8; JX-107 Ex. A-9-10 (emphasis added). In short, IB interests may exist if designated by the "related Seller" as a condition of the sale to Coventry. Here, however, the interests were designated by *Coventry's affiliates*, not the "related Seller," and *after* Coventry had acquired the policies from the "related Seller" with Lavastone's POR approval in hand. *Compare* JX-8452, JX-10328 & JX-10443 (IB designations), *with* PX-1002B1 (POR approval dates and Coventry acquisition dates for policies 83080, 90660, 94619, and 95091). Thus, Coventry breached the SA.[72]

The evidence also conclusively establishes that Coventry breached the implied covenant of good faith and fair dealing by exploiting Lavastone's confidential information to further its own competing interests and those of the LST entities.[73]

---

[72] The SA only requires notice of breach of representations and warranties. *See* JX-104 & JX-107 § 5.04. Because § 5.03(b) is a *covenant*, notice is not required. *See id.* § 5.03.

[73] Although the parties' Confidentiality Agreement ("CA") contemplates that Coventry and its affiliates may come into possession of Lavastone's confidential information, the agreement as a whole unambiguously evinces an intent to prohibit disclosure of Lavastone's confidential information to competitors. *See* JX-108 § 2(b); JX-110. But that is precisely what occurred here—the LST entities accessed Lavastone's information *not* as Coventry's *affiliates*, but as Lavastone's *competitors*. *See, e.g.*, Tr. 1359:8-20, 1541:15-16; JX-5086; JX-8473; JX-8797; *supra* pp. 47, 49 & nn. 66, 68. Even if technically permitted, the exploitation of Lavastone's information "undercut what [Coventry] knew the [confidentiality restrictions were] designed to prevent." *Empresas Cablevision, S.A.B. de CV v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d

**VI.    The Non-Coventry Defendants Were Unjustly Enriched At Lavastone's Expense.**

Recovery for unjust enrichment requires "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 304 (S.D.N.Y. 2006) (quotation omitted). Here, all Defendants were enriched by marking up prices and broker's fees at Lavastone's expense, and equity and good conscience require restitution because Defendants "benefit[ted] from misleading representations." *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 404 (E.D.N.Y. 2010) (citations omitted); *see also, e.g.*, *Sergeants Benev. Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 78 (1st Dep't 2005) (defendants "charg[ed] undisclosed, excessive markups and excessive commissions"); *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (1st Dep't 2004) (defendants' "deceptive practices caused [plaintiff] to pay artificially inflated prices").[74] Even if any of the Defendants had not defrauded Lavastone, however, Lavastone would be entitled to the proceeds they were gifted at Lavastone's expense. *See Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978).

**VII.   The Court Should Award Lavastone Money Damages And Equitable Relief.**

**A.    Coventry Is Liable For Breach Of Contract Damages Of $254.3 Million.**

Lavastone demonstrated at trial that it suffered three types of injuries from Coventry's breach: marked-up Origination Policies, marked-up broker compensation through the prepaid scheme, and value lost to fraudulently designated IB interests.

**1.    Lavastone Overpaid By $139.4 Million For Origination Policies.**

In gross, Defendants overcharged Lavastone by $163.7 million on Origination Policies.

---

625, 632 (S.D.N.Y. 2010). "Such an end-run, if not a downright sham, is not permissible if, as here, it does away with the 'fruits' of the contract." *Id.*

[74] Lavastone's unjust enrichment claim against the non-Coventry Defendants is not precluded by Lavastone's contract with Coventry. *See* MTD Op. 26 n.12.

Tr. 1478:3-13; PX-1007B; PX-1075B.  The parties agree that after subtracting underpayments, the net overcharge was $139.4 million.  Tr. 629:11-25, 1472:21-24; JX-189.  This stipulated figure accounts for all relevant acquisition costs—purchase price, broker compensation, and premium payments—in the amounts paid by Coventry (or an LST affiliate) and the amounts paid by Lavastone, when each acquired the Origination Policies.  Tr. 629:11-630:24; PX-1077B.

**2.     Lavastone Overpaid By $18.9 Million In Broker Compensation Mark-Ups Through The Prepaid Account.**

According to Defendants' own data, Coventry overcharged Lavastone for broker's fees through the prepaid account by $23.1 million in gross, which represents the sum of the prepaid account's overpayment entries for non-affiliate policies ($27.7 million), minus each undercharge associated with any policy that also had an overcharge.  *See* PX-1481; DX-298; Tr. 2722:20-2723:20 (Zmijewski explaining that $27.7 million gross figure should be reduced by "cancellations" where the prepaid account includes multiple entries for a policy).  Lavastone's expert, who did not rely on Coventry's internal accounting data, estimated via a statistical sample that Lavastone overpaid by $18.9 million in gross on broker compensation for non-affiliate policies due to the prepaid scheme.  Tr. 1397:11-13; PX-1102A; PX-733A.[75]

_____

[75] A non-affiliate policy is defined by a one-step transaction in which Coventry negotiates for Lavastone to purchase directly from the underlying seller through a tripartite entitlement order. Tr. 499:8-500:5.  In arguing that damages from the prepaid scheme should account for broker's fee overcharges and undercharges from *all* policies sold to Lavastone, Defendants misleadingly lump together the 6,296 non-affiliate policies with a mutually exclusive universe—the 683 affiliate policies, typically sold in a two-step transaction from the underlying seller to an LST entity and then to Lavastone, which were the focus of the purchase price mark-up scheme.  In accounting for affiliate policies (unlike non-affiliate policies) Defendants treated purchase prices and broker's fees as fungible, in a funhouse scheme that makes it impossible to distinguish purchase price payments from its broker's fee payments.  Defendants' analysis of affiliate policies therefore purports to identify massive undercharges on broker's fees that, in fact, were merely taken from the broker compensation line item and stuffed into the purchase price line item.  *See* Tr. 701:22-704:15, 712:16-717:11.

If the Court decides that Lavastone's overcharges in the prepaid scheme must be offset by undercharges in other transactions (*but see infra* pp. 56-57), the most conservative number either side seriously urges as the *net* overcharge is $7.9 million.  Tr. 2666:12-16.  But that figure *understates* the amount of marked-up broker's fees, because it relies on Coventry's internal prepaid account spreadsheet, which omits obvious overcharges.[76]  Therefore, the $7.9 million "floor" of damages from broker's fee mark-ups is actually far below any realistic net overcharge.

### 3.    Lavastone Was Deprived Of $557,274 In Policy Value Due To Fraudulently Designated IB Interests.

Lavastone's expert calculated that Lavastone was overcharged $557,274 due to IB interests.  Tr. 540:1-542:22; PX-1037 (*aide-memoire* citing 104 admitted JXs).

### 4.    Prejudgment Interest Is Mandatory.

Based on the foregoing, Lavastone overpaid Defendants by $158.8 million.  The Court is required to award prejudgment interest on all legal damages for Lavastone's state-law claims. *See* N.Y. C.P.L.R. § 5001(a).  For Lavastone's $158.8 million in damages, it is owed

---

For example, for one affiliate policy, Coventry originally set $2,150,000 as the purchase price and $75,000 as the broker's fee with a total price of $2,225,000.  Tr. 716:17-22.  The pricing was later revised, at Reid Buerger's direction, to charge Lavastone $2,225,000 in purchase price, and $0 for broker compensation.  Tr. 716:23-717:11; JX-5786 (policy 63672).  In another example, Alan Buerger approved the "repricing" of a $25,000 broker's fee into the purchase price, so that the broker compensation line item appeared as $0.  Tr. 713:9-714:20 (policy 92179).  Defendants' analysis counts these re-pricings as broker's fee undercharges to Lavastone.  *Compare* DX-299A, p.2 row 51, *with* DX-299B, p.1 row 51; *see also* Tr. 2700:4-2703:22.  Any analysis of broker compensation charges that includes affiliate policies, *see, e.g.*, DX-2145, cannot help but introduce such nonsensical accounting.

[76]  Examples include the absence from Coventry's spreadsheet and Dr. Zmijewski's data of an overcharge for broker's fees on policy 15891, a non-affiliate policy for which Coventry paid no broker's fees, JX-2199; JX-2200, but for which Lavastone "reimbursed" $270,000 in such fees, JX-2201.  Similarly, Coventry's records and Dr. Zmijewski's data inexplicably exclude policy 10860, a non-affiliate policy for which Coventry paid $105,000 in broker compensation, DX-721.0080, and Lavastone "reimbursed" $135,000 in broker compensation, JX-720.0109.

$254 million including prejudgment interest.[77]  Tr. 1474:2-1481:7; PX-1066A.

**B.    All Defendants Are Jointly And Severally Liable, Or Are Subject To Execution Of Any Judgment Through Veil-Piercing.**

Because Lavastone's $254 million injury from Coventry's breach also represents its injury attributable to the other causes of action, all Defendants found liable are jointly and severally so.  *See, e.g.*, *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir. 1995); *Ravo v. Rogatnick*, 70 N.Y.2d 305, 310 (1987).  In the event any Defendant is not found liable, the Court should pierce the veil between any liable entity Defendant and any other Defendant, or alternatively, grant discovery on veil-piercing.  Under Delaware and Irish law, which govern the veil-piercing analysis,[78] Defendants' corporate veils are properly pierced even if they observed all corporate formalities because "[n]one of these corporate formalities outweigh the misuse of the corporate form to perpetrate an inducement by deception contrary to law."  *David v. Mast*, 1999 WL 135244, at *3 (Del. Ch. Mar. 2, 1999); *cf.* Irene Lynch Fannon & Karole Cuddihy, *Corporations and Partnerships in Ireland* 54 (2010) (explaining similar theories under Irish law).  Defendants' fraud was made possible by abuse of Defendants' corporate form, thus fitting this description.[79]

---

[77]  Interest calculations were current as of August 27, 2015, *see* Tr. 1471:10-12, and should be adjusted upon entry of judgment to reflect the intervening time.

[78]  The law of the state of incorporation governs veil-piercing.  *See Daelim Trading Co. v. Giagni Enters., LLC*, 2014 U.S. Dist. LEXIS 165544, *11 (S.D.N.Y. Nov. 12, 2014).  The entity Defendants are incorporated in Delaware, except LST Holdings, a Republic of Ireland entity.

[79]  Defendants' purported separateness enabled them to buy and sell policies among themselves under the guise of arms-length transactions, pass the policies through the LST entities to mark them up, hide these mark-ups, funnel the proceeds through Montgomery, and falsely reassure Lavastone that its proprietary information remained private from the LST entities.

### C.      There Should Be No Reduction Of Damages.

#### 1.      No Statute Of Limitations Diminishes Lavastone's Recovery.

Defendants have argued that some of their mark-ups cannot be recovered because Lavastone paid them before the relevant limitations periods.  They are incorrect.

Most of Lavastone's claims are governed by discovery-based statutes of limitations, so those clocks did not begin to run until the concealed mark-ups became known or reasonably discoverable to Lavastone.[80]  As to Lavastone's other claims, the Court should equitably toll the statutes of limitations to account for Defendants' fraudulent concealment.  *See St. John's Univ.*, 757 F. Supp. 2d at 187.  The trial evidence confirms Defendants' painstaking (and successful) efforts to conceal their mark-ups, keeping Lavastone in the dark until 2013.  *See supra* pp. 13-20. The Court should not subtract any damages from Lavastone's recovery for the time during which Defendants fraudulently concealed their scheme.

#### 2.      Setoffs Are Not Available.

For both equitable and legal reasons, the Court should deny Defendants the benefit of any setoff, which they claim as an affirmative defense.  The Court "may invoke equitable considerations and deny set-off in the interests of justice."  *In re Manshul Constr. Corp.*, 2000 WL 1228866, at *56 (S.D.N.Y. Aug. 30, 2000); *see Morris v. Windsor Tr. Co.*, 213 N.Y. 27, 29-30 (1914) (Cardozo, J.).  Given Defendants' exploitation of Lavastone, equity militates against any setoff.  It would be inequitable to allow Defendants to elect breach and fraud over honest performance of the contract, and then seek reimbursement for costs they incurred as a result.

---

[80]  *See Cohen v. SAC Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) (RICO); *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009) (fraud); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 257 n.21 (S.D.N.Y. 2011) (fraud-based negligent misrepresentation); *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 186 (E.D.N.Y. 2010) (fraud-based fiduciary claims).

Defendants' proposed setoffs are also barred by legal principles.  Under New York law,[81]

Defendants face the burden of proving a setoff.  *See Aniero Concrete Co. v. N.Y.C. Constr.*

*Auth.*, 308 F. Supp. 2d 164, 190-91 n.17 (S.D.N.Y. 2003).  To prove entitlement to a setoff, a

defendant must show that damages are linked to "mutual debts" owed by the plaintiff.

*Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002) (applying N.Y. law).

Defendants have failed to satisfy their burden with respect to each setoff they claim:

- Defendants want to set off overcharged broker's fees with undercharges in other transactions.  But there can be no setoff for merely "possible," "disputed," or "unliquidated" claims, *Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*, 524 F. Supp. 2d 412, 424-25 (S.D.N.Y. 2007)—exactly the sort of claims Defendants urge by drawing their undercharge figures from Coventry's distorted prepaid account data.

- Defendants want to set off damages with incentive fees that Lavastone might have paid in the absence of mark-ups, but setoffs are unavailable for unliquidated or hypothetical costs.  *See Diamond Servs. Mgmt. v. Fable Jewelry Co.*, 2012 WL 5871616, at *5 (S.D.N.Y. Nov. 20, 2012).[82]

- Defendants want to set off their gains with the opportunity cost of capital and servicing costs.  But the mutuality requirement limits setoffs to payments or credits that *Lavastone* received from Defendants.  *Arch Ins. Co v. Precision Stone, Inc.*, 584 F.3d 33, 40-41 (2d Cir. 2009).

All the claimed setoffs therefore lack some aspect of mutuality.  They largely constitute the

overhead costs of the scheme, and Defendants are not entitled to demand reimbursement.

### 3.    Defendants' Attempted Carve-Outs Are Not Available.

In an effort to reduce the $139 million overpayment for Origination Policies, Defendants

seek to carve out two categories of polices from the OA's prohibition on mark-ups.  First, they

---

[81]  New York law informs the Court's calculation of damages with respect to the state-law claims, *see Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*, 392 F. Supp. 2d 621, 628 (S.D.N.Y. 2005), and RICO, *see* Jed S. Rakoff & Howard W. Goldstein, *RICO: Civil and Criminal Law and Strategy* § 4.02[1] (2015) ("To determine the appropriate amount of plaintiff's recovery, courts appear to scrutinize [*inter alia*] . . . common law remedies in the forum state.").

[82]  Defendants' expert calculated this hypothetical amount by assuming without any basis that the fees for the 315 Origination Policies would apply to other policy populations.  Tr. 2729:6-13.

identify policies for which POR approval came after a "Signed Acceptance Date" or after an "Exhibit A Date." *See* DX-802.  However, as Defendants themselves admit, those dates indicate when Coventry subjectively expected to buy a policy, which is "different from when did there become a legal obligation to buy that policy."  Tr. 2753:3-10.[83]  Second, Defendants try to avoid liability for policies they held for such a lengthy period that Lavastone was forced to issue additional POR approvals because more than six months had passed.  *See* DX-900.  Of course, the later POR approval does not change the fact that Coventry bought each policy off-risk (given the initial POR approval, binding on Lavastone at the time of Coventry's purchase), and it was Defendants who unilaterally delayed the sale to Lavastone in order to extract a higher price.  *See* PX-1032B; Tr. 1705:25-1707:9, 1768:3-11.  At any rate, this Court has already resolved what policies are subject to the OA's prohibition on mark-ups, as it has found that two dates are relevant in determining whether a policy is subject to this prohibition: (1) the date of the POR approval, and (2) the date of Coventry's purchase from the underlying seller.  MSJ Op. 3.

### D.   RICO Requires Trebling Of Compensatory Damages, For A Total Of $572 Million, Plus Attorney's Fees.

Treble damages and reasonable attorney's fees are mandatory under RICO.  *See* 18 U.S.C. § 1964(c).  The Court should therefore treble Lavastone's damages to $476 million (and add to that the non-trebled prejudgment interest, for a sum of $572 million).  PX-1066A.  Moreover, Lavastone should have an opportunity to submit evidence of its attorney's fees.

---

[83]  That concession was necessary in light of each Purchase Agreement's provision that Coventry was "UNDER NO OBLIGATION TO PURCHASE THE POLICY UNTIL THE ASSIGNMENT EFFECTIVE DATE."  *E.g.*, JX-717.082 at 39.  The "Signed Acceptance Date" precedes the "assignment effective date."  Tr. 2740:10-2742:10.  And the "Exhibit A Date" often bore no relation to the actual Exhibit A signature date.  Tr. 2742:25-2745:17.

### E.   The Court Should Disgorge Defendants' $1.2 Billion Of Ill-Gotten Fees.

Disgorgement is available as an equitable remedy for causes of action that invoke equity jurisdiction, such as breach of fiduciary duty, *see Resnick v. Resnick*, 763 F. Supp. 760, 767 (S.D.N.Y. 1991), and unjust enrichment, *see Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 421 (S.D.N.Y. 2010).  If the Court awards Lavastone its full legal damages for overpayments—but no more—Defendants might still be in the absurd position of profiting by a billion-plus dollars from fees paid by Lavastone during the period of the scheme.  To avoid this inequitable result, the Court should order disgorgement of all fees paid to Defendants from the moment of first infidelity through the end of the parties' relationship.

Defendants' profits exceeded the amount of their mark-ups by the $760 million they induced Lavastone to pay them in fees (on top of the prices Lavastone paid for policies themselves and broker compensation).  Tr. 1481:8-1483:15; PX-1080B (fees beginning September 2006).  Given the passage of time, those fees are now worth $1.2 billion after prejudgment interest.  PX-1080B; *see SEC v. Contorinis*, 743 F.3d 296, 308 (2d Cir. 2014) (district court's discretion to assess prejudgment interest on disgorgement).

### F.   The Court Should, In Its Discretion, Award Punitive Damages.

In addition to remedial and equitable damages, the Court may impose punitive damages in cases of "'gross, wanton or willful fraud.'"  *Greenfield v. Prof. Care, Inc.*, 677 F. Supp. 110, 117 (E.D.N.Y. 1987) (citation omitted).  Punitive damages are appropriate for Defendants' gross and willful fraud, not only toward Lavastone, but also in undermining the fairness of the life settlement market, artificially suppressing prices paid to original policyholders, and affecting volume and competition in the marketplace.  The Court may impose punitive damages in addition to trebled RICO damages, *Bingham*, 66 F.3d at 565; but punitive damages are especially critical if any Defendants escape RICO liability, in which case the Court should impose a similar

59

trebling effect punitively, to deter similar common-law violations by others.

**G.      The Servicing Agreement Should Be Unwound.**

The Court should unwind the SA because the contract provides for it, and equity demands it.  The SA states that Lavastone may terminate upon a "material breach of any representation, warranty or covenant."  JX-104 § 7.01(1)(E).  By designating IB interests, Defendants breached the SA—in which Coventry covenanted to not "suffer to exist any Lien on any interest" in life policies.  JX-104 § 5.03(b).  Defendants also concealed that they had designated the IB interests themselves and created the trust that was the beneficiary.

Unwinding the contract also falls within the Court's authority "to do equity and to mould each decree to the necessities of the particular case."  *Philip Morris, USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228, 246 (S.D.N.Y. 2004) (quotation omitted).[84]  Only by exercising its equitable power to release Lavastone from the SA can the court provide complete relief to Lavastone, which otherwise must continue doing business with those who defrauded it.

## CONCLUSION

For the foregoing reasons, this Court should find Defendants liable on Lavastone's remaining claims, grant the requested relief, and enter final judgment in Lavastone's favor.

---

[84]  Equitable unwinding is also available under RICO.  *See* 18 U.S.C. § 1964(a); *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 244 (S.D.N.Y. 2002) (Rakoff, J.) (remedies under § 1964(a) extend to private civil RICO suits), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003).

Dated: New York, New York
November 4, 2015

GIBSON, DUNN & CRUTCHER LLP


By:    /s/ Randy M. Mastro
           Randy M. Mastro
           Reed Brodsky
           Caitlin J. Halligan
           James L. Hallowell
           Alexander H. Southwell
           Jefferson E. Bell
           Akiva Shapiro

           200 Park Avenue
           New York, New York 10166
           Tel.:  (212) 351-4000
           Fax:  (212) 351-4035

           Ashley S. Boizelle (appearing *pro hac vice*)
           1050 Connecticut Avenue, NW
           Washington, DC 20036
           Tel: (202) 887-3635
           Fax: (202) 530-9605

           *Attorneys for Lavastone Capital LLC*